# Tab A

| Summons | CIVIL DOCKET NO.<br>2579CV | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| CASE NAME:<br><br>Alphonzia Jacobs<br><br>Plaintiff(s)<br><br>vs.<br><br>Smith & Wesson, Inc.<br><br>Defendant(s) | Laura S. Gentile                   Clerk of Courts<br>Hampden                          County<br>COURT NAME & ADDRESS:<br>Hampden Superior Court<br>Roderick L. Ireland Courthouse<br>50 State Street<br>Springfield, MA 01103 |
|---|---|

THIS SUMMONS IS DIRECTED TO Smith & Wesson, Inc. (Defendant's name).

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the Hampden Superior Court.

### YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

A true copy Attes:

2/19/26

Deputy Sheriff Suffolk County

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court **and** mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, Hampden Superior Court P.O. Box 559, Springfield, MA 01102 (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, **AND** Alphonzia Jacobs

b) Delivering or mailing **a copy** of your response to the Plaintiff's attorney/Plaintiff at the following address:
140 Norfolk Street, Springfield, MA 01109

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

3. (cont.) Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure.** If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon.  Michael D. Ricciuti _____ Chief Justice on _February 11_____ , 20 _26_ . (Seal)

Clerk _____

Note: The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

---

### PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ , I served a copy of this Summons, together with a copy of the Complaint in this action, on the Defendant named in this Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

_____

_____

_____

Dated: _____          Signature: _____

N.B.  TO PROCESS SERVER:

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

Date: _____

rev. 1/2023

# COMMONWEALTH OF MASSACHUSETTS

Hampden, ss.

**SUPERIOR COURT**
**CIVIL ACTION NO.**

25   702

Alphonzia Jacobs Jr
_____
Plaintiff

HAMPDEN COUNTY
SUPERIOR COURT
FILED

OCT 2 0 2025

*Yara & Jems*
CLERK OF COURTS

vs.

Smith & Wesson, Inc.  2100 Roosevelt Ave
_____
Defendant

## COMPLAINT

RE: Alphonzia Jacobs Jr vs Smith & Wesson, Inc.
   Legal Reference: MCAD Docket No. 23SEM01011
   EEOC Charge No. 16C-2023-01298

# **COMPLAINT**

Dear Judge, this letter represents examples of treatment encountered. I want your evaluation of the factual document regarding elements of harassment, discrimination, and wrongful termination. This is my testament of the treatment I experienced perpetrated by multiple members of Smith & Wesson's management team, not excluding Engineering Director John Pliska and his direct report, my manager Marion Moryl, causing my MA PFML claim and absence from work.

Please find the following written testimony of discriminatory practices during my 10-year employment at Smith & Wesson, Inc.

I present this document to clarify moments of my personal experiences while working at Smith & Wesson, Inc. The events will be presented in chronological order and reflect that some things were happening simultaneously. My goal is to provide an accurate and meaningful account of my time in both the manufacturing and engineering departments. My aim is to shed light on the pervasive culture of non-responsiveness, harassment, and discrimination, which made it impossible to achieve fairness for myself at Smith & Wesson Inc.

I have included the names of specific individuals because they hold positions as officers within the company. As mandated reporters, they are required to report any incidents or situations that violate company policies and necessitate corrective action. Their roles obligate them to address and redirect any circumstances that could potentially harm the organization or its employees, ensuring that all matters are handled according to established protocols.

The first thing that I would like to highlight, actually, is the last act of aggression from Smith & Wesson Inc. It came in the form of willfully placing a financial hardship on me and my family.

I want to highlight what I view as a collaborative effort by the Smith & Wesson Inc. Leadership team, not just regular employees. This document will connect an abundance of mandated reporters complacent with hostility and aversion, minimizing unwarranted aggression towards persons of color, including me. I offer the following facts to consider:

- I didn't receive my first benefit payment until week 8 of being out.
- Attorney DeProspo Jr stated in our Zoom hearing that "Smith & Wesson terminated my employment for not returning to work."
- The last exercisable show of power was also directed to hurt me financially in the form of denying my unemployment insurance because they said, "I quit."

I don't believe that the turn of events that will be described in this document is coincidental; on the contrary, my race and age were major contributors to the way I was treated. This document, when you read between the lines, will show certain behavior patterns and ideological beliefs that will blur the lines

of appropriate conduct. Some of the content will show an attempt to defy objective reality. Throughout this document, I will show circumstances that contributed to feelings of stress, anxiety, and depression. In my opinion, it is absurd for Smith & Wesson to claim that I hadn't raised areas of concern. Furthermore, as a response to the investigative conference question: during any encounter, did I ever mention that I was being treated this way because I was black or old, is correct. I never played the "Black Card" as it has been termed. However, that does not negate the actions or behavior of officers in the company who cannot see past their discriminatory and harassing actions.

I state for the record that I believe that Smith & Wesson Inc. overstepped their authority when it denied my leave extension. It is also my assertion that my leadership conspired and engaged in retaliatory behavior in an attempt to control the narrative of the initial circumstances that led to my leave. Ultimately terminated from my employment and denied my unemployment insurance claim because they said I quit.

As you review this document through your legal paradigm, I hope to get justice.

However, as you will become aware, this document will contradict elements of Smith & Wesson Inc.'s ability to provide a work environment free of unlawful discrimination and harassment. As a matter of fact, upon conclusion, I believe that you will find that Smith & Wesson Inc. Is libel for engaging in a continuous campaign to marginalize my employment as a Black Man. I submit the following record of events, showing proof that discrimination, harassment, written denigrating jokes, and deplorable graphic material enclosed therein are not a figment of my imagination. Unfortunately, this is an accurate depiction of my workplace, at times it could be intimidating, hostile, offensive, threatening, denigrating, and overall hostile in culture.

I will also assert that Smith & Wesson skirted their own policy and procedures of HR-013 Non-Discrimination Harassment Policy when they failed to inform Human Resources or the General Counsel.

The policy states that... "Any manager, supervisor, or member of management who becomes aware of an informal complaint, potentially involving (a) discrimination, (b) harassment, (c) sexual misconduct, (d) sexual harassment, or a consensual romantic or sexual relationship." It is to be reported to H.R. or the General Counsel immediately.

I wish to be provided with the documentation that supports the policy showing that my concerns of discrimination and harassment were reported to Human Resources or the General Counsel in accordance with company policy. I would also ask that you provide the good-faith investigation that was conducted in accordance with HR-013 section 4.4

Request for additional leave

I called the Standard two weeks before my return date on or around May 20th, 2022, requesting an extension to my MA PFML, and was denied. I called to enter the appeal process a day or two after hearing I was denied. It was clear that Smith & Wesson was content with forcing me back into work. From the onset, the tactics used were always meant to affect me financially. This situation would be no different. The culture at Smith & Wesson Inc. is well documented. And in my case, I clearly experienced social forces that protected the essence of mainstream societal beliefs. "If you do not have it, we are not going to let you get it," which is evident within the pages of this document. I believe this is why they

"terminated my employment," as stated by attorney DePalmo during our Zoom hearing. The fact that I was denied unemployment insurance by the corporation because I quit was reported.

It is my assertion that engineering leadership conspired, corroborated, and engaged in retaliatory behavior to control the narrative. This document will show a repetitive theme of company frugality whenever I and compensation are concerned.

Enclosed, you will also find my medical diagnosis and what I will offer as accounts of marginalization pertaining to pay, harassment, and discrimination. My aim is to provide my perspective on the significance of the noose found on Smith & Wesson's premises, and how it pertains to the conservative culture, while shedding light on the challenges I faced as a Black engineer employee at this organization.

To aid with the technical jargon, I have also included a glossary of terms and definitions relevant to my job at Smith & Wesson, Inc.

In the following pages, you will come to realize that Smith & Wesson skirted their own HR-013 Non-Discrimination/Harassment Policy section 3.3 when it was complacent to the hostile act of a denigrating joke that was written on my whiteboard. This was, in my opinion, a clear display of aversion towards me for everyone to see. Sections 4.3 and 4.7 were also ignored when managers became aware of my concerns and willfully did not report my harassment complaints of coworkers or my manager, Marion Moryl in accordance with policies and procedures.

I will be describing instances that I experienced in the workplace, some during the very same time periods, lending reason to those who view the dialogue enclosed as a dire dilemma I experienced.

I will show that despite not receiving adequate compensation, I interacted with the highest levels in the engineering organization, completing any task assigned, delighting my customer. I will also provide examples of email communication between coworkers and leadership that highlight the tension between myself and management, which in my opinion ultimately led to retaliatory actions against me, once I went out on leave.

Ultimately, I regret spending a decade working diligently for a company that, upon reflection, seems to undervalue and view Black and Brown employees as expendable. At Smith & Wesson, it is well-known that most of the leadership holds conservative beliefs, which often align with far-right ideologies such as the Tea Party and MAGA.

I will assert individuals that Smith & Wesson have elevated to leadership roles are one and the same.

Smith & Wesson Inc., from my perspective, has fostered a racial and ethnic hierarchy disproportionately summed up of white male leadership creating disparities and impediments within a diverse racial population. I would also like to add, that any individual talking about collective bargaining components like healthcare, a safe, and respectful workplace, or mentioning the word UNION would be subject to immediate termination. This document will highlight components of group power, in specific numerical population power used by my leadership being one of three individuals of color in a room of seventy-five I believe it gives me the right to make that conclusion. It is also my assertion that my engineering leadership fell unresponsive to concerns of compensation, and harassment, and responded in a discriminatory fashion when they retaliated against me by ending my employment, as I was out with stress, depression, and anxiety. Leaving me feeling powerless to disparities spawned by racial inequities.

I hope that my testimony of experiences can bring attention to the discrimination, harassment, and unfair treatment that I endured at Smith & Wesson Inc.

## Glossary of Terms & Definitions

- Tool Designer – Creates parametric solid model designs for machine apparatuses, gauges, cutting tools, molds, dies, and blueprints with the use of Computer Aided Drafting Software.
- Marked Print – Hand altered print that convey engineering changes
- Marked Print Incorporation – Action of altering print.
- TDR – Tool Design Request.
- ECR – Engineering Change Request.
- Tool Assembly – Solid Model Components assembled in working envelope.
- Solid Model – Parametric 3D geometry.
- Parlec System – System used by tool setters to confirm cutter characteristics, and key measures, such as height and width.
- Set tool – Check cutter characteristics for conformance then read height and width onto data chip for C.N.C. operation.

## Employment Years 2011-2013 – Manufacturing Department

While working on the manufacturing floor at Smith & Wesson, I raised my first concern regarding my pay. I thought that I was entitled to receive my regular rate plus half for each hour worked after 40 hours in a scheduled 40-hour week. However, I worked in a department that was understaffed, and the company offered unlimited overtime to meet production targets. When I received my pay stubs, I noticed that my overtime compensation did not reflect the time and a half-rate that I was entitled to. Instead, it only showed the half-rate figure, which confused me.

I made an appointment to meet with Dottie Perella, the payroll manager, and showed her my pay stubs. She was surprised to see the number of hours I had worked and needed to verify with my cell coordinator, Carl Buss. Even after confirming the accuracy of my hours worked, Dottie could not explain the bookkeeping method she was using. I showed her one of my pay stubs, which had only four hours of overtime and was marked as "special," but it still did not reflect the correct sum.

I left Dottie's office feeling disheartened. Unfortunately, this was just one of the examples of poor leadership that I experienced at the company. I have included images of my pay stubs to illustrate the confusion I was facing. However, I never received a resolution for my concern, and it fell into the category of "never getting back to you."

ALPHONZIA JACOBS, JR
140 NORFOLK STREET
SPRINGFIELD, MASS. 01109

Date: December 9th, 2012

To:    Dottie Perella, Payroll

Re:    Payroll discrepancies

Dear Ms. Perella,

Enclosed please find information regarding payroll
discrepancies for 4 checks that I reviewed.  To date I've
reviewed checks:  A413119, A415260, A417425, and A419576.
I have not reviewed all of my paystubs as of yet.

I look forward to a resolution as soon as possible.

Respectfully,



In check # A413119 the overtime rate does not include the regular hourly rate of 18.70 + 9.35 which would equal 28.05 for my overtime hourly rate.

The stated overtime earnings on this check is 308.55 and it should be 925.65

The difference in this check is 617.10



In check # A419576 My regular rate has dropped from 18.70 to 17.00 and my regular rate earnings statement of 1496.30 is correct but I didn't receive the 8 hours of overtime pay of 224.40. In this check there is no overtime but yet I worked 8 hours.

The difference in this check is 374.00



In check # A415260 the overtime rate does not include the regular hourly rate of 18.70 + 9.35 which would equal 28.05 for my overtime hourly rate.

The stated overtime earnings on this check is 523.60 and it should be 1047.20

The difference in this check is 523.60



In check # A417425 My regular rate has dropped from 18.70 to 17.00 and my regular rate earnings statement of 2108.00 should be 2318.80 the difference of 210.80   the overtime rate does include the regular hourly rate of 18.70 + 9.35 which would equal 28.05 for my overtime hourly rate.

The stated overtime earnings on this check is 272.00 and it should be 897.60

The difference in this check is 836.40

**SMITH & WESSON**
2100 ROOSEVELT AVENUE
SPRINGFIELD, MA 01104

| | |
|---|---|
| CHECK NO. | 431002 |
| CHECK DATE: | 5/2/2013 |
| PERIOD ENDING: | 5/2/2013 |
| PAY FREQUENCY: | Weekly |
| PAY PERIOD: | 05/03/2013 - 05/03/2013 |

Alphonzie Jacobs, Jr
140 Norfolk Street

Springfield, MA 01183

ID NUMBER: 13531
BASE RATE: 680.00
SSN: 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

| | STATUS | EXEMPT | TAX ADJUSTMENTS | |
|---|---|---|---|---|
| FED: | Married | 4 | FED: | ST1: |
| ST1: | | 3 | D-UC: | |
| ST2: | | | LOCAL: | ST2: |

STATE AND LOCAL CODES
PRI: MA  LOC1:   LOC3:
SEC:   LOC2:   LOC4:
                LOC5:

## IMPORTANT MESSAGE

### HOURS AND EARNINGS

| DESCRIPTION | RATE | HOURS/UNITS | EARNINGS |
|---|---|---|---|
| | | CURRENT | |
| REGULAR | 17.0000 | 40.0 | 680.00 |
| OVERTIME | 8.5000 | 4.0 | 34.00 |
| SPECIAL | | | 42.84 |
| TOTAL H-E | | 44.0 | 756.84 |

### PRE-TAX ITEMS

| | |
|---|---|
| FLEXIBLE SPENDING ACCOUNT | -2.69 |
| 401K PT% | -22.62 |
| VISION | -2.49 |
| DENTAL | -15.18 |
| MEDICAL PPO | -43.52 |
| DEPNDNT CARE | -2.69 |

### TAXES AND DEDUCTIONS

| DESCRIPTION | AMOUNT |
|---|---|
| | CURRENT |
| SOC SEC | 42.80 |
| MEDICARE | 10.01 |
| FED INC | 20.78 |
| PRI-STATE | 25.03 |
| TOTAL | 99.39 |

### AFTER-TAX DEDUCTIONS

| | |
|---|---|
| SUPP LIFE NT | 4.16 |
| ADD LIFE | 0.58 |
| VOL ADC | 0.09 |
| TOTAL PEB DED | 4.83 |

### SPECIAL INFORMATION

| | |
|---|---|
| GRP TERM LIFE | 0.43 |

| TOTAL | EARNINGS | PRETAX | FIT TAXABLE | LESS TAXES | LESS DEDS | EQ NET PAY |
|---|---|---|---|---|---|---|
| | | 657.24 | | | | |
| CURRENT | 756.84 | -89.60 | 667.25 | 99.39 | 4.83 | 563.03 |

Employment Years 2013-2019  Engineering Department

Hired by Engineering Manager Brian Emmett As a Tool Designer 1

Mr. Chris Fedina, the Human Resources Hiring Director, was aware of my expertise in computer-aided drafting and proficiency in the Unigraphics Solid Modeling Program. He informed me of a Tool Designer 3 position working under Mr. Brian Emmett, the department head. Mr. Emmett and I had not met until the interview. Although the job wasn't as challenging as my previous roles, it was as Chris put it "a good fit for me." As a result, I met Mr. Emmett and his drafting manager John Matrishon, for the first time during the interview. During that interview, our discussion was more about the technical relevance of the position. As a result, I was told I'd be an added asset to the Tool Design group and John Matrishon's drafting group. My previous position on the manufacturing floor opened the door for contributing in both groups and although reporting to Mr. Emmett I was to be utilized as drafting support to Mr. Matrishon's group of blueprint creation due to my practical experience from Pratt & Whitney.

The mention of salary didn't come up, and at that time, I wasn't concerned because the internal position posting showed the engineering pay range.

Only during the presentation of paperwork and the official offer of my new position did I see that my increase was marginal compared to what I was making on the production floor. When I spoke with Mr. Fedina about my pay rate and position level, he informed me that Mr. Emmett had changed the position from Tool Designer 3 to Entry-level Tool Designer 1. I was confused as to what occurred between the time I left the interview the and presented paperwork, but I felt as if I couldn't turn down the opportunity even though the compensation fell short of industry standards. In my opinion, this decision was post-interview and had a direct impact on the compensation I would begin to receive in taking the new position. Despite my appeal to both Mr. Fedina and Emmett, nothing would change as to the department transfer compensation. It was clear that I could do nothing, and I felt powerless. In year one I never met with management regarding performance and during the year two's review I appealed to Mr. Emmett about his decision to place me at level 1 and his response was, *"You may have experience in the industry, but you don't have tool design experience." He then said, "Continue to work the way you are working and go through the Geometric, Dimensioning & Tolerancing (GD&T) training and I will move you up to a level II Tool Designer." Mr. Emmett never moved me to Level 2 despite successfully completing the training as indicated in my performance review below dated 2017.*

It was during my third year and second performance review I continued to advocate for myself to Mr. Emmett, following up on the previous year's evaluation. *I questioned why I was still categorized as a "Level I Tool Designer". Mr. Emmett's response was, yes even though I had successfully completed the proponents of training, he set forth I wouldn't be able to receive a Level II designation because the budged line item didn't occur to change the position that year.*

In my opinion, the first evaluation from Mr. Emmett was not accurate. On paper, it looked like I was progressing along but he was stalling me out by giving me objectives to meet before advancing my level 1 status pay. Despite giving me credit for intangibles like attentiveness and communication that I will interject later in this document. I took it as a slight to my abilities. Here is my rationale. My previous employment/experience made me a person to be considered for the position. I had Department of Defense top secret clearance with Fortune 500 Corporation Pratt & Whitney, making engineering drawings that conveyed information necessary to define engineering intent clearly and completely for

eight (8) years. I had real practical experience in creating solid models of airfoils, heat shields, turbine exhaust cases, and vectoring nozzles for Pratt & Whitney's F35 Joint Strike Fighter program. I created solid models and blueprints for rocket scientists. I knew my worth but yet it felt like I was taking part in some psychological, social conditioning process, in which I was the unexperienced ignorant one.

I've attached evaluations from my manager, Mr. Emmett. The first year when I was new to the department my evaluation reflected that I was meeting expectations in all categories except, Initiative, computer/keyboarding skills, teamwork, and cooperation in which I exceeded expectations. He also mentioned that a new employee would need time to learn tool design tasks. However, I wanted to highlight that I completed 340 drawings in 2017, averaging 0.7 days per drawing, while the Tool Design group averaged 1.6 days per drawing. Although I felt frustrated, I focused on showcasing my skills and proving my worth.

Despite my efforts this was my normal merit compensation, which left me feeling unfulfilled for the work I was performing.

Smith&Wesson

**Employee Compensation Statement**

| Employee Name: | Jacobs, Alphonzia | Employee ID: | 13531 |
|---|---|---|---|
| Job Title: | Drafter & Tool Designer I | Planner: | Emmett, Brian |

Our Company is committed to rewarding employees for their performance and contribution to the success of the business. The annual compensation planning review considers business profitability, competitive factors and assessment of business unit and individual goals in the decision making process. This statement details your pay elements for the current fiscal year.

**Base Pay**

Current Base Pay:        20.20 USD

| Element Type | Element Amount | Element Percent | Effective Date |
|---|---|---|---|
| Merit | 0.50 USD | 2.50% | 06/20/2018 |
| Total | 0.50 USD | 2.50% | |

New Base Pay:        20.70 USD

On behalf of the Leadership Team, we look forward to your continued contribution, dedication and success within the organization.

| Run Date: | 06/20/2018 | Company Confidential |
|---|---|---|

**Smith&Wesson**

General Professional

## PERFORMANCE APPRAISAL

**DATE OF THIS REVIEW:**

**NAME:** Alphonzia Jacobs JR

**JOB TITLE:** Tool Setter

### TYPE OF REVIEW

- **ANNUAL:** ☐

- **TRIAL PERIOD: New Hire or Transferred Employee**

(Complete competency check box and signature sections only.)

30 Day ☐  60 Day ☐  90 Day ☐

### INSTRUCTIONS FOR ANNUAL REVIEW

1. Review performance factors and competencies listed below
2. Review past objectives, Assign an overall "Performance Rating"
3. Review the evaluation with employee and discuss future objectives & development needs.
4. Review the Evaluation with appraiser's supervisor. Obtain their signature
5. Completed form is to be retained in employee's official personnel file

## PERFORMANCE FACTORS

| Does Not Meet Expectations | Needs Improvement | Meets Expectations | Exceeds Expectations | Role Model |
|---|---|---|---|---|
| This score indicates that most if not all expectations of the position are not being met. It is unlikely that skills will be developed in a timely manner to achieve satisfactory levels of performance. Immediate attention is required. The manager should work in partnership with HR to ensure that there is a plan for corrective action and a Performance Improvement Plan is used. A 30-60 day timeframe for improvement should be established. | This score indicates that some expectations of the position are being met, but some effort is required to meet a satisfactory level of performance. Scores may reflect a learning curve for an individual who has recently taken on new responsibilities or has recently been promoted into a new position, or may reflect a performance deficit. The manager will need to discuss a plan for continued development (PDP) or improvement (PIPI) with the employee | This score indicates strong performance in all facets of the position, solid achievement. Expectations have been met and in times, exceeded. Commitment to quality is evident. It is expected that a majority of scores will fall in this range. | This score signals performance above and beyond the expectations of the position. This score is characterized by unusual expertise, commitment, and quality. Performance reflects unique self-initiative and drive by the employee, resulting in valuable contributions to the organization | This score indicates performance that is consistently exceptional. Performance warrants consideration for promotion and significant increases in scope and responsibility. The manager should be in discussion with the employee and his/her manager and HR about how to best leverage the employee's talents within the organization. Scores in this range are rare |

| SMITH & WESSON CORE PRINCIPLES | Does Not Meet Expectations | Needs Improvement | Meets Expectations | Exceeds Expectations | Role Model |
|---|---|---|---|---|---|
| **CUSTOMER FOCUS** <br> -Keeps external and internal customer needs and requirements, paramount when making decisions and taking action | ☐ | ☐ | ✓ | ☐ | ☐ |
| **RESULTS ORIENTATION** <br> -Working to achieve high levels of individual and organizational performance | ☐ | ☐ | ✓ | ☐ | ☐ |
| **INITIATIVE** <br> -Takes independent action and goes beyond what the job or situation requires | ☐ | ☐ | ☐ | ✓ | ☐ |

| GENERAL PROFESSIONAL COMPETENCIES | Does Not Meet Expectations | Needs Improvement | Meets Expectations | Exceeds Expectations | Role Model |
|---|---|---|---|---|---|
| **ORGANIZATION** <br> -Naturally keeps personal area neat <br> -Puts things up when finished for the day <br> -Assembles all necessary materials and information before starting a task | ☐ | ☐ | ✓ | ☐ | ☐ |
| **LISTENING** <br> -Can keep silent while others express themselves <br> -Keeps ego and personal needs out of the conversation <br> -Tries to understand others before expressing self | ☐ | ☐ | ✓ | ☐ | ☐ |
| **SERVICE ORIENTATION** <br> -Is driven by the desire to serve the customer, focused on customer needs <br> -Responds as promptly as possible to customer needs and requests <br> -Knows customers, alliances, and partners well and supports them in appropriate ways | ☐ | ☐ | ✓ | ☐ | ☐ |

1

General Professional

| | | | | | |
|---|---|---|---|---|---|
| **FOLLOW THROUGH**<br>-Keeps focus on priorities; perseveres; delivers<br>-Doesn't let the details fall between the cracks<br>-Stays with a project through to it's conclusion | ☐ | ☐ | ☑ | ☐ | ☐ |
| **PERFORMANCE FOCUS**<br>-Avoids procrastination: pushes for results<br>-Manages time and priorities effectively<br>-Meets deadlines and other targets | ☐ | ☐ | ☑ | ☐ | ☐ |
| **TEAMWORK & COOPERATION**<br>-Is able to subordinate personal needs to team success<br>-Is willing to follow or lead based on the team's need; is approachable<br>-Is committed to building the spirit of the team; genuinely enjoys being a part of the team | ☐ | ☐ | ☐ | ☑ | ☐ |
| **COMPUTER/KEYBOARDING SKILLS**<br>-Can focus on the here and now<br>-Is patient paying close attention to detail<br>-Is careful to avoid errors | ☐ | ☐ | ☐ | ☑ | ☐ |
| **COMFORT WITH PAPERWORK**<br>-Is comfortable with repetitious attention to detail<br>-Tends to avoid making errors, and enjoys catching them<br>-Maintains accurate and timely records, files and reports | ☐ | ☐ | ☑ | ☐ | ☐ |
| **COMFORT WORKING INDEPENDENTLY**<br>-Is comfortable working alone when necessary<br>-Does not require close supervision<br>-Does not need others to provide structure | ☐ | ☐ | ☑ | ☐ | ☐ |
| **QUALITY ORIENTATION**<br>-Maintains high standards with staff and facility<br>-Effectively inspects and monitors for performance<br>-Shows a bias for proper maintenance, housekeeping, and adherence to requirements in general | ☐ | ☐ | ☑ | ☐ | ☐ |
| **TECHNICAL LEARNING**<br>-Prefers mastering the details before moving on to the next level<br>-Shows mastery of knowledge about the job, whether about products, markets, or subject areas<br>-Eagerly seeks and assimilates new relevant technical information | ☐ | ☐ | ☑ | ☐ | ☐ |
| **ADHERENCE TO POLICY**<br>-Adheres to industry guidelines<br>-Is prone to follow established procedures<br>-Tends to go by the book | ☐ | ☐ | ☑ | ☐ | ☐ |

**RESULTS OF PRIOR YEAR'S OBJECTIVES:**

N/A

| OVERALL PERFORMANCE RATING | Does Not Meet Expectations | Needs Improvement | Meets Expectations | Exceeds Expectations | Role Model |
|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ |

2

General Professional

**INDIVIDUAL DEVELOPMENT PLAN**

**Description of Development Need(s)** *Incorporate ERP/SAP System into my daily operations. Discover ways to cut cost and cycle time. Continue to work safe and be an effective team member.*

**Action Steps for Employee**

**Coaching Plan for Supervisor**

---

**INDIVIDUAL OBJECTIVES FOR NEXT YEAR** (Attach additional pages if necessary)

**Business Objective:** Compliance – Fanatical pursuit of excellence. Invest in systems and cross functional business processes to ensure operations meet the highest legal and ethical standards.
**Associated Individual Performance Objective:**

**Business Objective:** Enterprise Resource Planning – Invest in integrated and configurable technology infrastructure to standardize business processes and minimize costs.
**Associated Individual Performance Objective:**

**Business Objective:** Quality – Continue our focus on flexible manufacturing and standardized process for efficiency and scalability to provide our customers with world class quality, reliability and value in our products.
**Associated Individual Performance Objective:**

**Business Objective:** M & P Platform – Grow and diversify our business by continuing to build on the M & P Brand and effectively respond to consumer needs.
**Associated Individual Performance Objective:**

**Business Objective:** Supply Chain – Transition to an integrated supply chain to create a competitive advantage through purchasing, manufacturing and distribution of our products.
**Associated Individual Performance Objective:**

| APPRAISED BY: | EMPLOYEE SIGNATURE: | APPRAISER'S SUPERVISOR: |
|---|---|---|
| DATE: | DATE: 5/1/2013 | DATE: |
| | APPRAISER'S RECOMMENDATION (Check One) | |
| ____ Allow 30 additional days for improvement | ____ Schedule next formal review 1 year from this date | |

3

### Alphonzia Jacobs's Goals

CREATE    ADD FROM LIBRARY    VIEW ARCHIVED

| Actions | Name | Align | Weight (%) ⇩ | Obstacles | Progress | Due Date | 🗑 |
|---|---|---|---|---|---|---|---|
| ⟩ | Support Department Goals | ● | | 0 | ▓▓▓▓▓▓▓ | 0% | May 31, 2016 |
| ⟩ | Support NPD - Drawings completed with | ● | | 0 | ▓▓▓▓▓▓▓ | 0% | May 31, 2016 |
| ⟩ | Support NPD - Returned drawings to be | ○ | | 0 | ▓▓▓▓▓▓▓ | 0% | May 31, 2016 |
| ⟩ | Support NPD - Review Complex Design . | ● | | 0 | ▓▓▓▓▓▓▓ | 0% | May 31, 2016 |

# Review Evaluation Check-In

| EMPLID | 13531 |
|---|---|
| Name | Jacobs, Alphonzia |
| Job Title | Drafter & Tool Designer I |
| Job Id | RDTLP1 |
| Job Grade | LP1 |
| Supervisor | Emmett, Brian |

---

**Goals**

**Comment**   Al is new to this position.  He has a long way to get where he needs to be but has shown willingness to learn and do the right thing.

---

**Competencies**

**Comment**   Al needs to listen more closely and then do the work.  I find he tends to over think and analyze.  Yes, continue to ask questions but then get the job done.  Less discussion about it and more work doing it.

---

**Development Activities**

**Comment**   Increase his GD&T knowledge by taking a class.

---

**Overall**

**Comment**   Al must continue improving.  The amount of time to get the work done needs to continue improving.

Instructions for Annual Review
Jacobs, Alphonzia

 Smith&Wesson

| | |
|---|---|
| **EmpID**   13531 | **Name**   Jacobs, Alphonzia |
| **Job Title**   Drafter & Tool Designer I | **Job Id**   RDTLP1 |
| **Job Grade**   LP1 | **Supervisor**   Emmett, Brian |

## Goals/Strategic Objectives | Section Weight 50%

FY2017 All Tool Designs need to be completed in less than 20 days.

Reduce all delays and wait states.

| Start Date: | Due Date: | Actual End Date: |
|---|---|---|
| May 01, 2016 | Apr 30, 2017 | |

| Progress: | Weight: | Obstacles: |
|---|---|---|
| 0% | 50% | NONE |

**Employee Comments**
Most if not all of my assigned tasks dont require more than a few days to complete.

**Employee Rating**
Significantly Exceeds Expectations

**Manager Comments**
Al completed his tasks within goal limits.

**Manager Rating**
Consistently Meets Expectations

FY2017 Complete all NPD Tool Designs as Priority

NPD Tool Design work needs to be completed without any delays to ensure they stay on schedule.

| Start Date: | Due Date: | Actual End Date: |
|---|---|---|
| May 01, 2016 | Apr 30, 2017 | |

| Progress: | Weight: | Obstacles: |
|---|---|---|
| 0% | 50% | NONE |

**Employee Comments**
Most if not all of my assigned tasks don't require more than a few days to complete.

1

Instructions for Annual Review
Jacobs, Alphonzia

 Smith&Wesson

**Employee Rating**
Significantly Exceeds Expectations

**Manager Comments**
All priority work was done efficiently.

**Manager Rating**
Consistently Meets Expectations

## Goals/Strategic Objectives

**Employee Comments**
I consistantly complete my tasks within a twenty day time frame.

**Employee Rating**
Significantly Exceeds Expectations

**Manager Comments**
Goals were met.

**Manager Rating**
Consistently Meets Expectations

Score:3.0000

## Competencies | Section Weight 50%

Communication

Provides information in a timely manner in a way that others can understand and take appropriate action

**Behaviors**
Example Behaviors
- Keeps people informed about the current status of own work.

- Provides updates to managers and internal/external customers.

- Asks questions to clarify requirements and actively listens to understand.

- Checks to make sure that others understand what is needed.

2

Instructions for Annual Review
Jacobs, Alphonzia



**Employee Comments**
I'm very conscious of communicating clearly. And at times find myself reiterating information.

**Employee Rating**
Exceeds Expectations

**Manager Comments**
Al communication has improved. Al over communicates rather what is more common under communication. Since we discussed this issue he has improved greatly. There is still a little more room for improvement.

**Manager Rating**
Consistently Meets Expectations

## Continuous Improvement

Identifies and/or implements ways to do things more efficiently and effectively

**Behaviors**
  Example Behaviors
- Identifies and/or solves problems needing attention.

- Challenges the status quo and looks for better ways to do things.

- Continually looks for ways to improve the way work gets done.

- Uses time on the job in the most productive manner.

**Employee Comments**
I was tasked to create a format and one of the stakeholders mentioned some enhancements that he would like to incorporate into the task. This incorporation had a direct impact on tool assy creation and efficiency.

**Employee Rating**
Significantly Exceeds Expectations

**Manager Comments**
Al took on the task on how Tool Assemblies were added to the Tool Design.

**Manager Rating**
Exceeds Expectations

## Customer Focus

Meets the needs of internal and external customers with a sense of urgency and long term customer satisfaction in mind

**Behaviors**

3

Instructions for Annual Review
Jacobs, Alphonzia

 Smith&Wesson

Example behaviors
- Acts with urgency and commitment to meet the needs of internal and external customers.

- Explores and recommends ways to improve customer service.

- Takes responsibility for ensuring that customer problems are resolved.

- Responds with a sense of urgency to address internal and external customer needs.

**Employee Comments**
I view every task as a chance to delight my customer.

**Employee Rating**
Exceeds Expectations

**Manager Comments**
Al is still on the learning curve in Tool Design. He has been given increase Tool Designs.

**Manager Rating**
Consistently Meets Expectations

Employee Development

Takes advantage of opportunities to improve own and other's skills and abilities

**Behaviors**
Example Behaviors
- Takes charge of their own development.

- Puts in the time and effort to learn new skills.

- Shows passion and curiosity for learning about the business.

- Develops self to prepare for the next step on their career path.

**Employee Comments**
This past year I had the opportunity to attend concept 2 design, a two day conference put on by our software provider. The conference turned out to be an invaluable resource that I continue to tap into. that along with so-licited approaches from senior tool designers I believe my development is on track.

**Employee Rating**
Exceeds Expectations

**Manager Comments**
SolidWorks training has helped Al.

**Manager Rating**

4

Instructions for Annual Review
Jacobs, Alphonzia



Consistently Meets Expectations

### Initiative

Takes necessary action without being asked or told what to do

**Behaviors**
Example Behaviors
- Takes initiative to solve problems and make decisions.

- Speaks up to point out issues so they can be addressed.

- Anticipates issues and requirements and act in advance to address them.

- Does what is needed without being told what to do.

**Employee Comments**
In my role it is difficult to initiate new methodology so I concentrate on staying motivated and having customer centered solutions.

**Employee Rating**
Consistently Meets Expectations

**Manager Comments**
He is always interested to take on the next challenge.

**Manager Rating**
Consistently Meets Expectations

### Making Sound Decisions

Makes effective, timely and fact-based decisions, utilizing all available information

**Behaviors**
Example Behaviors
- Insists on getting down to the details to fully understand issues.

- Asks questions to understand situations and uncover root causes.

- Makes decisions based on the best and most approriate information, evidence and/or data.

- Makes decisions according to what is best for the situation without letting personal feelings interfere.

**Employee Comments**
A few times I needed to explain my position to the customer and as a result my approach was accepted as a viable solution.

5

Instructions for Annual Review
Jacobs, Alphonzia



**Employee Rating**
Exceeds Expectations

**Manager Comments**
There has need significant improvement this past year with Al's tool design knowledge.

**Manager Rating**
Exceeds Expectations

## Planning Ahead/Thinking Strategically

Anticipates problems and opportunities. and makes plans to deal effectively with them

**Behaviors**
  Example behaviors
  - Prepares in advance to deal with potential obstacles and foreseeable.

  - Identifies key implications of new information and events.

  - Develops clear action plans that address the details needed to achieve objectives.

  - Works out solutions to current problems that take into account potential future issues.

  - Anticipates future needs and makes plans to address them.

**Employee Comments**
I continue to try and eliminate any unclear directives by planning ahead, asking relevant questions. gathering my task expectations and beginning with the end in mind.

**Employee Rating**
Exceeds Expectations

**Manager Comments**
Much improvement but more is needed.

**Manager Rating**
Consistently Meets Expectations

## Competencies

**Employee Comments**
I consitantly complete my tasks within a twenty day time frame.

**Employee Rating**

6

Instructions for Annual Review
Jacobs, Alphonzia



Exceeds Expectations

**Manager Comments**
On the right path now. Needs on target when discussing designs.

**Manager Rating**
Consistently Meets Expectations                                                    Score:3.2857

## Development Activities

### Development Activities

**Employee Comments**
I've increased my SolidWorks proficiency by visiting the customer portal, watching trainings and contacting some of the experts that I was fortunate to meet during the past year.lj;lk]

**Employee Rating**
Exceeds Expectations

**Manager Comments**
Improved his SolidWorks skills by attending class this year.  May he should consider do another this coming year.

**Manager Rating**
Consistently Meets Expectations                                                    Score:3.0000

## Manager Comments

### Employee Questions and Answers

**Question**
What do you see as your 3 biggest accomplishments in the past year?

**Answer**
* I completed the recomended GD&T training with Quality Manager Don Vacon

* I've reduced the lead time of my tasks with minimum input from checkers

* I've increased the confidence level of my peers to get the job done correctly the first time.

**Question**

7

Instructions for Annual Review
Jacobs, Alphonzia

 Smith&Wesson'

What would you identify as an area for additional growth and development?

**Answer**
Continue to enhance my assigned task and solidworks efficiency.

**Question**
In what ways can your Manager help you in your overall development?

**Answer**
By continuing to help me identify developmental milestones.

**Question**
Provide any other comments.

**Answer**
In the upcoming year my goal is to remain adaptable to TDR & ECO work tasks assigned from respective Tool Design and Product Definition groups. Stay dependable by completing tasks in a timely manner and attend as many professional development opportunities that I can.

## Manager Questions and Answers

**Question**
What development needs does your employee have for continuous improvement?

**Answer**
Continue with SolidWorks learning

Continue with Tool Design concept learning

**Question**
Please provide information with regard to the employee's overall development.

**Answer**
Al is an entry level Tool Designer. He is progressing well.

**Question**
Did you conduct the Mid-Year Check-In?

**Answer**
No

8

Instructions for Annual Review
Jacobs, Alphonzia



## Overall

**Employee Comments**
In the past year I believe I've grown as a Tool Designer / Product Draftsman and built confidence within stakeholders and customers.

**Employee Rating**
Significantly Exceeds Expectations

**Manager Comments**
Al is progressing well learning Tool Design and SolidWorks.  He will be given increasing complex Tool Designs this coming year.

**Manager Rating**
Consistently Meets Expectations                                    Score:3.1429

9

Instructions for Annual Review
Jacobs, Alphonzia



## Employee Signoff

I acknowledge that I have reviewed the employee's performance and have conducted a meeting to discuss, in detail,the review document, along with other documents that support this employee's overall rating.

**Employee Comments**

Signed By                   Alphonzia Jacobs

Date                        Jun 28, 2017

## Manager Signoff

I acknowledge that I have reviewed the employee's performance and have conducted a meeting to discuss, in detail,the review document, along with other documents that support this employee's overall rating.

**Manager Comments**

Signed By                   Brian Emmett

Date                        Jun 28, 2017

10

Instructions for Annual Review
Jacobs, Alphonzia



**EmpID** 13531
**Job Title** Drafter & Tool Designer I
**Job Grade** LP1

**Name** Jacobs, Alphonzia
**Job Id** RDTLP1
**Supervisor** Emmett, Brian

## Goals & Objectives | Section Weight 100%

FY2017 All Tool Designs need to be completed in less than 20 days.

Reduce all delays and wait states.

**Start Date:**
May 01, 2016

**Due Date:**
Apr 30, 2017

**Actual End Date:**
Apr 25, 2017

**Progress:**
100%

**Weight:**
50%

**Obstacles:**
NONE

**Employee Comments**
Most if not all my assigned tasks are completed in a timely manner.

**Employee Rating**
Achieved Expectations

**Manager Comments**
Al currently has 5 Tool Designs over the 20 day limit. He needs to monitor this closer.

**Manager Rating**
Achieved Expectations

FY2017 Complete all NPD Tool Designs as Priority

NPD Tool Design work needs to be completed without any delays to ensure they stay on schedule.

**Start Date:**
May 01, 2016

**Due Date:**
Apr 30, 2017

**Actual End Date:**
Apr 25, 2017

**Progress:**
100%

**Weight:**
50%

**Obstacles:**
NONE

**Employee Comments**
Most if not all my assigned tasks are completed in a timely manner.

1

Instructions for Annual Review
Jacobs, Alphonzia



**Employee Rating**
Achieved Expectations

**Manager Comments**
Al does a good job reacting to priority work. He communicates well regarding the Tool Designs status.

**Manager Rating**
Achieved Expectations

## Goals & Objectives

**Employee Comments**
In the past year I have been dependable in regards to completing tasks and look forward to enhancing my ability with developmental opportunities.

**Employee Rating**
Achieved Expectations

**Manager Comments**
Al completed 340 drawings during 2017. This is an average of 0.7 days per drawing while the Tool Design group averaged 1.6 days per drawing. This is a good average for the easier Level 1 work.

In 2018 Al requested some Level II work and he completed drawings mixed with his Level I work at a rate of 2.7 drawings per day.

**Manager Rating**
Achieved Expectations                                                                    Score:75.0000

## Development Activities

### Development Activities

**Employee Comments**
I've taken my managers suggestion and attended SolidWorks User Group meetings, receive daily information from the SolidWorks Community and started utilizing the My SolidWorks link from our software provider getting more in depth training from software experts.

**Manager Comments**
The quality and quantity of Al's work is good for Level I. To get to Tool Designer Level II status he needs to improve his through put for that type of work. It just takes time to learn.

**Manager Rating**

2

Instructions for Annual Review
Jacobs, Alphonzia



Achieved Expectations

Score:75.0000

## Employee Comments

### Employee Questions and Answers

**Question**
What do you see as your 3 biggest accomplishments in the past year?

**Answer**
Improved essential communication
Increased SolidWorks software user abilities
Increased confidence from my manager that I can get task he assigns done.

**Question**
What would you identify as an area for additional growth and development?

**Answer**
Become a better employee by capitalizing on Life long learning opportunities at the university level.

**Question**
In what ways can your Manager help you in your overall development?

**Answer**
By continuing his open door policy and sharing his knowledge whenever I have questions.

**Question**
Provide any other comments.

**Answer**

## Overall

**Employee Comments**
In the past year I have requested level 2 proficiency work. During which time I have demonstrated the ability to com-

3

Instructions for Annual Review
Jacobs, Alphonzia

 Smith&Wesson

plete acceptable tasks in a timely manner. I believe I have grown as a Tool Designer and continue to build confidence within stakeholders and my customer base.

Employee Rating
Achieved Expectations

Manager Comments

Manager Rating
Achieved Expectations                                                      Score:75.0000

4

One day shortly after Mr. Emmett called a meeting with two of his groups, Process Engineering & Tool Design. In that meeting, he informed my group of tool design that we would be assuming the responsibility for creating a new and distinct drawing format to be used on all new tool assembly drawings and supplying those drawings to the cutter grind department, specifically the tool setter group. Our finished drawings would be uploaded into Matrix and once approved would be seen in the Parlec System allowing the tool setter group to "set" the assembly to be used in the C.N.C. machines. Shortly thereafter, Mr. Emmett assigned me a task to create a set of tool assembly drawings, and when I enquired where the new formats were stored, he replied, "Thanks for volunteering". At that point under him and Scott Ignachuk another engineering manager over the cutter department direction I worked with Richard Foulkes one of the company's brightest engineers for about a month and together we created a new smart format that would have multiple uses for different stakeholders. From a process engineering standpoint, it stored an accurate bill of material for each assembly making ordering a breeze, it also housed the data needed for C.N.C. programming. The tool setter used it as a visual interpretation of which manufacturer holder, collet, lock nut, and pull stud is needed for the correct assembly and once built and placed on the Parlec Measuring System verifying height and width to a ten-thousandth repeatable accuracy.

Cutter grind used the file to stock the tool cribs, track scrap, and maintain cutter usage and inventory stockouts.

Let me clarify when I say smart, I mean when you placed any object into the field of the drawing it would draw the pre-loaded custom properties placed in each solid model making up the assembly, that same information populated the bill of material on the drawing. The format worked perfectly, it automatically populated the bill of material with all of the pertinent information needed to utilize in the C.N.C. machines as well as allowing the process engineer a digital representation to be used in a Computer Aided Manufacturing file to be used in verifying tool paths and cuts. The file was also the master file of all the specific characteristics such as manufacturer, part number, size, etc...It was beautiful and had everything...

My goal is not to criticize, but my group overwrote the custom properties of the files even though there was a built-in message stating "You are about to overwrite a custom property," in two short days. It is during this time I hear them laughing and conversing with each other saying things like "Let it ride." As they pushed the button overwriting the properties...At this point I'm exasperated, all the work that I put into the new format was destroyed and I needed to take a walk...

During this same time, I had the displeasure of finding a noose in the welding department on the grounds of Smith & Wesson Inc. First, let me respond to the assertion...

"That the existence of a noose on Smith & Wesson premises created a discriminatorily hostile work environment is baseless."

As a Black man, the noose symbolizes one of the most horrific, racist acts committed against black people, I can't express the amount of mental discomfort I felt when I saw it, and more disturbing it was

being used to intimidate all others. Smith & Wesson, Inc.'s stance is that "I'm desperate and attempting to deflect attention away from the fact that complainant's charge, as drafted, is utterly baseless."

Your records have indicated my direct connection with the noose, a reflection of exercisable hate and one that I really couldn't believe I was looking at in the year 2017 at my place of employment (Smith & Wesson, Inc..)

As a person who has first-hand knowledge concerning the noose, let me interject the fact that Mr. Latham was complacent for a couple of weeks and the noose was able to stay visible for a prolonged period before he showed me, and then I ultimately was the first employee to come forward and report it immediately to Anne Glicka in human resources. Incidentally, I was never spoken to again regarding how I felt about the noose or any other follow-up after that point. This begs the question, if I hadn't reported it would it still be allowed to hang in the workplace? My assertion of yes is concluded, because a lot of employees had access to that area, there was a microwave in close proximity that suggests it may have been put there by one individual, but it was permitted and acceptable by others. In my opinion that speaks directly to the culture of Smith & Wesson, Inc. It exhibits that leadership seems to act as if they believe that if they ignore the facts of racism, it will not exist. This approach has fostered a virulent undercurrent of racism, insinuating itself in every department, and empowering the racist to be bolden with conversation and actions. I've attached the picture that I shared with human resources and the litigation hold letter sent to me on behalf of Smith & Wesson Inc.



Directive Regarding Preservation of Information Related to Charles Latham

LITIGATION HOLD NOTICE

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

From: Ann B. Makkiya

Date: July 19, 2018

Hold Period: July 1, 2018 – Until Further Notice

---

S&W has become aware of a potential legal dispute with Charles Latham concerning his employment at S&W. S&W has a legal obligation to retain documents and other materials that may be relevant to any legal proceeding brought by Mr. Latham. *Please do not discuss this lawsuit or its subject matter, other than with S&W's Legal Department or outside legal counsel.*

*It is critically important that you take immediate steps to preserve all documents and information relevant to the dispute between S&W and Mr. Latham.* Failure to preserve such documents and information could harm S&W's ability to prosecute or defend against any legal claims and could subject the Company to severe penalties. Accordingly, it is critical that every employee take all steps necessary to preserve all potentially relevant documents and information that are within his or her control, including those documents that may be created after the date of this memorandum.

Until further notice, all documents (including hard-copy documents, e-mails, and other electronic records) that relate in any way to the following must be preserved and retained (i.e., do not alter, delete or otherwise modify such records, and take steps to preserve such records). The documents and electronic data that you should retain include, but are not limited to:

- All communications to and from Mr. Latham.
- All internal or external communications concerning Mr. Latham.
- All documents concerning Mr. Latham's employment with S&W, whether hard-copy or electronic, including: relevant personnel or other files; performance evaluations; job descriptions; job transfer/job assignment notices; time and attendance records; payroll files; other compensation records; investigation files; Human Resources files; Employee Relations files; legal files.
- All documents regarding any verbal and written warnings, or other discipline, given to Mr. Latham.
- All handbooks, policy statements, rules, procedures, training and orientation materials provided to Mr. Latham at any time during his employment.

- All documents that reflect or relate to any complaints by Mr. Latham, and any investigations into any such complaints.
- All notes of conversations with Mr. Latham.
- All video footage of Mr. Latham's work area.
- All still photographs of Mr. Latham's work area.
- All badge swipes for entry to/exit from Mr. Latham's work area.

In identifying and preserving data, the term "document" is to be defined broadly and includes, but is not limited to, non-identical copies of hard-copy documents that contain marginalia, underlining or highlighting. Hard-copy documents may be located in your office (e.g., desk, filing cabinets), home, department files, central storage locations, and/or off-site storage locations. "Electronic data" also is defined broadly and includes, but is not limited to, all text files (including word processing documents and presentations), spreadsheets, e-mails, databases, calendars, computer system activity logs, internet usage files, network access information, voicemail messages, instant messages, text messages, photographs, and video and audio recordings. S&W's computer systems include, but are not limited to, all workstations, laptops, network servers, shared drives, removable media (for example, USB thumb drives), handheld devices, voicemail, back-up tapes, your S&W-issued or personal phone or tablet, the cloud, social media sites, personal e-mail accounts and any files that you have at the office or at your home.

Potentially relevant documents must be preserved regardless of where they are located or the media on which they reside. Thus, this request includes not only documents and electronic data in your possession, but any documents and electronic data in your custody or control, including electronic documents or data that may be kept in departmental or central files or offsite. This also includes files and e-mails stored in a personal e-mail account (for example, Yahoo or Gmail) or on personal electronic devices. Any questions as to the scope of this directive should be resolved in favor of preservation and retention.

## Actions You Must Take Now

By way of example, the following types of documents relating or referring to the subject matter of any of the topics listed above must be preserved:

- *Hard-copy documents: Do not destroy, collect, segregate or otherwise disturb potentially relevant paper records.*
- *E-mail: Do not delete, forward or copy potentially relevant e-mail. Instead, create a "Preservation" folder in your mailbox and move all potentially relevant e-mail to this folder.*
- *Hard Drive: Do not delete, forward, modify, open or copy potentially relevant text files saved to your hard drive.*
- *Portable media: Do not discard, open, copy or modify any electronic files stored on CDs, DVDs or other portable media.*
- *Any Other Data Source: Please contact Ann Mokkiya for instructions for retaining potentially relevant information from any other data source not referenced.*

Again, any question you may have as to the relevance of a particular document should be resolved in favor of preservation and retention. Please ensure that no document outlined above is altered, destroyed, or displaced during this legal hold.

Additionally, to the extent it is applicable, S&W's Record Retention Policy should be suspended with regard to potentially relevant documents. None of these documents should be disposed of regardless of any retention period defined in that policy. Any similar policy or practice regarding the destruction or retention of documents, formal or informal, is likewise suspended. In addition, any computers, cell phones, data storage devices and/or other media and devices containing potentially relevant information must not be disposed of, even if they are being replaced due to failure, upgrade or other reason.

If you have any questions, please call Ann Makkiya at ext. 3248, or 413-244-7553.

34864851.1

A couple of days later I was summoned to Senior V.P. Kathy Salvatores's office, it was during that conversation I conveyed my concerns, frustrations, and experiences. I talked about how each interaction, I could be on the receiving end of some disrespectful statement or treatment, how a lot, if not all of my tasks are scrutinized during the checking process, and how it has been such a constant negative interaction to the extent of harassment. I also mentioned my continued concern about my pay rate. She was very concerned about all of what we talked about and followed up with the engineering leadership. It was at that point my concerns about pay were acknowledged, agreeing that I was being grossly unfairly paid, and through her involvement and engineering director Craig Mariani, I was to see a 12% that year, 10% the next, and 6% when my leadership changed. I've attached a Smith & Wesson paystub along with a couple of my Pratt & Whitney paystubs for comparison. Notice the difference in pay over the 20 years.

| ICO, | P.E. | DEPL | CLOCK | VOHR. NO. | CO |
|---|---|---|---|---|---|
| V77 | 31131 | 613000 | | 000C271310 | 1 |

SMITH & WESSON INC
2100 ROOSEVELT AVE.
SPRINGFIELD, MA 01104

Period Beginning: 06/28/2021
Period Ending: 07/04/2021
Pay Date: 07/08/2021

Taxable Marital Status: Married
Exemptions/Allowances:
Federal: 0.550 Additional Tax
MA: 0

ALPHONZIA JACOBS
140 NORFOLK STREET
SPRINGFIELD, MA 01109

| Earnings | rate | hours | this period | year to date | Other | this period | year to date |
|---|---|---|---|---|---|---|---|
| Pto Hrly | 27.1580 | 16:00 | 434.53 | 1,647.47 | Vife Sp | 2.92 | 78.84 |
| Reg Indirect | 27.1580 | 24.00 | 651.79 | 23,703.13 | Vol Add Chd | 0.08 | 2.16 |
| Bonus | | | 1,200.00 | 1,200.00 | Vol Add Ex | 1.53 | 41.31 |
| Gun Transfer | | | 114.74 | 114.74 | Vol Add Sp | 0.61 | 16.47 |
| Holiday | | | 1,255.62 | 1,255.62 | 401k R5 | 65.18 | 1,680.62 |
| Ltd Gross Up | | | 39.85 | 39.85 | Gun X'er Fee | | 75.00 |
| Ot Indirect | | | 194.44 | 194.44 | Ltd Gross Up | | 29.85 |
| Gross Pay | | | $11,088.32 | 28,165.20 | | | |

---

Earnings Statement  ADP

| CO. | PE | DEPT. | CLOCK | VCHR. NO | 125 |
|---|---|---|---|---|---|
| V77 | 31131 | 513000 | | 000282165 | 1 |

SMITH & WESSON INC.
2100 ROOSEVELT AVE.
SPRINGFIELD, MA 01104

Period Beginning: 06/13/2021
Period Ending: 06/13/2021
Pay Date: 06/24/2021

Taxable Marital Status: Married
Exemptions/Allowances:
Federal: 0.550 Additional Tax
MA: 0

ALPHONZIA JACOBS
140 NORFOLK STREET
SPRINGFIELD MA 01109

| Earnings | rate | hours | this period | year to date | Other | this period | year to date |
|---|---|---|---|---|---|---|---|
| Bonus | | | 1,200.00 | 1,200.00 | Vision | | 39.36 |
| Gun Transfer | | | 114.74 | | Vife Chd | | 11.04 |
| Holiday | | | 1,255.62 | | Vife Ex | | 351.92 |
| Ltd Gross Up | | | 39.85 | | Vife Sp | | 70.08 |
| Ot Indirect | | | 191.14 | | Vol Add Chd | | 1.92 |
| Flo Hrly | | | 210.94 | | Vol Add Ex | | 36.72 |
| Reg Indirect | | | 21,937.30 | | Vol Add Sp | | 14.04 |
| Gross Pay | | | $11,200.00 | 24,939.63 | | | |




GO. FILE DEPT CLOCK VCHR NO. 5855
PWS 025137 303119 1F12 0000455124 1
303119

**UNITED TECHNOLOGIES PRATT & WHITNEY**
400 MAIN ST., E. HARTFORD, CT 06108

### Earnings Statement

**ADP**

Period Ending: 11/15/2002
Pay Date: 11/15/2002

ALPHONZIA JACOBS JR
140 NORFOLK STREET
SPRINGFIELD, MA 01109

Taxable Marital Status: Single
Exemptions/Allowances:
Federal:       0
CT:            0, Filing Status A

Social Security Number: ■■■ -0118

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 1515.00 | 86.67 | 1,515.00 | 31,815.00 |
| Overtime | | | | 3,369.27 |
| Regular Adjust | | | | -148.59 |
| **Gross Pay** | | | **$1,515.00** | 35,035.68 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -160.52 | -4,107.96 |
| | Social Security Tax | -91.67 | -2,124.34 |
| | Medicare Tax | -21.44 | -496.82 |
| | CT State Income Tax | -36.58 | -963.13 |
| | **Other** | | |
| | Flex Ad&D | -0.29* | -6.09 |
| | Flex Dental | -9.00* | -189.00 |
| | Flex Hmo | -28.00* | -595.88 |
| | S/P Loan N/R | -30.28 | -151.40 |
| | Savings Acct | -909.97 | -21,145.72 |
| | 401K Basic N/R | -90.90* | -582.11 |
| | 401K Suppl N/R | -136.35* | -4,673.25 |
| | **Net Pay** | | **$909.97** |

| Taxable Wages | this period | total to date |
|---|---|---|
| Federal | 1,251.36 | 29,008.25 |
| Social Security | 1,478.61 | 34,263.61 |
| Medicare | 1,478.61 | 34,263.61 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| Group Term Life | 0.90 | 18.90 |
| Assigned Shift | | 1.00 |
| Department | | S012484 |

©2001 Automatic Data Processing, Inc.

\* Excluded from federal taxable wages

TEAR HERE

© HDR ADR Inc

VERIFY DOCUMENT AUTHENTICITY COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM

**UNITED TECHNOLOGIES PRATT & WHITNEY**
400 MAIN ST., E. HARTFORD, CT 06108

Deposited to the account of
ALPHONZIA JACOBS JR

THIS IS NOT A CHECK

Advice number: 00000455124
Pay date: 11/15/2002

| account number | transit ABA | amount |
|---|---|---|
| 2636106 | 2111 7689 | $909.97 |

**NON-NEGOTIABLE**

■ THE ORIGINAL DOCUMENT HAS AN ARTIFICIAL WATERMARK ON THE BACK. HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENT ■

CO.  FILE  DEPT  CLOCK  VCHR. NO.  5720
PWS  025137  30319  1F12  0000514875
303119


**UNITED
TECHNOLOGIES
PRATT & WHITNEY**
*400 MAIN ST., E. HARTFORD, CT 06108*

Social Security Number:  ▮▮▮-0116
Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 0
State:    0,Filing Status A

## Earnings Statement



Period Ending:    12/31/2001
Pay Date:         12/31/2001

**ALPHONZIA JACOBS JR
140 NORFOLK STREET
SPRINGFIELD, MA 01109**

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 1515.00 | 86.67 | 1,515.00 | 11,304.23 |
| Double Time | | 7.00 | 244.72 | 244.72 |
| Overtime | | 21.00 | 550.62 | 550.62 |
| **Gross Pay** | | | **$2,310.34** | 12,099.57 |

| Deductions | Statutory | this period | year to date |
|---|---|---|---|
| | Federal Income Tax | -360.36 | -1,655.64 |
| | Social Security Tax | -141.04 | -739.20 |
| | Medicare Tax | -32.99 | -172.88 |
| | CT State Income Tax | -72.44 | -333.05 |
| | **Other** | | |
| | Flex Ad&D | -0.29* | -1.45 |
| | Flex Dental | -6.00* | -30.00 |
| | Flex Hmo | -30.00* | -150.00 |
| | Savings Acct | -1,320.67 | -3,168.30 |
| | 401K Suppl N/R | -346.55* | -1,255.55 |
| | **Net Pay** | | **$1,320.67** |

\* Excluded from federal taxable wages

| Taxable Wages | this period | total to date |
|---|---|---|
| Federal | 1,928.40 | 10,667.07 |
| Social Security | 2,274.95 | 11,922.62 |
| Medicare | 2,274.95 | 11,922.62 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| Group Term Life | 0.90 | 4.50 |
| Assigned Shift | | 1.00 |
| Department | | S012484 |

**Important Notes**
ATTENTION:W2S WILL BE SENT TO THE ADDRESS ON YOUR
CHECK STUB. PLEASE REVIEW AND UPDATE IF NECESSARY.

©1998 Automatic Data Processing, Inc.

VERIFY DOCUMENT AUTHENTICITY. COLORED AREA MUST CHANGE INTO NEGRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM

**UNITED
TECHNOLOGIES
PRATT & WHITNEY**
*400 MAIN ST., E. HARTFORD, CT 06108*

Advice number:    00000514875
Pay date:          12/31/2001

Deposited to the account of
ALPHONZIA JACOBS JR

THIS IS NOT A CHECK

| | account number | transit· ABA | amount |
|---|---|---|---|
| | 2636106 | 2111 7689 | $1,320.67 |

**NON-NEGOTIABLE**

THE ORIGINAL DOCUMENT HAS AN ARTIFICIAL WATERMARK ON THE BACK. HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENT.

I am being completely honest when I tell you that it felt like the group was aware of everything that was transpiring between myself and the company. In my opinion, the tool designer group was aware that I had doubled the output of tasks compared to them, and as a result, I want to highlight the checking process, which was used as an apparatus to slow me down and add amusement to their day. However, I had a very different perception, in my opinion, it was a never-ending show of control, whereas often the target intent would be manipulated to degrees of harassment.

In drafting, when creating a blueprint/drawing we convey the information necessary to define engineering intent. The blueprint/drawing should avoid any unnecessary manufacturing restrictions. The checking process allows a fresh pair of trained eyes to overlook the drawing looking for things that could enhance the manufacturability or design intent of the print. The tool used in this operation is called a marked print.

(see the image below as an example)

Similar to how a letter can be corrected except everything is technical, and most often the contents are industry-specific, with its corporate caveats as well. I assert that my completed drawings would bounce back and forth from checker to myself a ridiculous amount of times. I raised this concern to my leadership, and it was ignored perpetuating a behavior pattern instead of a process riddled with elements of harassment. As the person incorporating the changes it is customary not to push back on the checkers marked print, and as a result that became the pathway of permitted harassment. Normally changes are minor and can be performed quickly, moving the drawing components to be created or assembled. In my case, our file management system called MATRIX will show multiple rejections for each task I performed, no matter the complexity. It was only during the checking process that the uncommon became common practice and it was customary for the whole design or concept to change. This was a clear show of power, and when my concerns were shared with leadership there was no intervention, and as a result, it empowered the unfair behavior towards me having an incalculable destructive effect on my health.



## ENGINEERING LEADERSHIP CHANGE

Brian Courtney Engineering Director takes a new position with a new company and my direct manager Brian Emmett retires. Rich Picard becomes my new manager, and John Pliska is named the new Engineering Director.

During Rich's brief tenure as Tool Design Manager, he assigned me as the engineering liaison to facilitate coordination between the tool setter department. Though there was no formal documentation, this new responsibility gave me the authority to assist the cutter department cell coordinator and all the tool setters who reported to him, by providing clarification on the part print, cutting tool print, supplier data, tool assembly components, or anything related to the tool assembly process. While this was a valuable bargaining tool for negotiating a higher salary, my new manager Marion Moryl felt otherwise.

I had participated in developing the process closely supervised by the previous managers Brian Emmett and Scott Ignachuk who oversaw all manufacturing. It was disheartening to see the months of work I had put in with Rich Foulkes to develop characteristic embedded solid models and formats, only to have them overwritten. Even though they were furnished with clear requirements for the tool assembly prints, our tool design checkers were falling short and contributing to the manufacturing scrap rate and were not taking or being held responsible for the non-conforming work they produced.

This gave me a feeling of disappointment. It was an opportunity for leadership to intervene and set the process and record straight by taking a firm stance on deliverables. However, this would become a major contributor to my stress and anxiety. As the liaison between engineering and manufacturing, I became intimate with details, hearing all the complaints directed to my peers with the expectation that I correct the issues. Unfortunately, the fact was I could do nothing to curb their behavior or the product they were releasing to the manufacturing floor.

This distraction didn't impede me from my responsibilities to other engineering customers despite my group dynamics I delivered and exceeded expectations frequently.

(See below correspondence and e-mail as an example of work performed.)

Model Employee Attributes





Dear Alphonzia

When D.B. Wesson wrote the words, "No thing of importance comes without effort," he did so with first-hand knowledge regarding the truth of that statement and he subsequently made history. The story of Smith & Wesson is not only about two passionate and enterprising men; it is also the story of thousands of men and women who were equally dedicated and whose efforts forever earned Smith & Wesson a place in American History.

As our businesses continue to evolve, each of us must adapt in an increasingly dynamic world. As we do so, the expertise and wisdom we gain through time and effort contributes to our combined success. In addition, our vision and mission are only meaningful if each of us integrates them into our daily actions and decisions. Your efforts reflect these core values and I thank you for your many contributions. Your dedication to the success of Smith & Wesson and American Outdoor Brands is greatly appreciated each and every day.

On behalf of the leadership team, please consider this a small token of our esteem and recognition of the commitment and loyalty you have demonstrated. On behalf of everyone at American Outdoor Brands, thank you for your efforts and for carrying forward our founders' dreams of building a great company.

With respect,

*James*

James Debney

President and Chief Executive Officer

Delighting My Customer

### Jacobs, Alphonzia

| | |
|---|---|
| **From:** | Vega, Sam |
| **Sent:** | Friday, May 04, 2018 3:47 PM |
| **To:** | Fadus, Richard; Asselin, Andrew |
| **Cc:** | Jacobs, Alphonzia; Cirelli, Christopher |
| **Subject:** | RE: New Revolver Sideplate Fixture |

Great job guys!!! I really like this!

From: Fadus, Richard
Sent: Friday, May 04, 2018 3:44 PM
To: Vega, Sam <svega@smith-wesson.com>; Asselin, Andrew <aasselin@smith-wesson.com>
Cc: Jacobs, Alphonzia <ajacobs@smith-wesson.com>; Cirelli, Christopher <ccirelli@smith-wesson.com>
Subject: New Revolver Sideplate Fixture

Sam:

Per your request... here's what the fixture is going to look like. The tool designer is just wrapping things now and it will be in check Monday (the step before it gets to me).

As discussed, please let me know of any guns you can think of that have compensators on them. As you can see based on below we may have to have longer caliber inserts on that little turret. The only ones I can think of are the V-comp, M19, 929 and the 629. X frames are exempt since they're held differently on the laser.

Thanks,

Rick



Rick Fadus
Smith & Wesson

<u>Year 2019-2022</u>

The tool assembly process has been a constant cause of stress, anxiety, and disappointment for years. Smith & Wessons Inc., appeared complicit with my tool design counterparts when they acted deliberately overwriting files years earlier.

Fast forward six years of unchecked behavior, and no accountability, Smith & Wesson empowered my co-worker's negative behavior allowing the escalation of maliciously vulgar language among things that I was subjected to. I was told "I'm not Fucking doing that" by co-workers Jim Lepage and Mike Kenney during two separate instances of producing marked prints for incorporation constitutes that statement.

At one point I was forwarded an email that originated from Rich Picard who was now the Cutter Department Cell Coordinator to my manager Marion Moryl requesting the cease from releasing tool assembly prints to manufacturing until I had a chance to view and approve them.

Rich Picard referenced my knowledge of the process and stated I was the only one who knew what was going on about the tool setter process, and how instrumental a conforming print was to his department's success. Within that e-mail he showed an example to Marion what his team leaders were identifying as unacceptable prints, commenting to his recollection the prints were supposed to be getting better not worse that our group was supplying to his group.

That e-mail was purged from my inbox. As a result, I would ask if investigator Joseph Greenhalgh has the authority to exercise a subpoena for emails and certain individuals during my last year of employment. I believe there will be an incriminating read for sure.

I offer the above as an example of how hostile my workplace had become and how leadership stood by and did nothing to intervene with the circumstances it helped create. These incidents were reported and never had any resolution in the form of accountability.

Although two influential managers, Brian Emmett and Scott Ignachuk, collaborated with me and entrusted me to update the process, my involvement did not provide me with the necessary tools for additional compensation. However, I was able to become an area expert in the Tool Assembly Process.

This had little bearing on the tool design group and as a result, improving the substandard prints was ignored for years as if there was no value in making good prints, nor were they held accountable even though it was a major job deliverable. I assert that after years of egregious behavior, it had finally become unacceptable. Consequently, I was to be pulled back in after years of watching what I will describe as willful ignorance, which showed that my concerns were never taken seriously. I had previously described the circumstances we were facing years prior but was ignored when mentioned. Maybe that is why I was never notified by my leadership that I was to be responsible for checking all the tool assembly drawings before them being released. Instead, it came in a forwarded email from Mike Agan, the only one with more seniority in the group than me and who up to that point was releasing the files to manufacturing. I would also like to point out that there was no real dialogue in the below e-mail, only when a file was hot and possibly could affect production. At this point, it was a rush job. See below:

**Jacobs, Alphonzia**

| | |
|---|---|
| From: | Agan, Michael |
| Sent: | Wednesday, November 10, 2021 12:50 PM |
| To: | Jacobs, Alphonzia |
| Cc: | Miller, Daniel |
| Subject: | FW: CSX Slide TDR's |

Al checks all tool assys

From: Miller, Daniel <dmiller@smith-wesson.com>
Sent: Wednesday, November 10, 2021 12:49 PM
To: Agan, Michael <magan@smith-wesson.com>
Subject: CSX Slide TDR's

Hey Mike,

Can you push the two following TDR's through? They are hot.

- TDR-21-672
- TDR-21-681

Thanks,
Daniel Miller
Process Engineer
(413) 747-3264
Smith&Wesson

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) Is intended only for the use of the

As an employee, I've always turned to Human Resources to voice my concerns about rules and regulations that impact my job security and employability. This fell into one of those times.

I had a lengthy discussion with Senior Vice President Kathy Salvatore. It was at that time I expressed my frustrations with what was being asked of me again regarding the tool assemblies on the production floor. I informed her that I was not told by Marion Moryl my manager to check the group's work, but in an e-mail from Mike Agan, I was expected to do so. I also disclosed a major obstacle of being told "Fuck that I'm not doing that." When I issued a marked print for incorporation to group members Jim Lepage and Mike Kenney it was an impossible task.

Somehow unofficially, I was responsible for checking all the tool assembly files now. It was during our conversation she followed up by asking me about my pay. She then proceeded to look at my employment file, then stated that my pay had slipped below average again and that I should also add that to the conversation with my manager Marion, and then follow up with her afterward.

See below email from Mike Agan:

Jacobs, Alphonzia
_____

From:       Agan, Michael
Sent:       Thursday, October 21, 2021 10:07 AM
To:         Miller, Daniel
Cc:         Jacobs, Alphonzia; Picard, Rich
Subject:    RE: TTA8335

Dan,

Al has TTA8335 to check and Rich Picard needs to approve T15386.
I've copied them on this so they can help you out.

Mike

From: Miller, Daniel <dmiller@smith-wesson.com>
Sent: Thursday, October 21, 2021 9:10 AM
To: Agan, Michael <magan@smith-wesson.com>
Subject: TTA8335

Hey Mike,

TTA8335 is in drafting check. Can we put a rush on that drawing so we can get it out to the tool setters to make?

Also its drill T15386 is in business review, who do I contact to get that moving along?

Thanks,
Daniel Miller
Process Engineer
(413) 747-3264
Smith&Wesson

---

## CONTINUED CONCERNS WITH PAY, RACIST ATTITUDES, AND DEMEANING BEHAVIOR

It was apparent that my present leadership of Marion Moryl and John Pliska didn't realize that I raised the issue of pay upon entry into the engineering department and during my first review with then-engineering manager Brian Emmett, explained earlier in this document.

When I had the conversation with my manager Marion Moryl, I didn't feel like he cared about being fair or impartial on the contrary I felt like my concerns about racist attitudes and demeaning behavior towards me were being minimized. I left that meeting with my manager asking me what I thought about him asking the tool design group if I deserved a raise. These were the same individuals who I complained about days earlier telling me "fuck that I'm not doing that." Concerning a marked print.

I was blown away, the preferential treatment being shown to others in the group, was disheartening. I had never experienced nor could anticipate this form of structural racism exhibited by leadership, thus was clear benign neglect and racist behavior from management. I followed up our meeting with an e-mail summarizing the facts of that meeting, and shortly after there was an acceleration of forms of aggression, discrimination, and harassment from my engineering manager and director.

Here is an example of a concerted effort to undermine my work performance. This example shows the indifference the hierarchy of power holders exhibited trying to diminish the harassment that I experienced as I worked on this task.

- Mike Agan has a meeting with our manager Marion Moryl. During that meeting, he pitched a design for a file I was assigned.
- Marion called me to his office to discuss the files and task.
- He suggested that I use Mike's solid model, and blueprint file to complete the task, informing me that Mike already had them ready to use.
- I go with his suggestion and use his files and put it in Mike's cue to check
- To my surprise Mike rejected the file, and now it needs to be redesigned.
- The file starts to bounce back and forth between Mike Agan the creator and myself.
- After multiple rejections of the file he furnished, I requested a meeting with leadership.
- In that meeting I express my frustrations and concerns with Marion Moryl and John Pliska
- It was clear the engineering manager John Pliska was uncomfortable having to explain the rationale for so many rejections and then said he reviewed the process, and it looked like I was the problem.
- At that point we went over the blueprint one more time before I was to incorporate this next set of marked print changes.
- John Pliska assured me that everything was in accordance with the protocol and that the file would not come back.
- No one informed Mike Agan that the game was over, and he rejected the file yet again.

See below communication :

From: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Sent: Wednesday, March 16, 2022 10:16 AM
To: Moryl, Marion <mmoryl@smith-wesson.com>
Cc: Pliska, John <jpliska@smith-wesson.com>
Subject: RE: Please expedite

Good morning Marion In response to Sharon Smith's e-mail to S Ignachuck that you forwarded to me, these are the files that I raised concerns about back in January. I know we are all busy so let me refresh your memory. These are the files that you called me into your office to suggest Mike Agan's concept made since from a monetary stand point one-gauge vs two. I went with the suggested design only to have to improve upon the design, and then incorporate an extensive marked print. At this time, it must have been in checking because I received it back in rejected state two months later. When I brought my concern to you again about my feelings around the checking process at that point I was under the impression that you were going to follow up with Mike. That was back in January and because I never heard anything, I sent the files back to you on Monday. Tuesday, I get CC'd dialog from Ms. Smith regarding these gauges and questioning if the person that was assigned them still works here. An hour later the files are back in my task pane without any mediation or resolution of my raised concerns. In the interest of expediting these files it may be best to reassign TDR 21-456 & 21-457 to someone else because I've incorporated multiple marked prints and each time checking turns back my file with more updates.

Sincerely,

Al J

From: Moryl, Marion
Sent: Tuesday, March 15, 2022 5:15 PM
To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: Please expedite

Al,

We need to expedite all outstanding gaging listed below and the ones I have forward back you today. Most of them are from last year and production was expecting them months ego. Please review some of the TDR's and let me know which one you want to keep and the rest I will move around within the group to get them completed by end of next week. I will stop by and see you tomorrow.
Thanks,

Marion

I would like to highlight the psychological implications that these encounters had on my health. I was being barraged by leadership with issues that are all pessimistic, and subjective in measure. At this point my leadership started to act unscrupulous, trying to portray me as being the irrational, unreasonable one, adding to my stress and anxiety. I'm frustrated and not receiving any resolution from my manager Marion Moryl, so I follow the chain of command for myself and request a meeting with engineering director John Pliska.

During that meeting, we discussed how my manager Marion suggested that I use Mike Agan's file, and how Mike wouldn't promote his file and kept rejecting it. We went over the print extensively and he reassured me that this would be the last time I incorporated a marked print for this file because he couldn't explain why it kept coming back. Then I asked him about the tool assembly process and how I gave two of my peers marked prints to incorporate and was told "fuck that I'm not doing it" he acted shocked and appeared to write Jim Lepage and Mike Kenney's names in a notebook, but there was to be no follow up with John Pliska either.

See below the Non-discrimination and Non-harassment Policy:

**Smith&Wesson**

| Title: | HR-013 Non-Discrimination/Harassment Policy | Effective Date: | 06/14/2021 | Revision #: | 5 |
|--------|---------------------------------------------|-----------------|------------|-------------|---|

## SMITH & WESSON BRANDS, INC.

## NON-DISCRIMINATION AND NON-HARASSMENT POLICY

### 1. PURPOSE

1.1. It is the goal of Smith and Wesson Brands, Inc. and all of its subsidiaries (collectively the "Company") to promote and maintain a work environment free of any (a) unlawful discrimination and harassment based on race, color, religion, national origin, ancestry, sex, pregnancy, sexual orientation, gender identity, gender expression, parental status, marital status, order of protection status, age, disability, citizenship, veteran status, military status, unfavorable discharge from military service, genetic information or testing, or any other classification protected by federal, state, or local law in matters of employment and (b) sexual misconduct or sexual harassment.

1.2. Please note that while this policy sets forth Company's goals of promoting a workplace that is free from discrimination and harassment, this policy is not designed or intended to limit the Company's authority to discipline or take remedial action for workplace conduct that the Company deems unacceptable, regardless of whether that conduct satisfies the legal definition of discrimination or harassment based on sex or other protected classifications.

### 2. SCOPE

2.1. This policy applies to all employees of the Company.

### 3. POLICY

3.1. The Company does not tolerate unlawful discrimination, harassment, sexual misconduct, or sexual harassment in the workplace by employees, contract workers, vendors, suppliers, visitors, or family members of any of them. Its intent is to provide a work environment that is professional and free from intimidation, hostility, and other offenses that might interfere with employment or work performance, or any business relationships of the Company. All employees have a responsibility to keep the work environment free of such discrimination and harassment. Any employee found to have violated this policy will be subject to appropriate disciplinary action, up to and including termination of employment. Any non-employee found to have violated this policy may be subject to consequences deemed reasonable and appropriate by the Company. This policy prohibits improper conduct that courts may or may not find to be unlawful discrimination, harassment, sexual misconduct, or sexual harassment because it is Company's intent to encourage early reporting and resolution of complaints before the conduct becomes unlawful. This policy relates to conduct by a person of any gender and can occur between persons of the same or a different gender. The Company also has procedures relating to consensual romantic or sexual relationships.

3.2. **Discrimination.** It is a violation of the Company's policy to unlawfully discriminate against any employee or job applicant based on race, color, religion, national origin, ancestry, sex, pregnancy, sexual orientation, gender identity, gender expression, parental status, marital status, order of protection status, age, disability, citizenship, veteran status, military status, unfavorable discharge from military

**Smith&Wesson**

| Title: | HR-013 Non-Discrimination/Harassment Policy | Effective Date: | 06/14/2021 | Revision #: | 5 |
|--------|--------------------------------------------|-----------------|------------|-------------|---|

service, genetic information or testing, or any other classification protected by federal, state, or local law in matters of employment.

3.3. **Harassment.** It is a violation of the Company's policy to engage in unwelcome, hostile, or offensive conduct that is based on race, color, religion, national origin, ancestry, sex, pregnancy, sexual orientation, gender identity, gender expression, parental status, marital status, order of protection status, age, disability, citizenship, veteran status, military status, unfavorable discharge from military service, genetic information or testing, or any other protected status, in a manner such that interferes with an individual's performance or creates an intimidating, hostile, or offensive work environment. Harassing conduct includes, but is not limited to, slurs or negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; and display or circulation in the workplace of written or graphic material that denigrates or shows hostility or aversion toward an individual or group (including through email).

3.4. **Sexual misconduct, sexual harassment, and consensual romantic or sexual relationships.** It is a violation of the Company's policy to engage in sexual misconduct or sexual harassment in any manner or to engage in a consensual romantic or sexual relationship with any employee, contract worker, vendor, or supplier or family member of any of the them, without complying with the Company's procedures.

3.5. **TYPES OF SEXUAL CONDUCT AND RELATIONSHIPS COVERED BY THIS POLICY**

3.5.1. Sexual harassment means any unwelcome sexual advances, requests for sexual favors, or other physical, verbal, or visual conduct of a sexual nature when:

3.5.1.1. Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment by the Company, or any direct or indirect affiliation with the Company

3.5.1.2. Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual or any vendor or supplier to the Company

3.5.1.3. The conduct has the purpose or effect of unreasonably interfering with an individual's work performance at the Company or with any vendor or supplier to the Company; or

3.5.1.4. The conduct creates an intimidating, hostile, or offensive work environment at the Company.

3.5.2. The following examples of sexual harassment are intended to be guidelines and are not exclusive when determining whether there has been a violation of this policy:

3.5.2.1. Verbal sexual harassment includes innuendoes, suggestive comments, jokes of a sexual nature, sexual propositions, lewd remarks and threats, requests for any type of sexual favor (including repeated, unwelcome requests for dates), and verbal abuse or "kidding" that is oriented toward a prohibitive form of harassment, including that which is sexual in nature, inappropriate, and unwelcome.

Now I'm going to highlight an element of harassment concerning the work and checking process that I complained about many times. The process of creating a blueprint that meets design intent in Smith & Wesson Inc. became another topic of concern that I believe will show my unfair treatment.

This encounter started with being called into my manager Marion Moryl's office so we could discuss one of my assigned tasks. During our discussion, he informed me that the checker Mike Agan showed him a design for one of the tasks that he had assigned to me. I told him, that Mike and I hadn't spoken about the file at that point and it was a surprise that he came to talk to him in regards to the file. There was no response as to why the checker went to discuss my task with my boss before speaking to me...Instead, his response was Mike showed him a concept that eliminated one fixture from the build and he agreed from a cost standpoint. I mentioned that his concept didn't meet the engineer's TDR. It was at this time he suggested that I utilize Mike's design, anyway. He told me that Mike already had the solid model and print complete. All I had to do was use it. As any other rational employee, when your manager makes a suggestion adhere to the request. I do so and as it would have it. Once I put the file in for checking, Mike rejected his file and handed me a marked print to incorporate. After incorporating three or more marked prints I informed my manager, that the file that he suggested that I use can't seem to make it through the checking process of its creator. These concerns were also ignored. Later he sends myself and Director Pliska this email repeatedly asking about the status as if we never conversed about the file.

---

**Jacobs, Alphonzia**

| | |
|---|---|
| From: | Pliska, John |
| Sent: | Thursday, April 07, 2022 5:27 PM |
| To: | Jacobs, Alphonzia; Moryl, Marion |
| Subject: | RE: 'Drawing Print' 'G10651' A |

Marion,
Please forward this TDR on. This needs to get completed.

Al,
The print we reviewed had the design for a SD 9mm sear. The request is for a Firing Pin Retainer Plate fixture. That is what the checker is seeing. That is why its being rejected.

-----Original Message-----
From: Jacobs, Alphonzia
Sent: Tuesday, March 29, 2022 11:41 AM
To: Moryl, Marion <mmoryl@smith-wesson.com>
Cc: Pliska, John <jpliska@smith-wesson.com>
Subject: FW: 'Drawing Print' 'G10651' A

Good morning just following up with our conversation that we had on March 18th regarding the checking of TDR's 21-456 & 21-457...

During that meeting I conveyed my concerns regarding the checking process, in particular how many times I've incorporated changes to a file that was supplied to me and how it felt like I would never complete the task. The determination of your review was "that the process looked fine and I'm the only one who seems to be having these issues". I left assured that the process was good and the file would not come back, but as you can see the file was rejected again...

Regards,

Al J

-----Original Message-----
From: Mike Agan <magan@smith-wesson.com>
Sent: Monday, March 28, 2022 9:06 AM
To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: 'Drawing Print' 'G10651' A

1

**Jacobs, Alphonzia**

| | |
|---|---|
| **From:** | Pliska, John |
| **Sent:** | Monday, April 11, 2022 12:36 PM |
| **To:** | Jacobs, Alphonzia |
| **Cc:** | Moryl, Marion |
| **Subject:** | Re: 'Drawing Print' 'G10651' A |

Al,

The request of the checker was legitimate. This could have been resolve by simply talking with the checker. I'm moving the task because needs to get completed.

John Pliska
Director of Engineering, Facilities & Maintenance
Smith & Wesson

Sent from my iPhone

> On Apr 11, 2022, at 11:36 AM, Jacobs, Alphonzia <ajacobs@smith-wesson.com> wrote:
>
> Good morning my apologize for the delayed response. I see I missed some correspondence when I was out last week due to my wife contracting Covid. With all due respect John the last of many requests were.
> "Take SolidWorks drawing G10651, renumber as G10652 and resubmit". I did and now the part that is being fixtured changed...FYI each product print calls out six different profiles that will need multiple orientations so they can be checked.
>
> I thank you for having this task reassigned, it feels like a weight has been lifted of me...
>
> Sincerely,
>
> Al J
>
> -----Original Message-----
> From: Moryl, Marion
> Sent: Friday, April 08, 2022 11:42 AM
> To: Pliska, John <jpliska@smith-wesson.com>; Jacobs, Alphonzia <ajacobs@smith-wesson.com>
> Subject: RE: 'Drawing Print' 'G10651' A
>
> Will do.
>
> -----Original Message-----
> From: Pliska, John <jpliska@smith-wesson.com>
> Sent: Thursday, April 07, 2022 5:27 PM
> To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>; Moryl, Marion <mmoryl@smith-wesson.com>
> Subject: RE: 'Drawing Print' 'G10651' A
>
> Marlon,
> Please forward this TDR on. This needs to get completed.

1

AJ,

The print we reviewed had the design for a SD 9mm sear. The request is for a Firing Pin Retainer Plate fixture. That is what the checker is seeing. That is why its being rejected.

---Original Message-----
From: Jacobs, Alphonzia
Sent: Tuesday, March 29, 2022 11:41 AM
To: Moryl, Marion <mmoryl@smith-wesson.com>
Cc: Pliska, John <jpliska@smith-wesson.com>
Subject: FW: 'Drawing Print' 'G10651' A

Good morning Just following up with our conversation that we had on March 18th regarding the checking of TDR's 21-456 & 21-457...

During that meeting I conveyed my concerns regarding the checking process, In particular how many times I've incorporated changes to a file that was supplied to me and how it felt like I would never complete the task. The determination of your review was "that the process looked fine and I'm the only one who seems to be having these issues". I left assured that the process was good and the file would not come back, but as you can see the file was rejected again...

Regards,

Al J                            :

----Original Message----
From: Mike Agan <magan@smith-wesson.com>
Sent: Monday, March 28, 2022 9:06 AM
To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: 'Drawing Print' 'G10651' A

Business Object: Inbox Task IT-0411686

http://matrix.smith-
wesson.com/ematrix/common/emxNavigator.jsp?objectId=41723.36060.22591.41800

Your task Instructions are:
G10651 was rejected by magan. Rejection Comments are: FOR 3011022, FIRING PIN RETAINER PLATE

To find out more about the Task, use the following URL:
http://matrix.smith-
wesson.com/ematrix/common/emxNavigator.jsp?objectId=41723.36060.55748.32570

This message, Including all attachments: (I) May contain technical data as defined in the International

2

Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged,

confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.



This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) Is intended only for the use of the Individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

Leadership Mischaracterizing The Facts in Exhibits

Here is an example of bullying.

As the area expert, I'm aware that our customer The Process Engineering Group utilizes our solid models to verify tool path clearance during the Computer Aided Manufacturing process. I noticed my peer Mike Agan attempting to undermine the process and circumvent the system by placing a PDF file in place of a solid model component-based tool assembly. I pointed this out to Mike during the checking process as it was completely non-conforming to the process. He ignored our conversation and my marked print for a month. I get called into my manager's office where I explain all of the files nonconforming attributes. To no consequence, my manager Marion Moryl forced me to release the file in its non-conforming state. Before I left his office I informed him that I would comply with his directive and then leave for the rest of the day. I left that day very frustrated with my manager Marion Moryl, instead of gaining his understanding to the process that could be verified by other experts, he sought to use this as a chance to slander my name to Kristen Capannola and John Pliska mischaracterizing the facts and blatantly lying saying I stormed out of his office in the months to follow.

See below:

**Jacobs, Alphonzia**

| | |
|---|---|
| From: | Jacobs, Alphonzia |
| Sent: | Wednesday, November 24, 2021 10:38 AM |
| To: | Kaczor, Ryszard; Agan, Michael |
| Cc: | Moryl, Marion |
| Subject: | RE: 3013230 X350 cylinder |

Sorry Rysz, I didn't follow up with Marion yet...

From: Kaczor, Ryszard
Sent: Wednesday, November 24, 2021 9:38 AM
To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>; Agan, Michael <magan@smith-wesson.com>
Cc: Moryl, Marion <mmoryl@smith-wesson.com>
Subject: RE: 3013230 X350 cylinder

Hi AJ,

Any updates on this print ?I need it to complete my process documentation for 350 Legend cylinder.
Thanks for your help,

Rich

From: Jacobs, Alphonzia
Sent: Tuesday, November 23, 2021 9:02 AM
To: Agan, Michael <magan@smith-wesson.com>; Kaczor, Ryszard <rkaczor@smith-wesson.com>
Cc: Moryl, Marion <mmoryl@smith-wesson.com>
Subject: RE: 3013230 X350 cylinder

Mike since when do we only provide pdf files? We own the process and all definition in its entirety...
Let me know when you update the file and I will check it out.

Regards,

AJ

1

From: Agan, Michael
Sent: Tuesday, November 23, 2021 7:52 AM
To: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Cc: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: RE: 3013230 X350 cylinder

Rich-does Cylinder set their own tools?

From: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Sent: Tuesday, November 23, 2021 7:23 AM
To: Agan, Michael <magan@smith-wesson.com>
Cc: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: RE: 3013230 X350 cylinder

Mike,

For our tool assembly drawings we only provide pdfs.

Rich

From: Agan, Michael
Sent: Tuesday, November 23, 2021 7:15 AM
To: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Cc: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: RE: 3013230 X350 cylinder

Al,
Please check OTA0206.

Rich,
Can you pack'n'go the original Solidworks drawing and assembly? Or is this an automated file?

Mike

From: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Sent: Monday, November 22, 2021 3:27 PM
To: Agan, Michael <magan@smith-wesson.com>
Subject: FW: 3013230 X350 cylinder

2

Mike,

See attached dwg.
Thanks,

Rich

From: Moryl, Marion
Sent: Monday, November 22, 2021 3:18 PM
To: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Cc: Agan, Michael <magan@smith-wesson.com>
Subject: RE: 3013230 X350 cylinder

Assigned to Mike.

From: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Sent: Monday, November 22, 2021 2:19 PM
To: Moryl, Marion <mmoryl@smith-wesson.com>
Cc: Agan, Michael <magan@smith-wesson.com>
Subject: FW: 3013230 X350 cylinder

Marion,

Can you assign TDR-21-726 to tool designer?
It's for tool assembly OTA0206 (350 legend chamber reamer).
I already have finished drawing that needs to be put in Matrix (should be quick).
Thanks,

Rich

From: Ignachuck, Scott
Sent: Monday, November 22, 2021 1:45 PM
To: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Cc: Moryl, Marion <mmoryl@smith-wesson.com>; Gallant, Kristopher <kgallant@smith-wesson.com>
Subject: 3013230 X350 cylinder

3

Rich, I sent you the Rev A drawing print task for the X350 cylinder. This means it has passed First Article Inspection and testing. Please make sure everything is production ready:

- MMR complete to flip routing and BOM to production
- New tool assemblies have drawings released in Matrix and viewable on Parlec
- New cutters are set up and stocked in Autocrib
- Programs ready and available in CPMS

If you have any questions or need help with any of this, Kris Gallant can provide guidance.

Scott

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

**Moryl, Marion**

| | |
|---|---|
| From: | Capannola, Kristen |
| Sent: | Monday, January 17, 2022 4:16 PM |
| To: | Moryl, Marion |
| Subject: | RE: Al Jacobs Incident 11/30 |

Thanks – let me know what happens when you speak with him tomorrow about his incidents of leaving early last Thurs and Friday

 **Kristen Capannola**
*Senior HR Business Partner*

From: Moryl, Marion
Sent: Monday, January 17, 2022 12:21 PM
To: Capannola, Kristen <kcapannola@smith-wesson.com>
Subject: Al Jacobs Incident 11/30

Hi Kristen,

We had a critical project tool update that needed to be pushed through the matrix right away and I asked Al to process this per Rich Kaczor request.
Al had an issue with older drawing template that was used at that time and he refused to complete the task as instructed. After a brief conversation
to explain the reason we need this task done per engineering request Al stormed out and left work. I did brought up this incident to John Pliska and we
decided to talk to him following day to understand his frustration. After 10-15 conversation he understood he can't lose his temper and just get up and leave work.
From my understanding Al got a break and knew I have to follow the policy in any future non-compliance from him.

25

<u>Collaborative, Cruel, Unscrupulous, Abusive, and Vindictive Behavior</u>

The below e-mail culminates all my previous concerns. Despite Attorney's DeProspo Jr stating that there were no issues with my performance during our Zoom conference. My leadership appears to be moving clandestinely fabricating the need for me to be put on a Personal Improvement Plan - PIP Instead of addressing any of the many circumstances that I shared that involved misconduct, discriminatory, or harassing behavior. The hypocrisy of leadership concerning these circumstances should be noted, Marion Moryl used his power to silence my previous concerns, he then changed the narrative to assign blame and slander my name in an attempt to justify his inactions to suit those in Human Resources unaware I raised concerns of compliance involving the same file to the process. Despite his efforts, the facts remain.

- Pressured me to release a non-conforming file.
- Mischaracterized the fact when he stated I refused to complete an engineering request.
- Slandered my abilities when he implied I was falling short in job performance.
- Lacked compliance with protocol when he discredited my concerns.
- These are the types of actions that contributed to my psychological abuse.

**Pamela Peck**

| | |
|---|---|
| **From:** | Capannola, Kristen <kcapannola@smith-wesson.com> |
| **Sent:** | Tuesday, February 1, 2022 4:50 PM |
| **To:** | Alexander, Nasia; Cirillo, Danielle |
| **Cc:** | Moryl, Marion |
| **Subject:** | FW: Al Jacobs |

Hi guys – just wanted to bring you up to speed on some issues we're having with Al's performance.
Marion will let us know if Al is able to complete his current tasks within the time period required, or if we are headed towards preparing a PIP.



**Kristen Capannola**
*Senior HR Business Partner*

From: Moryl, Marion
Sent: Tuesday, February 1, 2022 4:42 PM
To: Capannola, Kristen <kcapannola@smith-wesson.com>
Subject: Al Jacobs

Hi Kristen,

I was told to document most recent incident with Al. As you may know Al has been given tasks over last few months which he
refused to complete per engineering requests and at one time lost his temper and decided to leave work for rest of the day without submitting absence in ADP.
We did have a meeting with Scott Ignachuck, Rich Picard, Al Jacobs and myself to go over his concerns and agree on specific tasks definition and
manager responsible (myself) to make final decisions when it comes to any matrix tasks. As of right now Al has over 150+ tool/assembly drawings to complete on which
we both agree will take 80 hours to complete (meeting (1/27/22). I did verify with Scott time requirement for this project and he did agree that time frame was more than satisfactory.

*Marion Moryl*

**Engineering Manager**
*Smith & Wesson*
*2100 Roosevelt Ave., P O Box 2208*
*Springfield, MA 01104*
Office: 1-413-747-6292
Mobile: (413) 262-4652
email: mmoryl@smith-wesson.com



Please visit our website at www.smith-wesson.com

1

Here is an example of how Manager Marion Moryl ignored my concerns for months, then later adapted a negative narrative chastising me in an e-mail with the person solely responsible for the task not being completed. This was a virtual slap in the face causing undue stress and anxiety. The treatment that I experienced during this task reflects a racial undertone, and as a result, I could not "just do my job". I was subject to unfair scrutiny, from someone who had no clue regarding process and procedures. The only thing that was starting to ring true was that the checking process was being used as a means of harassment and was allowed to do so because of the following facts.

- This was a major public relations FUBAR moment for Smith & Wesson Inc., Engineering
- Intern Gabriella Pires created the files and performed her tasks under the direction of Senior Tool Designer Mike Agan until I was asked to step in.
- Grabriella has to give some sort of account to The Western New England University Engineering Department whether favorable or not.
- Our customer/Cutter Grind's Tool Setter Department rejected all of the interns' tool assembly prints and elevated them through the chain of command until they reached the Cell Coordinator.
- The Cutter Grind Department Cell Coordinator requested by e-mail that our group halt all tool assembly prints until I had a chance to review them.
- During my file review I uncovered that all the files were not just substandard from the tool setter group requirements to set the assembly for cutting in the C.N.C. machines, the files also violated our official file management system Matrix.
- I had to coordinate with Bob Shumsky who controls all file management to have the first 30 tool assembly drawings purged from the system.
- Despite being the area expert, I was having a hard time getting the tool assemblies released because Gavin Giguere was repeatedly rejecting the files with no real explanation.
- Due to the excessive number of rejections, I spoke with Marion Moryl regarding Gavin's new discretionary release of the files, suddenly.
- There was no leadership intervention for months.

See related email below:

## Jacobs, Alphonzia

| | |
|---|---|
| **From:** | Jacobs, Alphonzia |
| **Sent:** | Thursday, June 02, 2022 9:11 AM |
| **To:** | Moryl, Marion; Giguere, Gavin |
| **Subject:** | RE: New Gemtech Tool Assemblies |

Good morning all, Marion I got involved with this task when Rich Picard forwarded you an e-mail from his team leaders complaining about the tool assemblies Gavin had released to the floor. At that time my task was to clean up his prints. However to put it frankly Gavin is getting in his own way in regards to the multiple times these files are being rejected before completion.

The first go round he appeared not to care what was on the print, but now that I'm working on it everything is under extreme scrutiny. I've mentioned this to you in the early days of my accepting those tasks to check and now it's been months and I'm still not complete with his 30 tool assemblies. I am very frustrated at that fact, but, it is out of my control when Gavin keeps rejecting my work as if I don't know what I'm doing. He was and still is under the false impression he owns my print and can dictate what goes on it, and their lies the problem. I would be happy to sit with Gavin and yourself to finally hash this out or you can reassign, whatever you think is best. At this time the only thing we seem to agree on is that this should have been done a long time ago...

I can use Rob Marsland's task as an example...
I jumped off Gavin's TDR and created 150 cutters & tool assemblies and got them through checking to the production floor for Rob Marsland in two weeks...

Again all I can do is update the files which in this case seems like I'm chasing my tail...So you would be doing me a favor taking me off his task.

Regards,

Al J

From: Moryl, Marion <mmoryl@smith-wesson.com>
Sent: Friday, May 27, 2022 4:49 PM
To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>; Giguere, Gavin <ggiguere@smith-wesson.com>
Subject: RE: New Gemtech Tool Assemblies

Al,

What's going on with this request? It is absolutely critical we push NPD tooling through right away. If there's an issue Gavin is just
two steps away from where you sit and things like this cannot hold up urgent projects.

Gavin,

I will reassign your request and I will make sure this is completed right away. I apologize for the delay.

*Marion Moryl*

1

<u>Racist Techniques are used to dilute concerns.</u>

During a meeting on January 27[th,] 2022 about compensation, my manager asked me if I thought he should go ask my co-workers if I deserved a raise. When I followed up with an email acknowledging this and how I felt it was inappropriate for him to make that suggestion to John Pliska, his boss there was no follow-up, other than additional aggression that came in the form of a corrective action later that day.

I believe this encounter to be unjust and racially motivated. The Corrective Action Notice I received with no basis from my manager Marion Moryl alleging that on January 14 I failed to give proper notice to take time off from work and left early without contacting him was another show of power. I offer the below contradiction to his allegation. I provided notice on 01/11/2022 by a text message to Mr. Moryl 3 days prior concerning my childhood friend's funeral arrangements.

On the day of the funeral, Mr. Moryl abruptly scheduled a meeting during the same time as my friend's service. The meeting was in regard to the tool assembly issues I raised and requested a meeting months earlier. I attended the meeting despite the conflict in time, then left for the service immediately after. In attendance at this meeting were Scott Ignachuk (Director of Manufacturing), Richard Foulkes (Lead Process Engineer), Rich Picard (Cutter Grind Cell Coordinator), Bill Copson (Lead Engineer over Cutter Dept.), Marion Moryl (Engineer Manager), and me. Please see the text message below, following the disputed Corrective Action Notice.

**Moryl, Marion**

| | |
|---|---|
| **From:** | Moryl, Marion |
| **Sent:** | Thursday, January 27, 2022 8:24 AM |
| **To:** | Jacobs, Alphonzia |
| **Subject:** | RE: Verbal warning |

HIAl,

Stop by and see me when you can so I can explain the performance evaluation process. Thanks,

From: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Sent: Thursday, January 27, 2022 8:20 AM
To: Moryl, Marion <mmoryl@smith-wesson.com>
Subject: RE: Verbal warning

I'm sure there was already a plan to elevate my pay...That didn't happen and now I'm just pointing out again I'm below average when it comes to the pay-scale.

From: Moryl, Marion
Sent: Thursday, January 27, 2022 8:05 AM
To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: RE: Verbal warning

All evaluations are performance based. Not sure what you mean by discrepancy.

From: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Sent: Thursday, January 27, 2022 8:00 AM
To: Moryl, Marion <mmoryl@smith-wesson.com>
Subject: RE: Verbal warning

That in my opinion is part of the discrepancy...None of my evaluations have been bad yet I'm on the lower end of compensation.

From: Moryl, Marion
Sent: Wednesday, January 26, 2022 4:00 PM
To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: RE: Verbal warning

I will not. Evaluation will be performance based.

From: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Sent: Wednesday, January 26, 2022 10:57 AM
To: Moryl, Marion <mmoryl@smith-wesson.com>
Subject: Verbal warning

Hey the verbal warning that you spoke about won't affect me getting additional compensation because of some unknown factor will it?

20

# Corrective Action Notice

**⑆ Smith&Wesson®**

| Employee Name: Jacobs Alphonzia | Department: 13900 |
|---|---|
| Badge #:13531 | Date Presented: 1/27/22 |

## Disciplinary Level

☒ First Written Warning – *(Active for one (1) year)*
☐ Final Written Warning – *(Active for one (1) year)*
☐ Suspension/Investigation & Review to Determine Continued Employment –
*(Active for two (2) years)* – Dates of Suspension: _____

**Subject** (Reason for discipline):   | **Attendance** |

☐ Policy/Procedure Violation
☐ Behavior/Conduct Infraction
☒ Absenteeism/Tardiness

## Prior Notifications

| Level of Discipline | Date | Subject |
|---|---|---|
| First Written | | |
| Final Written | | |
| Suspension/Investigation | | |

### Incident Description and Supporting Details:
Include the following information: Date & Time of Incident, Description, Persons Involved

On January 14th Al failed to give proper notice to take time off from work and left early without contacting his active manager.

---

### Performance Improvement Plan

---

1. Measurable/Tangible Improvement Goals:
2. Training or Special Direction to Be Provided:
3. Interim Performance Evaluation Necessary?
4. Our Employee Assistance Program (EAP) Provider, ESI, can be confidentially reached to assist you at (800) 252-4555. This is strictly voluntary. A pamphlet regarding the EAP's services is available from Human Resources, or at www.theEAP.com.

---

### Employee Comments

---

(Attach additional sheets if needed)

Pursuant to Massachusetts Law, you are being formally notified that this document, along with any and all attachments, will be placed in your personnel file and may negatively impact your opportunities for employment, promotion, transfer, additional compensation and/or disciplinary action now or in the future.

This corrective action should not be taken lightly, and any further violation of company rules will result in additional disciplinary action up to and including termination of employment.

### Employee Acknowledgment

I understand that Smith & Wesson is an "at-will" employer, meaning my employment has no specified term and that the employment relationship may be terminated any time at the will of either party upon notice to the other. I also realize that Smith & Wesson is opting to provide me with corrective action measures, and can terminate such measures at any time, solely at its own discretion, and that the use of progressive discipline will not change my at-will employment status.

I have received a copy of this corrective action notice. It has been discussed with me, and I have been advised to take time to consider it before I sign it. I have indicated my opinion regarding this notice below:

☐ I agree with this corrective action.

☑ I disagree with this corrective action.
(add comments above)

Employee Signature        Date

Employee Signature        Date

**Management Signatures**

Team Leader        Date

Cell Coordinator        Date    1/27/22

Human Resources        Date    2/15/22

☐ Copy to Personnel File
☐ Copy to Employee



Marion >

iMessage
Tue, Jan 11, 10:53 AM



**Obituary for Philip Anthony Malone at Henderson's Funeral...**
hendersonsfh.com

Another good friend has been called home 😔

Delivered



PHYSICAL HEALTH CHALLENGES AND DIAGNOSIS

The exacerbation of my health was starting to become evident. I was at work one morning and was feeling under the weather when I contacted a doctor through the Smith & Wesson 98.6 platform application. It was during that interaction that I was told to leave work immediately and visit an urgent care facility. Urgent Care didn't have the equipment to diagnose my heart issue and sent me to the emergency room. Once seen by an E.R. doctor, I was admitted to the hospital from July 6th through July 9th, 2021.

These events prompted my application for MA PFML through The Standard, which states that employees with medical conditions can qualify for Paid family and medical leave of which I only used 12 weeks, not coming close to exhausting the 20-week maximum allowance according to Massachusetts law. This makes Smith & Wesson Inc,. libel when it retaliated against me for raising concerns about its leadership, causing the denial of my extension and terminating my employment while out on protected leave.

At this point, I would like to highlight my interaction with The Standard, in particular, how many times the Standard requested to have my doctor fill out the same forms over and over and over again. As always, I brought my concern to Human Resources, and they informed me that Smith & Wesson Inc. allows the Standard to manage and administer benefits, and Smith & Wesson had no control over their process. I took that as an overt act that allowed Smith & Wesson to skirt their responsibilities once again. The un-talked-about advantage to this was, that they claimed to have no control over the insurance benefits being paid out or lack thereof. I was skeptical of that answer because I knew of one matter that occurred months earlier when they used the same tactics with my friend Vinnie Brower, an employee who went out with lead poisoning and was forced to come back to work against his doctors' orders. He told me he had no choice but to return because the alternative was being evicted from his apartment because the Standard didn't send him his check. Little did I know the same playbook would be used on me later. Again, I doubt it was just a coincidence that another Black Man was being taken advantage of. The culture promoted it. My personal experience was dreadful, unusually difficult, and nerve-racking to say the least. Something as routine as turning in requested medical documentation turned into an exhausting correspondence of requests. I submit the following as proof of an obstructive process that ensures Smith & Wesson benefits in the form of slowly compensating the employee as a delayed tactic.

See the below correspondence between my cardiologist and the Standard where there are repeated requests on the following dates: 10/19/2021, 3/21/2022, 4/29/2022, 5/25/, and 5/27/2022.

It was while out on MA PFML one of my coworkers decided to write these degrading remarks on my whiteboard.



## Transmission Report

| | | | | |
|---|---|---|---|---|
| Date/Time | 05-31-2022 | 15:18:14 | Transmit Header Text | |
| Local ID 1 | 4137487191 | | Local Name 1 | PVC |

**This document : Confirmed**
**(reduced sample and details below)**
**Document size : 8.5"x11"**

05/27/22 14:03:04 · -> 4137487191 · Page 001

STANDARD INSURANCE COMPANY
Absence Management Service Center
PO BOX 3877
Portland, OR 97208
CUSTOMER SERVICE NUMBER: (866) 756-8116
FAX: (856) 751-5174

TheStandard

Date: 5/27/2022 4:02:20 PM Pages: 3

To: ATTN: Dr. Hadad / Re: Alphonsis Jacobs Fax: 4137487191

From: Customer Service Fax:

Dept: Absence Management

Your patient recently initiated a short term disability claim with The Standard. Attached, please find an Attending Physician Statement (APS) for completion. Please complete this form and return it to our office via fax. Fax# 866-751-5174.

Prompt completion of APS will allow us to process your patient's disability claim quickly.

Thank you for your assistance in this matter.

WARNING: PRIVILEGED AND CONFIDENTIAL MATERIAL

The information contained in this facsimile message is confidential, privileged, and exempt from disclosure to third persons and is intended solely for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any retention, dissemination, distribution, copying, or unauthorized use of this communication is strictly prohibited. If you have received this facsimile in error, please notify the sender immediately by telephone, and also return the facsimile and any copies thereof to the sender at the above address via the U.S. Postal Service. All postal expenses will be paid by sender. Thank you.

Original available upon request

Total Pages Scanned : 3 Total Pages Confirmed : 3

| No. | Job | Remote Station | Start Time | Duration | Pages | Line | Mode | Job Type | Results |
|---|---|---|---|---|---|---|---|---|---|
| 001 | 576 | . | 15:16:15 05-31-2022 | 00:01:37 | 3/3 | 1 | EC | HS | CP14400 |

Abbreviations:

| | | | | |
|---|---|---|---|---|
| HS: Host send | PL: Polled local | MP: Mailbox print | CP: Completed | TS: Terminated by system |
| HR: Host receive | PR: Polled remote | RP: Report | FA: Fail | G3: Group 3 |
| WS: Waiting send | MS: Mailbox save | FF: Fax Forward | TU: Terminated by user | EC: Error Correct |

B5/27/22  14:03:04    .                    ->              4137487191 .                        Page 001

STANDARD INSURANCE COMPANY
Absence Management Service Center
PO BOX 3877
Portland, OR 97208
CUSTOMER SERVICE NUMBER: (866) 756-8116
FAX: (866) 751-5174



TheStandard™
Positively different

| | | | |
|---|---|---|---|
| Date: | 5/27/2022 4:02:20 PM | Pages: | 3 |
| To: | ATTN: Dr. Hadad / Re: Alphonzia Jacobs | Fax: | 4137487191 |
| From: | Customer Service | Fax: | |
| Dept: | Absence Management | | |

Your patient recently initiated a short term disability claim with The Standard. Attached, please find an Attending Physician Statement (APS) for completion. **Please complete this form and return it to our office via fax. Fax# 866-751-5174.**

Prompt completion of APS will allow us to process your patient's disability claim quickly.

Thank you for your assistance in this matter.

## WARNING: PRIVILEGED AND CONFIDENTIAL MATERIAL

The information contained in this facsimile message is confidential, privileged, and exempt from disclosure to third persons and is intended solely for the use of the individual or entity named above. If the recipient or reader of this message I s not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any retention, dissemination, distribution, copying, or unauthorized use of this communication is strictly prohibited. If you have received this facsimile in error, please notify the sender immediately by telephone, and also return the facsimile and any copies thereof to the sender at the above address via the U.S. Postal Service. All postal expenses will be paid by sender. Thank you.

Original available upon request.

05/27/22  14:83:16  .                    ->            4137487191 .                Page 882

**Standard Insurance Company**

866.756.8116 Tel  866.751.5174 Fax
PO Box 3877  Portland OR 97208

**Disability Claim/Family Medical Leave**
**Attending Physician's Statement**

## To Be Completed By Employee

| Full Name: Alphonzla Jacobs 00JC6618 - DOB: ███ 1969 | Employer/Company Name: | Group Policy No.: |
|---|---|---|

Federal law requires us to notify you that sections marked with * are required for purposes of completing your disability claim.

## To Be Completed By The Attending Physician

The following information is needed to document the patient's inability to work. The patient is responsible for obtaining a complete form without expense to The Standard. Please complete this form and mail or fax it to The Standard using the contact information listed above.

| 1. Diagnosis | A. Diagnosis CHF CM | | | ICDA Classification 370 150.9  142.9  150.00 |
|---|---|---|---|---|

| B Symptoms dyspnea   lower extremity edema | *C. Height 6'1" | Weight 215 lbs | B/P 126/98 |
|---|---|---|---|

| 2. Pregnancy (if applicable) | A. Expected date of delivery | B. Actual date of delivery | ☐ Vaginal  ☐ C-section |
|---|---|---|---|

| 3. History and Treatment | A. Date you recommended the patient stop work | B. When did symptoms appear or accident happen? 7-6-21 |
|---|---|---|

*C. Has the patient ever had the same or similar condition? ☐ Yes ☐ No     If yes, when?

*D. Is this condition related to the patient's employment? ☐ Yes ☑ No    *E. Did you complete a Workers' Compensation claim form? ☑ Yes ☐ No

| F. Date of first visit for this condition 7-6-21 hospital | G. Frequency of subsequent visits: ☐ Weekly ☐ Monthly ☑ Other every 3-4 months | H. Date of most recent visit 3-28-22 |
|---|---|---|

I. Describe planned course and duration of treatment

| J. Hospitalization? ☑ Yes ☐ No | K. Date Admitted 7-6-21 | Date Discharged 7-9-21 | L. Surgery? ☐ Yes ☑ No | M. Date Surgery Completed/Scheduled |
|---|---|---|---|---|

| N. Reason/Surgery Type | O. Surgery/Post-Surgery Complications? ☐ Yes ☐ No   If yes, please describe |
|---|---|

**4. Level of Functional Impairment** *Please attach recent chart notes/pertinent records.*

A. Describe patient's physical and/or mental limitations and restrictions (functional capacity).
Reduced EF, lift/push/pull weight restrictions

B. Factors Delaying Recovery (if applicable)

C. How long do you expect these limitations and restrictions to impair your patient?
☐ Date expected to return to work _____  ☑ Unable to determine, follow up in 8/10/2022 weeks  ☐ Permanently

*D. Is the patient competent to manage insurance benefits? ☑ Yes ☐ No
If no, is the patient competent to appoint someone to help manage the insurance benefits? ☐ Yes ☐ No

**5. Physician Information** *Please type or print.*

| Name of physician completing this form Elizabeth Peckham | Specialty Cardiology | | | Phone No. (413) 748-7095 |
|---|---|---|---|---|
| Address 300 Stafford St. | City Springfield | State MA | ZIP 01104 | Fax No. (413) 748-7191 |

*Acknowledgement — I certify that the answers I have made to the above questions are complete and true to the best of my knowledge and belief. I acknowledge that I have read the fraud notice on page 2 of this form.

Signature _____     Date 5/31/2022

51 14550                    1 of 2                    (5/13)

Jacobs, Alphonzia (MRN 687046)                                    Encounter Date: 10/19/2021

██ -69

## Jacobs, Alphonzia                                             MRN: 687046

**Telephone** 10/19/2021        Provider: Elizabeth Nicole Peckham, NP (Cardiology)
Cardio PVC POC 154              Reason for call: other

### Conversation: other                                          (Newest Message First)

October 19, 2021

Jillian Menec R.M.A.

Note 🔺 📧                                          4:40 PM            JM

Copy sent to be scanned in

Jillian Menec R.M.A.

Note 🔺 📧                                          4:30 PM            JM

Disability claim form from standard insurance company filled out by ENP. I
have faxed it to them and mailed the pt a copy also

### Media
From this encounter

Scan on 10/21/2021  3:13 PM by Sasha Otanez: FORM

### Orders Placed

None

### Medication Renewals and Changes
As of 10/19/2021  4:40 PM

None

### Medication List at End of Visit
As of 10/19/2021  4:40 PM

|  | Refills | Start Date | End Date |
|---|---|---|---|
| aspirin 81 MG EC tablet |  |  | 8/10/2022 |
| Take 81 mg by mouth. - Oral |  |  |  |
| Patient-reported medication |  |  |  |
| carvedilol (COREG) 12.5 MG tablet | 2 | 9/24/2021 | 3/31/2022 |
| Take 1 tablet by mouth 2 times daily (with meals) for 180 days. - Oral |  |  |  |

Jacobs, Alphonzia (MRN 687046) Printed by Jillian Menec R.M.A. [995794] at 5/26/202...  Page 1 of 2

Jacobs, Alphonzia (MRN 687046)                          Encounter Date: 03/21/2022

## Jacobs, Alphonzia                                     MRN: 687046

**Telephone** 3/21/2022          Provider: Elizabeth Nicole Peckham, NP (Cardiology)
Cardio PVC POC 154               Reason for call: other

### Conversation: other                                 (Newest Message First)

March 21, 2022

Jillian Menec R.M.A.

Note 🔒 📧                                              4:07 PM        JM

I spoke with the patient and I have faxed paper work and I will leave a copy at
he front desk for him to pick it up. A copy will also be scanned in

Elizabeth Nicole Peckham, NP

Note 🔒 📧                                              3:31 PM        EP

I filled this out already and Jill has it.

Dawn Grimaldi R.N. routed this conversation to Elizabeth Nicole Peckham, NP • 3:09 PM        DG
Jillian Menec R.M.A.

Catheline Martinez routed this conversation to Pvca Triage Mercy Site Pool    2:49 PM        CM

Catheline Martinez

· 'Note 🔒 📧                                           2:49 PM        CM

Patientstates that he dropped off paperwork this Friday for ENP to fill out.
Patient states that he received a call questioning why this paperwork needs to
be filled out now by ENP? I could not find any documentation of this but
patient wants ENP to know that this paperwork was needed back when he
was first seen but the insurance company did not send it to PVCA. Please call
patient with any questions at 413-244-2938

AJ      ↪ Jacobs, Alphonzia contacted Catheline Martinez                2:46 PM

Jacobs, Alphonzia (MRN 687046)                          Encounter Date: 04/29/2022

# Jacobs, Alphonzia                                       MRN: 687046

**Telephone** 4/29/2022       Provider: James D. Haddad, MD (Cardiovascular Disease)
Status: Open                  Reason for call: other
Cardio PVC POC 154

## Conversation: other                                    (Newest Message First)

### May 2, 2022

Jillian Menec R.M.A.

- Note 🔒 📧                                               3:54 PM        JM

Only the second half of section 7 had to be filled out. Per Nen we could just
add on to the old paper work. I have faxed it back to them. I called and spoke
to the patient and he will pick up a copy of this.

### April 29, 2022

Jillian Menec R.M.A.

Note 🔒 📧                                                 3:35 PM        JM

I called and spoke to Nen at the insurance company and I will have ENP take
a look at the paper work

Frank Rios routed this conversation to Jillian Menec R.M.A.        3:21 PM   FR

**Frank Rios**

- Note 🔒 📧                                               3:21 PM        FR

Pt is calling stating that ENP usually fills out this form he needs filled out, she
last filled it out in march but pt states insurance company sent him an email
showing where the provider needs to fill out. Pt states frequency from when
he first started seeing ENP". Pls call pt with any questions 413-244-2938

AJ    ↪ Jacobs, Alphonzia contacted Frank Rios                    3:19 PM

*This encounter is not signed. The conversation may still be ongoing.*

## Communications

Jacobs, Alphonzia (MRN 687046) Printed by Jillian Menec R.M.A. [995794] at 5/26/202...   Page 1 of 2

Jacobs, Alphonzia (MRN 687046)                    Encounter Date: 05/25/2022

Meaghan Landry R.N. routed this conversation to Jillian Menec R.M.A. • James    1:54 PM    ML
D. Haddad, MD • Elizabeth Nicole Peckham, NP

Natasha L Rivera routed this conversation to Pvca Triage Mercy Site Pool    1:48 PM    NR

Natasha L Rivera

Note 🔔 📧                                                         1:48 PM    NR

Patient called in regarding the TFML form that had previously been completed
for him by the provider. The patient did not elaborate on the exact definition of
the form. Patient stated that the forms had been completed last year, but his
insurance company is now requesting the forms to be filled out again with
more in depth information. Patient stated that the last forms that had been
completed were interpreted by the insurance company as only giving the
patient 2 days off per cardiac episode. And only 2 episodes per every six
months. Patient stated this is incorrect.
Please call the patient back at 413-244-2938.

AJ    ↪ Jacobs, Alphonzia contacted Natasha L Rivera                    1:42 PM

*This encounter is not signed. The conversation may still be ongoing.*

Jacobs, Alphonzia (MRN 687046) Printed by Jillian Menec R.M.A. [995794] at 5/26/202...    Page 2 of 3

Jacobs, Alphonzia (MRN 687046)                              Encounter Date: 05/25/2022

# Jacobs, Alphonzia                                         MRN: 687046

**Telephone** 5/25/2022        Provider: James D. Haddad, MD (Cardiovascular Disease)
Status: Open                   Reason for call: other
Cardio PVC POC 154

## Conversation: other                                      (Newest Message First)

### May 31, 2022

Jillian Menec R.M.A.

Note 🔺 📧                                                   4:25 PM        JM

The patient will pick up a copy also. I have left a copy up front

Jillian Menec R.M.A.

Note 🔺 📧                                                   4:11 PM        JM

I faxed over paper work to Standard Insurnace company I faxed it to 866-751-5174.

Jillian Menec R.M.A.

Note 🔺 📧                                                   4:03 PM        JM

New paper work faxed over to be filled out and left on ENP's desk

### May 25, 2022

Jillian Menec R.M.A. routed this conversation to Elizabeth Nicole Peckham, NP   3:11 PM   JM

Jillian Menec R.M.A.

Note 🔺 📧                                                   3:11 PM        JM

The patient called and is asking for some help. We filled out some FMLA paper work for him and it was faxed over back in March. They still have not processed his paper work. He has not gotten paid for the time that he missed since last July. He is asking if maybe you can type a letter stating that we have provided all infor mation that was requested but they still are givin him a hard time about when he has a flare up how much time he can take. They told him he can have 2 days every 6 months if needed which is not what you filled out. He is asking for any help that you can provide.

Jacobs, Alphonzia (MRN 687046) Printed by Jillian Menec R.M.A. [995794] at 5/26/202...   Page 1 of 3

## MENTAL HEALTH AND DIAGNOSIS

The constant barrage of mental anguish took a toll on my body and spirit, resulting in securing mental health treatment. Please see the below from Breaking Ground.



# Breaking Ground

Counseling, Coaching, Consulting

July 20, 2023

Dear Sir or Madam:

Per request from Alphonzia Jacobs, this letter is to confirm that Alphonzia Jacobs, birthdate ███/1969, was diagnosed with the following at the time he was last seen for psychotherapy with this practice in August 2022:

F324 Major Depressive Disorder, Single Episode, Moderate, in partial remission
F419 Anxiety Disorder, Unspecified

Treatment was terminated by client after he did not reschedule more than 30 days after a missed appointment on September 6, 2022.

Sincerely,

Tamika Brock

Tamika Brock, MSW, CISD, LCSW
381 Hubbard Street
Glastonbury, CT 06033
Fax: 855-955-3938
Phone: 860-470-6747

# BIOPSYCHOSOCIAL [MENTAL HEALTH ASSESSMENT]

| | | | |
|---|---|---|---|
| **Client Name:** | Alphonzia Jacobs | **Medical Record Number:** | 9545-142 |
| **DOB:** | ▇▇/1969 | | |
| **Treating Clinician:** | Tamika Brock, MSW, CISD, LCSW MSW, CERTIFIED SCHOOL SOCIAL WORKER, CISD, LCSW | **Provider:** | Tamika Brock, MSW, CISD, LCSW Breaking Ground Counseling |

## Diagnostic Codes

[F419] Anxiety disorder, unspecified

[F324] Major depressive disorder, single episode, in partial remission

| Date of service | Duration | Service Location | Location Code |
|---|---|---|---|
| Sat Apr 02 2022 | 0 hour(s) 45 minute(s) | Office | 11 |

**Referred by:**

Self-referral through ESI EAP

**Client's idea of presenting problem:**

"Work-related issues that may have some racially-based components to it. I found you through ESI EAP. I am looking for a black or Spanish clinician. I don't want to talk to white people about certain things. I am going through shit at work. I don't want to keep feeling like that all the time. I am a total design engineer at Smith and Wesson and I am one of two Black people there out of 75. They don't want to let me have any success here. I have been here about 10 years in total but things have escalated the past six months. They have not been as subtle. I am in Springfield but I can come to Glastonbury this Saturday. I am not sure if this is going to be helpful but I do need someone to talk to. I have never had a suicide attempt before and I am not having thoughts of hurting myself or anyone else. I have never been hospitalized for mental health issues. I have never been in therapy before. No one in my family has ever had a suicide attempt, been hospitalized for mental health issues, or completed suicide. No one else in my family has over been diagnosed with any mental health issues. I started high blood pressure pills about 10 years ago. I was diagnosed with high blood pressure about 10 years ago. I am not addicted to anything. I do smoke marijuana. Do you think that is an addiction?"

**Problem onset timeline**

It has been about the past 6 months that things have escalated. As a black man there is a certain level of inherent racism that we have to deal with- even when they do not realize they are being racist they are. We basically numb ourselves to it. Things definitely became more intense when I mentioned the money to my supervisor - my pay being so low. I mentioned that in January 2022. "

**Reason/Motivation for Treatment/Eval Now: On a scale of 1 to 5 how motivated are you for tx now? What motivates you to change now? Is there anyone influencing your decision to get help/treatment now?**

"5 - Because I am really interested in learning about what the process is going to hold for me. This is me sharing what is going on but the other side is things that I can do to help me cope."

**Tell me about any barriers/obstacles between you and getting tx now? (External, internal)**

Client denied

**What concerns, if any, do you have about getting tx or changing yourself or current circumstances now?**

Client denied

Jacobs, Alphonzia (MRN 687046)                          Encounter Date: 09/01/2021

HEMATOLOGY/LYMPHOLOGY No prolonged bleeding, easy bruisability or swollen nodes
NEURO: No persistent headache, syncope, seizures, weakness or numbness

## PAST MEDICAL HISTORY:

Patient Active Problem List

| Diagnosis | Date Noted |
|---|---|
| • Cardiomyopathy (HCC) [I42.9] | 09/01/2021 |
| • HFrEF (heart failure with reduced ejection fraction) (HCC) [I50.20] | 09/01/2021 |
| • HTN (hypertension) [I10] | 08/19/2021 |
| • Dyspnea [R06.00] | 08/31/2021 |
| • Dyslipidemia [E78.5] | 08/19/2021 |
| • CHF (congestive heart failure) (HCC) [I50.9] | 08/19/2021 |

## FAMILY HISTORY:

Family History

| Problem | Relation | Age of Onset |
|---|---|---|
| • CAD | Mother | |

## SOCIAL HISTORY:

Social History

Tobacco Use
- Smoking status:        Never Smoker
- Smokeless tobacco:     Never Used
Substance Use Topics
- Alcohol use:           Yes
        Comment: Socially

History
    **Last Reviewed by Jillian Menec R.M.A. on 9/1/2021 at 10:46 AM**
    Sections Reviewed
    _____
    Family, Tobacco, Alcohol, Drug Use

## ACTIVE MEDICATIONS:

Current Outpatient Medications

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • aspirin 81 MG EC tablet | Take 81 mg by mouth. | | |
| • atorvastatin (LIPITOR) 40 MG tablet | Take 40 mg by mouth. | | |

The purpose of this document was to bring attention to the concerns that I have raised over my ten-year tenure with Smith & Wesson Inc. The discrimination I've experienced, the harassment I felt, and overall, the unfair treatment I endured.  This document will also demonstrate that the company's diversity initiatives are shortsighted. I will provide examples to help differentiate between situations that I believe are racially motivated. Specifically, I will discuss how maintaining power and control through numerical dominance I perceived as discriminatory, and how being one of only two people of color in a room of 75 for years reinforced that perception.  I believe this lack of diversity contributed to my struggle for equitable pay.

Despite Smith & Wesson's claims of equality and inclusivity for all, as a black employee, I have personally experienced a consistent struggle to receive what the industry has determined as fair compensation.  I will show how despite receiving a 12%, 10%, and 6% increase in salary over three consecutive years, I was still below average on the pay scale.

Senior Vice President of Human Resources, Kathy Salvatore, and Engineering Director Craig Mariani were instrumental.  It was under the new leadership of John Pliska and Marion Moryl my rate of pay fell below average again.  This fact was brought to my attention by Kathy Salvatore for the second time who suggested that I speak with my manager, Marion Moryl.

As a reflection of the type of employee I tried to be while under the employ of Smith & Wesson Inc.

### INITIATED HOLIDAY LUNCHEON AND GATHERING – 2013 - 2021

I state the following to give a perspective on the type of collaborative person I am despite the treatment I received from the company, my leadership, and my colleagues.  I attempted to bring positive energy to the work environment a few months into my transition to the engineering group. During the holiday season, I discovered that there had never been a holiday party. I asked Mr. Emmett if I could organize one, and he agreed as long as no one objected. I collected signatures of approval from 63 out of 65 people, and I created The Engineering Annual Holiday Party termed "Festivus" which was a term I used from the show Seinfeld in an attempt to be all-inclusive.  At first, it started out as a complete day of eating delightful dishes created or purchased by members of engineering.  Then I changed the mission and started collecting undergarments to be donated to the less fortunate in our society.  As a secure facility, I also coordinated day passes for our retired colleagues, or as I called them, "Pioneers of the company," to come back to their old department of engineering on our last day before the holiday shutdown. This event had become an annual staple.



Season's Greetings Everyone. Hard to believe it's that time of year again! I HO-HO-Hope you can find it in your heart to show some compassion for our less fortunate and donate NEW: under clothes, briefs, socks, t-shirts...ei

to be delivered to the Springfield Rescue Mission on behalf of Smith & Wesson Engineering Dept.

He's made his list & checked it twice, but you're still invited to attend whether you've been naughty or nice. So, wear your festive apparel and enjoy our last working day of the year with a FESTIVUS POT LUCK FEAST!

This year's FESTIVUS FEAST

Date: 12/20/2019

Place: EC-2

Signup sheet will be by the microwaves





$$CVSSv3AVG = \frac{1}{n}\sum_{i=1}^{n} a_i$$

Good afternoon all. I hope this message finds you well.

Hard to believe it's that time of year again...Whether you've been NAUGHTY OR NICE please save the date of 12/22/2017 wear your ugly sweater and help make Festivus the sequel a memorable day.

Sign-up sheets will be in the microwave area

Thanks in advance,

All

In conclusion, It is my position that Smith & Wesson, the leadership, or my colleagues:

- Failed to pay me fairly while employed in the engineering department despite my practical and expert experience. The initial leader changed the position level from III to I, then denied my previous experience was relevant. When I transitioned from floor laborer to engineer, my salary increased by fifty cents (.50). At the end of my time at Smith & Wesson my gross salary was less in 2022 than my salary was at Pratt & Whitney twenty years earlier in 2002. Human Resources recognized the salary to be extremely low resulting in increases with increments of 12%, 10%, and 6% within 3 years but not retroactive to address lost wages over the years.
- Failed to protect me and other Black and Brown employees from numerous racist and harassing acts from colleagues who participated in maintaining a hostile work environment. This includes the noose I found in another department and reported to Human Resources, colleagues writing inappropriately on my whiteboard.
- Made false allegations that I failed to give appropriate notice to and improperly provided me with a Corrective Action Notice claiming, "On January 14, Al failed to give proper notice to take time off from work and left early without contacting his active manager." I produced as evidence the text message that confirms the manager was made aware of the funeral on the eve of January 11th. Due to the time of the text, it's fair to say that Mr. Moryl may not have seen the text until January 12, two days before the funeral. I didn't take the full day off. I believe Mr. Moryl was trying to frustrate me.
- Attempted to force me out of the Company after 10 years of employment and during an age making it difficult for me to secure employment elsewhere, discriminating against me. Leadership failed to give me an extension on my MA PFML adding to the mental and physical anguished experiences and health condition.

Respectfully Submitted,

Alphonzia Jacobs, Jr.

## RELIEF

I respectfully urge your honor to impose a decree that reflects the reality that, although Smith & Wesson possesses all necessary system-level procedures and protocols, the leadership opted to disregard their own guidelines. This decision allowed inherent biases to jeopardize the corporation's integrity. I advocate for a thorough review of their corporate policies, and ask that you tie this document to a substantial financial award that mirrors the insurance premiums corporations incur for litigations of this nature.

I firmly believe that a person's health is invaluable, and determining an appropriate figure to quantify it can be quite challenging. In my case, I must take into account my ongoing medication needs, which are critical for managing my condition. My doctor has informed me that I will require lifelong treatment with several essential medications, including Carvedilol, Entresto, Furosemide, Spironolactone, and Farxiga.

Given the circumstances of my health condition—specifically, my diagnosis of congestive heart failure—I would seek no less than $5 million in compensation. This figure is not merely arbitrary; it is a careful consideration of the profound impact my illness has had on my daily life. The heart failure I experience has been exacerbated by over a decade of stress, anxiety, and harassment in my workplace, and this financial amount accurately reflects the long-term effects on my physical and mental well-being. This sum also considers current and future medical expenses, lifestyle adjustments, and the overall toll that these challenges have taken on my quality of life.

Made Under The Penalties of Perjury:

_Alphonzia Jacobs_                    10/20/2025

Alphonzia Jacobs Jr
140 Norfolk Street
SPFLD, MA 01109
(413) 244-2938
alphonzia413@comcast.net          10/20/2025

**Summons**

CIVIL DOCKET NO.

2579CV

Commonwealth of Massachusetts

**The Superior Court**

Laura S. Gentile          Clerk of Courts

Hampden                          County

CASE NAME:

Alphonzia Jacobs

Plaintiff(s)

vs.

Smith & Wesson, Inc.

Defendant(s)

COURT NAME & ADDRESS:
Hampden Superior Court
Roderick L. Ireland Courthouse
50 State Street
Springfield, MA 01103

THIS SUMMONS IS DIRECTED TO Smith & Wesson, Inc. (Defendant's name)

You are being sued. The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the Hampden Superior Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. If you need more time to respond, you may request an extension of time in writing from the Court.

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court **and** mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, Hampden Superior Court P.O. Box 559, Springfield, MA 01102 (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, **AND** Alphonzia Jacobs

b) Delivering or mailing a **copy** of your response to the Plaintiff's attorney/Plaintiff at the following address: 140 Norfolk Street, Springfield, MA 01109

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

3. (cont.) Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure.** If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

### 4. Legal Assistance.

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

### 5. Required Information on All Filings.

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. __Michael D. Ricciuti__ Chief Justice on __February 11__ , 20 __26__ . (Seal)

Clerk

Note: The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

---

## PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ , I served a copy of this Summons, together with a copy of the Complaint in this action, on the Defendant named in this Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

_____

_____

_____

Dated: _____          Signature: _____

N.B.   TO PROCESS SERVER:

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX – BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

Date:

rev. 1/2023

| CIVIL TRACKING ORDER (STANDING ORDER 1-88) | DOCKET NUMBER 2579CV00702 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Jacobs, Alphonzia vs. Smith & Wesson Inc | Laura S Gentile, Clerk of Courts Hampden County |
|---|---|
| TO: File Copy | COURT NAME & ADDRESS Hampden County Superior Court Hall of Justice - 50 State Street P.O. Box 559 Springfield, MA 01102 |

## TRACKING ORDER - A - Average

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

### STAGES OF LITIGATION                                                      DEADLINE

|  | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court |  | 01/20/2026 |  |
| Response to the complaint filed (also see MRCP 12) |  | 02/17/2026 |  |
| All motions under MRCP 12, 19, and 20 | 02/17/2026 | 03/19/2026 | 04/21/2026 |
| All motions under MRCP 15 | 12/14/2026 | 01/13/2027 | 01/13/2027 |
| All discovery requests and depositions served and non-expert depositions completed | 10/11/2027 |  |  |
| All motions under MRCP 56 | 11/09/2027 | 12/09/2027 |  |
| Final pre-trial conference held and/or firm trial date set |  |  | 04/07/2028 |
| Case shall be resolved and judgment shall issue by |  |  | 10/19/2028 |

The final pre-trial deadline is <u>not the scheduled date of the conference</u>. You will be notified of that date at a later time. **Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.** This case is assigned to

| DATE ISSUED 10/20/2025 | ASSISTANT CLERK Edward Partyka | PHONE (413)735-6016 |
|---|---|---|

Date/Time Printed: 10-20-2025 12:55.17

SCV026 08/2018

# CIVIL ACTION COVER SHEET

| DOCKET NUMBER | Massachusetts Trial Court |
|---|---|
| 25   702 | **Superior Court** |

**COUNTY** Hampden Superior Court (Springfield)

| | |
|---|---|
| Plaintiff: Alphonzia Jacobs Jr | Defendant: Smith & Wesson Inc |
| ADDRESS: 140 Norfolk Street | ADDRESS: 2100 Roosevelt Ave |
| Springfield, MA 01109 | SPFLD, MA |
| Plaintiff Attorney: | Defendant Attorney: Schwartz Havuum PC |
| ADDRESS: | ADDRESS: |
| | |
| BBO: | BBO: |

## TYPE OF ACTION AND TRACK DESIGNATION (see instructions section on next page)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| E17 | Civil Rights Act | A | ☐ YES   ☑ NO |

*If "Other" please describe: _____

Is there a claim under G.L. c. 93A?     ☑ YES   ☐ NO     Is there a class action under Mass. R. Civ. P. 23?   ☐ YES   ☑ NO

### STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. (Note to plaintiff: for this form, do not state double or treble damages; indicate single damages only.)

**TORT CLAIMS**

A. Documented medical expenses to date
   1. Total hospital expenses _____
   2. Total doctor expenses _____
   3. Total chiropractic expenses _____
   4. Total physical therapy expenses _____
   5. Total other expenses (describe below) _____

   _____

HAMPDEN COUNTY
SUPERIOR COURT
**FILED**
OCT 20 2025

CLERK OF COURTS

Subtotal (1-5):     $0.00

B. Documented lost wages and compensation to date _____
C. Documented property damages to date _____
D. Reasonably anticipated future medical and hospital expenses _____
E. Reasonably anticipated lost wages _____
F. Other documented items of damages (describe below)

   _____

TOTAL (A-F):     $0.00

G. Briefly describe plaintiff's injury, including the nature and extent of the injury:

   _____

### CONTRACT CLAIMS

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | | |
| | Total | |

Signature of Attorney/Self-Represented Plaintiff: X _Alphonzia Jacobs_     Date: 10/20/2025

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

   _____

### CERTIFICATION UNDER S.J.C. RULE 1:18(5)

I hereby certify that I have complied with requirements of Rule 5 of Supreme Judicial Court Rule 1:18: Uniform Rules on Dispute Resolution, requiring that I inform my clients about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney: X _____     Date: _____

SC0001: 02/24     www.mass.gov/courts     Date/Time Printed:07-02-2025 15-56-54

## COMMONWEALTH OF MASSACHUSETTS

Hampden, ss.

**SUPERIOR COURT**
**CIVIL ACTION NO.**

25  702

Alphonzia Jacobs Jr
_____
Plaintiff

HAMPDEN COUNTY
SUPERIOR COURT
FILED

OCT 2 0 2025

CLERK OF COURTS

vs.

Smith & Wesson, Inc.  2100 Roosevelt Ave
_____
Defendant

## COMPLAINT

RE: Alphonzia Jacobs Jr vs Smith & Wesson, Inc.
    Legal Reference: MCAD Docket No. 23SEM01011
    EEOC Charge No. 16C-2023-01298

# **COMPLAINT**

Dear Judge, this letter represents examples of treatment encountered. I want your evaluation of the factual document regarding elements of harassment, discrimination, and wrongful termination. This is my testament of the treatment I experienced perpetrated by multiple members of Smith & Wesson's management team, not excluding Engineering Director John Pliska and his direct report, my manager Marion Moryl, causing my MA PFML claim and absence from work.

Please find the following written testimony of discriminatory practices during my 10-year employment at Smith & Wesson, Inc.

I present this document to clarify moments of my personal experiences while working at Smith & Wesson, Inc. The events will be presented in chronological order and reflect that some things were happening simultaneously. My goal is to provide an accurate and meaningful account of my time in both the manufacturing and engineering departments. My aim is to shed light on the pervasive culture of non-responsiveness, harassment, and discrimination, which made it impossible to achieve fairness for myself at Smith & Wesson Inc.

I have included the names of specific individuals because they hold positions as officers within the company. As mandated reporters, they are required to report any incidents or situations that violate company policies and necessitate corrective action. Their roles obligate them to address and redirect any circumstances that could potentially harm the organization or its employees, ensuring that all matters are handled according to established protocols.

The first thing that I would like to highlight, actually, is the last act of aggression from Smith & Wesson Inc. It came in the form of willfully placing a financial hardship on me and my family.

I want to highlight what I view as a collaborative effort by the Smith & Wesson Inc. Leadership team, not just regular employees. This document will connect an abundance of mandated reporters complacent with hostility and aversion, minimizing unwarranted aggression towards persons of color, including me. I offer the following facts to consider:

- I didn't receive my first benefit payment until week 8 of being out.
- Attorney DeProspo Jr stated in our Zoom hearing that "Smith & Wesson terminated my employment for not returning to work."
- The last exercisable show of power was also directed to hurt me financially in the form of denying my unemployment insurance because they said, "I quit."

I don't believe that the turn of events that will be described in this document is coincidental; on the contrary, my race and age were major contributors to the way I was treated. This document, when you read between the lines, will show certain behavior patterns and ideological beliefs that will blur the lines

of appropriate conduct. Some of the content will show an attempt to defy objective reality. Throughout this document, I will show circumstances that contributed to feelings of stress, anxiety, and depression. In my opinion, it is absurd for Smith & Wesson to claim that I hadn't raised areas of concern. Furthermore, as a response to the investigative conference question: during any encounter, did I ever mention that I was being treated this way because I was black or old, is correct. I never played the "Black Card" as it has been termed. However, that does not negate the actions or behavior of officers in the company who cannot see past their discriminatory and harassing actions.

I state for the record that I believe that Smith & Wesson Inc. overstepped their authority when it denied my leave extension. It is also my assertion that my leadership conspired and engaged in retaliatory behavior in an attempt to control the narrative of the initial circumstances that led to my leave. Ultimately terminated from my employment and denied my unemployment insurance claim because they said I quit.

As you review this document through your legal paradigm, I hope to get justice.

However, as you will become aware, this document will contradict elements of Smith & Wesson Inc.'s ability to provide a work environment free of unlawful discrimination and harassment. As a matter of fact, upon conclusion, I believe that you will find that Smith & Wesson Inc. Is libel for engaging in a continuous campaign to marginalize my employment as a Black Man. I submit the following record of events, showing proof that discrimination, harassment, written denigrating jokes, and deplorable graphic material enclosed therein are not a figment of my imagination. Unfortunately, this is an accurate depiction of my workplace, at times it could be intimidating, hostile, offensive, threatening, denigrating, and overall hostile in culture.

I will also assert that Smith & Wesson skirted their own policy and procedures of HR-013 Non-Discrimination Harassment Policy when they failed to inform Human Resources or the General Counsel.

The policy states that... "Any manager, supervisor, or member of management who becomes aware of an informal complaint, potentially involving (a) discrimination, (b) harassment, (c) sexual misconduct, (d) sexual harassment, or a consensual romantic or sexual relationship." It is to be reported to H.R. or the General Counsel immediately.

I wish to be provided with the documentation that supports the policy showing that my concerns of discrimination and harassment were reported to Human Resources or the General Counsel in accordance with company policy. I would also ask that you provide the good-faith investigation that was conducted in accordance with HR-013 section 4.4

Request for additional leave

I called the Standard two weeks before my return date on or around May 20th, 2022, requesting an extension to my MA PFML, and was denied. I called to enter the appeal process a day or two after hearing I was denied. It was clear that Smith & Wesson was content with forcing me back into work. From the onset, the tactics used were always meant to affect me financially. This situation would be no different. The culture at Smith & Wesson Inc. is well documented. And in my case, I clearly experienced social forces that protected the essence of mainstream societal beliefs. "If you do not have it, we are not going to let you get it," which is evident within the pages of this document. I believe this is why they

"terminated my employment," as stated by attorney DePalmo during our Zoom hearing. The fact that I was denied unemployment insurance by the corporation because I quit was reported.

It is my assertion that engineering leadership conspired, corroborated, and engaged in retaliatory behavior to control the narrative. This document will show a repetitive theme of company frugality whenever I and compensation are concerned.

Enclosed, you will also find my medical diagnosis and what I will offer as accounts of marginalization pertaining to pay, harassment, and discrimination. My aim is to provide my perspective on the significance of the noose found on Smith & Wesson's premises, and how it pertains to the conservative culture, while shedding light on the challenges I faced as a Black engineer employee at this organization.

To aid with the technical jargon, I have also included a glossary of terms and definitions relevant to my job at Smith & Wesson, Inc.

In the following pages, you will come to realize that Smith & Wesson skirted their own HR-013 Non-Discrimination/Harassment Policy section 3.3 when it was complacent to the hostile act of a denigrating joke that was written on my whiteboard. This was, in my opinion, a clear display of aversion towards me for everyone to see. Sections 4.3 and 4.7 were also ignored when managers became aware of my concerns and willfully did not report my harassment complaints of coworkers or my manager, Marion Moryl in accordance with policies and procedures.

I will be describing instances that I experienced in the workplace, some during the very same time periods, lending reason to those who view the dialogue enclosed as a dire dilemma I experienced.

I will show that despite not receiving adequate compensation, I interacted with the highest levels in the engineering organization, completing any task assigned, delighting my customer. I will also provide examples of email communication between coworkers and leadership that highlight the tension between myself and management, which in my opinion ultimately led to retaliatory actions against me, once I went out on leave.

Ultimately, I regret spending a decade working diligently for a company that, upon reflection, seems to undervalue and view Black and Brown employees as expendable. At Smith & Wesson, it is well-known that most of the leadership holds conservative beliefs, which often align with far-right ideologies such as the Tea Party and MAGA.

I will assert individuals that Smith & Wesson have elevated to leadership roles are one and the same.

Smith & Wesson Inc., from my perspective, has fostered a racial and ethnic hierarchy disproportionately summed up of white male leadership creating disparities and impediments within a diverse racial population. I would also like to add, that any individual talking about collective bargaining components like healthcare, a safe, and respectful workplace, or mentioning the word UNION would be subject to immediate termination. This document will highlight components of group power, in specific numerical population power used by my leadership being one of three individuals of color in a room of seventy-five I believe it gives me the right to make that conclusion. It is also my assertion that my engineering leadership fell unresponsive to concerns of compensation, and harassment, and responded in a discriminatory fashion when they retaliated against me by ending my employment, as I was out with stress, depression, and anxiety. Leaving me feeling powerless to disparities spawned by racial inequities.

I hope that my testimony of experiences can bring attention to the discrimination, harassment, and unfair treatment that I endured at Smith & Wesson Inc.

## Glossary of Terms & Definitions

- Tool Designer – Creates parametric solid model designs for machine apparatuses, gauges, cutting tools, molds, dies, and blueprints with the use of Computer Aided Drafting Software.
- Marked Print – Hand altered print that convey engineering changes
- Marked Print Incorporation – Action of altering print.
- TDR – Tool Design Request.
- ECR – Engineering Change Request.
- Tool Assembly – Solid Model Components assembled in working envelope.
- Solid Model – Parametric 3D geometry.
- Parlec System – System used by tool setters to confirm cutter characteristics, and key measures, such as height and width.
- Set tool – Check cutter characteristics for conformance then read height and width onto data chip for C.N.C. operation.

## Employment Years 2011-2013 – Manufacturing Department

While working on the manufacturing floor at Smith & Wesson, I raised my first concern regarding my pay. I thought that I was entitled to receive my regular rate plus half for each hour worked after 40 hours in a scheduled 40-hour week. However, I worked in a department that was understaffed, and the company offered unlimited overtime to meet production targets. When I received my pay stubs, I noticed that my overtime compensation did not reflect the time and a half-rate that I was entitled to. Instead, it only showed the half-rate figure, which confused me.

I made an appointment to meet with Dottie Perella, the payroll manager, and showed her my pay stubs. She was surprised to see the number of hours I had worked and needed to verify with my cell coordinator, Carl Buss. Even after confirming the accuracy of my hours worked, Dottie could not explain the bookkeeping method she was using. I showed her one of my pay stubs, which had only four hours of overtime and was marked as "special," but it still did not reflect the correct sum.

I left Dottie's office feeling disheartened. Unfortunately, this was just one of the examples of poor leadership that I experienced at the company. I have included images of my pay stubs to illustrate the confusion I was facing. However, I never received a resolution for my concern, and it fell into the category of "never getting back to you."

ALPHONZIA JACOBS, JR
140 NORFOLK STREET
SPRINGFIELD, MASS. 01109

Date: December 9th, 2012

To:    Dottie Perella, Payroll

Re:    Payroll discrepancies

Dear Ms. Perella,

Enclosed please find information regarding payroll discrepancies for 4 checks that I reviewed. To date I've reviewed checks: A413119, A415260, A417425, and A419576. I have not reviewed all of my paystubs as of yet.

I look forward to a resolution as soon as possible.

Respectfully, .

**Smith & Wesson**

SMITH & WESSON CORP
2100 ROOSEVELT AVE
SPRINGFIELD MA
01102

| | |
|---|---|
| CHECK NO: | A413119 |
| CHECK DATE: | 8/31/2012 |
| PERIOD ENDING: | 8/2/2012 |
| PAY FREQUENCY: | BI-WEEKLY |
| PAY PERIOD: | 08/20/2012 - 09/02/2012 |

JACOBS, JR ALPHONZIO
140 NORFOLK STREET
SPRINGFIELD, MA 01109

ID NUMBER: 0122613531
BASE RATE: 1,496.00
SSN: XXXXX0115

STATUS: EXEMPT
FED: MARRIED  4
ST1:  3
ST2:

TAX ADJUSTMENTS:
FED:  ST1:
DI/UC:  0
LOCAL:  ST2:  0

STATE AND LOCAL CODES
PRI: MA LOC1: LOC3:
SEC: LOC2: LOC4:
LOC5:

IMPORTANT MESSAGE

### HOURS AND EARNINGS

| DESCRIPTION | RATE | CURRENT HOURS/UNITS | CURRENT EARNINGS | Y-T-D HOURS/UNIT | Y-T-D EARNINGS |
|---|---|---|---|---|---|
| REGULAR | 18.7000 | 122.00 | 2,281.40 | 122.00 | 2,281.40 |
| OVERTIME | 9.3500 | 33.00 | 308.55 | 33.00 | 308.55 |
| TOTAL H/E | | 155.00 | 2,589.95 | 155.00 | 2,589.95 |

### TAXES AND DEDUCTIONS

| DESCRIPTION | CURRENT AMOUNT | Y-T-D AMOUNT |
|---|---|---|
| SO SEC TAX | 108.78 | 108.78 |
| MEDICARE TAX | 37.55 | 37.55 |
| FED INC TAX | 220.51 | 220.51 |
| PRI-STATE TAX | 115.37 | 115.37 |
| TOTAL TAXES | 482.31 | 482.31 |

SPECIAL INFORMATION

### PRE-TAX ITEMS

### AFTER-TAX ITEMS

### CURRENT NET PAY DISTRIBUTION

| | |
|---|---|
| XXXXXXXXXXXXXX40 | 2,107.68 |
| CHECK AMOUNT | .00 |

| TOTAL | 155.00 | 2,589.95 | 155.00 | 2,589.95 |
|---|---|---|---|---|

| | GROSS | PRE-TAX | FIT TAXABLE | LESS TAXES | LESS DEDS | EQ NET PAY | | |
|---|---|---|---|---|---|---|---|---|
| CURRENT | 2,589.95 | .00 | 2,589.95 | 482.31 | .00 | 2,107.64 | TOTAL CURRENT | 2,107.64 |
| Y-T-D | 2,589.95 | .00 | 2,589.95 | 482.31 | .00 | 2,107.64 | NET PAY | |

In check # A413119 the overtime rate does not include the regular hourly rate of 18.70 + 9.35 which would equal 28.05 for my overtime hourly rate.

The stated overtime earnings on this check is 308.55 and it should be 925.65

The difference in this check is 617.10

### Smith & Wesson

SMITH & WESSON CORP.
2100 ROOSEVELT AVE
SPRINGFIELD MA
01102

| | |
|---|---|
| CHECK NO: | A419576 |
| CHECK DATE: | 10/12/2012 |
| PERIOD ENDING: | 10/14/2012 |
| PAY FREQUENCY: | BI-WEEKLY |
| PAY PERIOD: | 10/01/2012 - 10/14/2012 |

| | | | |
|---|---|---|---|
| JACOBS, JR ALPHONZIO | ID NUMBER: 0122613531 | STATUS: EXEMPT | TAX |
| 140 NORFOLK STREET | BASE RATE: 1,496.00 | FED: MARRIED -4 | ADJUSTMENTS |
| SPRINGFIELD, MA 01109 | SSN: XXXXX0116 | ST1: 3 | FED: ST1: |
| | | ST2: | DI/UC: 0 |
| | | | LOCAL: ST2: 0 |

STATE AND LOCAL CODES
PRI: MA LOC1: LOC3:
SEC: LOC2: LOC4:
LOC5:

IMPORTANT MESSAGE

**HOURS AND EARNINGS**

| DESCRIPTION | RATE | CURRENT | | Y-T-D | | 
|---|---|---|---|---|---|
| | | HOURS/UNITS | EARNINGS | HOURS/UNITS | EARNINGS |
| REGULAR | 17.000 | 88.00 | 1,496.00 | 478.00 | 8,578.20 |
| ADJUST-ALL | | .00 | .00 | .00 | 306.00 |
| OVERTIME | | .00 | .00 | 121.00 | 1,104.15 |
| TOTAL H/E | | 88.00 | 1,496.00 | 599.00 | 9,988.35 |

**TAXES AND DEDUCTIONS**

| DESCRIPTION | CURRENT AMOUNT | Y-T-D AMOUNT |
|---|---|---|
| SO SEC TAX | 57.65 | 409.14 |
| MEDICARE TAX | 18.90 | 141.25 |
| FED INC TAX | 47.51 | 799.00 |
| PRI-STATE TAX | 55.06 | 430.84 |
| TOTAL TAXES | 180.12 | 1,780.23 |

**SPECIAL INFORMATION**

| | |
|---|---|
| GRP TERM LIFE | 1.29 |

**PRE-TAX ITEMS**

| DESCRIPTION | CURRENT | Y-T-D |
|---|---|---|
| DENTAL | 30.36 | 60.72 |
| MEDICAL PPO | 89.42 | 178.84 |
| VISION | 4.98 | 9.96 |
| TOTAL PRE-TAX | 124.76 | 249.52 |
| TOTAL | 88.00 1,371.24 | 599.00 9,738.83 |

**AFTER TAX ITEMS**

| DESCRIPTION | CURRENT | Y-T-D |
|---|---|---|
| ADD LIFE | 1.15 | 2.30 |
| SUPP LIFE NT | 8.32 | 16.64 |
| VOL ACC | .18 | .36 |
| TOTAL PER DED | 9.65 | 19.30 |

**CURRENT NET PAY DISTRIBUTION**

| | |
|---|---|
| XXXXXXXXXXXXXX40 68 | 1,181.47 |
| CHECK AMOUNT | .00 |

| | GROSS | PRE-TAX | FIT TAXABLE | LESS TAXES | LESS DEDS | EQ NET PAY |
|---|---|---|---|---|---|---|
| CURRENT | 1,496.00 | -124.76 | 1,371.24 | 180.12 | 9.65 | 1,181.47 |
| Y-T-D | 9,988.35 | -249.52 | 9,738.83 | 1,780.23 | 19.30 | 7,939.30 |

TOTAL CURRENT NET PAY: 1,181.47

In check # A419576 My regular rate has dropped from 18.70 to 17.00 and my regular rate earnings statement of 1496.30 is correct but I didn't receive the 8 hours of overtime pay of 224.40. In this check there is no overtime but yet I worked 8 hours.

The difference in this check is 374.00

**Smith&Wesson**

SMITH & WESSON CORP.
2100 ROOSEVELT AVE.
SPRINGFIELD MA
01102

| | |
|---|---|
| CHECK NO: | A415260 |
| CHECK DATE: | 9/14/2012 |
| PERIOD ENDING: | 9/16/2012 |
| PAY FREQUENCY: | BI-WEEKLY |
| PAY PERIOD: | 09/03/2012 - 09/16/2012 |

JACOBS, JR ALPHONZIO
140 NORFOLK STREET
SPRINGFIELD, MA 01109

ID NUMBER: 0122613531
BASE RATE: 1,496.00
SSN: XXXXX0116

| STATUS | EXEMPT |
|---|---|
| FED: MARRIED | 4 |
| ST1: | 3 |
| ST2: | |

TAX ADJUSTMENTS:
FED: ST1: 
DT/UC: 0
LOCAL: ST2: 0

STATE AND LOCAL CODES
PRI: MA LOC1: LOC3:
SEC: LOC2: LOC4:
LOC5:

**IMPORTANT MESSAGE**

### HOURS AND EARNINGS

| DESCRIPTION | RATE | CURRENT HOURS/UNITS | CURRENT EARNINGS | Y-T-D HOURS/UNITS | Y-T-D EARNINGS |
|---|---|---|---|---|---|
| REGULAR | 18.700 | 144.00 | 2,692.80 | 266.00 | 4,974.20 |
| OVERTIME | 9.3500 | 56.00 | 523.60 | 89.00 | 832.15 |
| TOTAL H/E | | 200.00 | 3,216.40 | 355.00 | 5,806.35 |

### TAXES AND DEDUCTIONS

| DESCRIPTION | CURRENT AMOUNT | Y-T-D AMOUNT |
|---|---|---|
| SO SEC TAX | 135.09 | 243.87 |
| MEDICARE TAX | 46.84 | 84.19 |
| FED INC TAX | 314.58 | 535.19 |
| PRI-STATE TAX | 148.40 | 261.77 |
| TOTAL TAXES | 642.71 | 1,125.02 |

### SPECIAL INFORMATION

### PRE-TAX ITEMS

### AFTER TAX ITEMS

### CURRENT NET PAY DISTRIBUTION

| | |
|---|---|
| XXXXXXXXXXXXX4068 | 2,573.69 |
| CHECK AMOUNT | .00 |

| TOTAL | 200.00 | 3,216.40 | 355.00 | 5,806.35 |
|---|---|---|---|---|

| | GROSS | PRE-TAX | FIT TAXABLE | LESS TAXES | LESS DEDS | FC NET PAY | | |
|---|---|---|---|---|---|---|---|---|
| CURRENT | 3,216.40 | .00 | 3,216.40 | 642.71 | .00 | 2,573.69 | TOTAL CURRENT | 2,573.69 |
| Y-T-D | 5,806.35 | .00 | 5,806.35 | 1,125.02 | .00 | 4,681.33 | NET PAY | 2,573.69 |

In check # A415260 the overtime rate does not include the regular hourly rate of 18.70 + 9.35 which would equal 28.05 for my overtime hourly rate.

The stated overtime earnings on this check is 523.60 and it should be 1047.20

The difference in this check is 523.60

| (logo) Smith&Wesson | SMITH & WESSON CORP. 2100 ROOSEVELT AVE, SPRINGFIELD MA 01102 | CHECK NO: A417425 |
|---|---|---|
| | | CHECK DATE: 9/28/2012 |
| | | PERIOD ENDING: 9/30/2012 |
| | | PAY FREQUENCY: BI-WEEKLY |
| | | PAY PERIOD: 09/17/2012 - 09/30/2012 |

| JACOBS, JR ALPHONZIO | ID NUMBER: 0122613531 | STATUS EXEMPT | TAX ADJUSTMENTS: | STATE AND LOCAL CODES |
|---|---|---|---|---|
| 140 NORFOLK STREET | BASE RATE: 1,498.00 | FED: MARRIED 4 | FED: ST1: | PRI: MA LOC1: LOC3: |
| SPRINGFIELD, MA 01109 | SSN: XXXXX0116 | ST1: 3 | DI/UC: 0 | SEC: LOC2: LOC4: |
| | | ST2: | LOCAL: ST2: 0 | LOC5: |

**IMPORTANT MESSAGE**

### HOURS AND EARNINGS

| DESCRIPTION | RATE | CURRENT HOURS/UNITS | CURRENT EARNINGS | Y-T-D HOURS/UNITS | Y-T-D EARNINGS |
|---|---|---|---|---|---|
| REGULAR | 17.000 | 124.00 | 2,108.00 | 390.00 | 7,082.20 |
| ADJUST-ALL | | .00 | 306.00 | .00 | 306.00 |
| OVERTIME | 8.5000 | 32.00 | 272.00 | 121.00 | 1,104.15 |
| TOTAL HR | | 158.00 | 2,686.00 | 511.00 | 8,492.35 |

### TAXES AND DEDUCTIONS

| DESCRIPTION | CURRENT AMOUNT | Y-T-D AMOUNT |
|---|---|---|
| SO SEC TAX | 107.62 | 351.49 |
| MEDICARE TAX | 37.18 | 121.35 |
| FED INC TAX | 216.30 | 751.49 |
| PRI-STATE TAX | 114.01 | 375.78 |
| TOTAL TAXES | 475.09 | 1,600.11 |

### SPECIAL INFORMATION

| GRP TERM LIFE | 1.29 |
|---|---|

### PRE-TAX ITEMS

| DENTAL | 30.38 | -30.38 |
|---|---|---|
| MEDICAL PPO | 89.42 | -89.42 |
| VISION | 4.98 | -4.98 |
| TOTAL PRE-TAX | 124.76 | -124.76 |
| TOTAL | 156.00 | 2,561.24 | 511.00 | 8,367.59 |

### AFTER TAX ITEMS

| ADD LIFE | 1.15 | 1.15 |
|---|---|---|
| SUPP LIFE NT | 8.32 | 8.32 |
| VOL ACC | .18 | .18 |
| TOTAL PER DED | 9.65 | 9.65 |

### CURRENT NET PAY DISTRIBUTION

| XXXXXXXXXXXX40 68 | 2,076.50 |
|---|---|
| CHECK AMOUNT | .00 |

| | GROSS | PRE TAX | FIT TAXABLE | LESS TAXES | LESS DEDS | EO NET PAY | |
|---|---|---|---|---|---|---|---|
| CURRENT | 2,686.00 | -124.76 | 2,561.24 | 475.09 | 9.65 | 2,076.50 | TOTAL CURRENT: 2,076.50 |
| Y-T-D | 8,492.35 | -124.76 | 8,367.59 | 1,600.11 | 9.65 | 6,757.83 | NET PAY |

In check # A417425 My regular rate has dropped from 18.70 to 17.00 and my regular rate earnings statement of 2108.00 should be 2318.80 the difference of 210.80   the overtime rate does include the regular hourly rate of 18.70 + 9.35 which would equal 28.05 for my overtime hourly rate.

The stated overtime earnings on this check is 272.00 and it should be 897.60

The difference in this check is 836.40



<u>Employment Years 2013-2019  Engineering Department</u>

Hired by Engineering Manager Brian Emmett As a Tool Designer 1

Mr. Chris Fedina, the Human Resources Hiring Director, was aware of my expertise in computer-aided drafting and proficiency in the Unigraphics Solid Modeling Program. He informed me of a Tool Designer 3 position working under Mr. Brian Emmett, the department head. Mr. Emmett and I had not met until the interview. Although the job wasn't as challenging as my previous roles, it was as Chris put it "a good fit for me." As a result, I met Mr. Emmett and his drafting manager John Matrishon, for the first time during the interview. During that interview, our discussion was more about the technical relevance of the position. As a result, I was told I'd be an added asset to the Tool Design group and John Matrishon's drafting group. My previous position on the manufacturing floor opened the door for contributing in both groups and although reporting to Mr. Emmett I was to be utilized as drafting support to Mr. Matrishon's group of blueprint creation due to my practical experience from Pratt & Whitney.

The mention of salary didn't come up, and at that time, I wasn't concerned because the internal position posting showed the engineering pay range.

Only during the presentation of paperwork and the official offer of my new position did I see that my increase was marginal compared to what I was making on the production floor. When I spoke with Mr. Fedina about my pay rate and position level, he informed me that Mr. Emmett had changed the position from Tool Designer 3 to Entry-level Tool Designer 1. I was confused as to what occurred between the time I left the interview the and presented paperwork, but I felt as if I couldn't turn down the opportunity even though the compensation fell short of industry standards. In my opinion, this decision was post-interview and had a direct impact on the compensation I would begin to receive in taking the new position. Despite my appeal to both Mr. Fedina and Emmett, nothing would change as to the department transfer compensation. It was clear that I could do nothing, and I felt powerless. In year one I never met with management regarding performance and during the year two's review I appealed to Mr. Emmett about his decision to place me at level 1 and his response was, *"You may have experience in the industry, but you don't have tool design experience."* He then said, *"Continue to work the way you are working and go through the Geometric, Dimensioning & Tolerancing (GD&T) training and I will move you up to a level II Tool Designer."* Mr. Emmett never moved me to Level 2 despite successfully completing the training as indicated in my performance review below dated 2017.

It was during my third year and second performance review I continued to advocate for myself to Mr. Emmett, following up on the previous year's evaluation. *I questioned why I was still categorized as a "Level I Tool Designer". Mr. Emmett's response was, yes even though I had successfully completed the proponents of training, he set forth I wouldn't be able to receive a Level II designation because the budged line item didn't occur to change the position that year.*

In my opinion, the first evaluation from Mr. Emmett was not accurate. On paper, it looked like I was progressing along but he was stalling me out by giving me objectives to meet before advancing my level 1 status pay. Despite giving me credit for intangibles like attentiveness and communication that I will interject later in this document. I took it as a slight to my abilities. Here is my rationale. My previous employment/experience made me a person to be considered for the position. I had Department of Defense top secret clearance with Fortune 500 Corporation Pratt & Whitney, making engineering drawings that conveyed information necessary to define engineering intent clearly and completely for

eight (8) years. I had real practical experience in creating solid models of airfoils, heat shields, turbine exhaust cases, and vectoring nozzles for Pratt & Whitney's F35 Joint Strike Fighter program. I created solid models and blueprints for rocket scientists. I knew my worth but yet it felt like I was taking part in some psychological, social conditioning process, in which I was the unexperienced ignorant one.

I've attached evaluations from my manager, Mr. Emmett. The first year when I was new to the department my evaluation reflected that I was meeting expectations in all categories except, Initiative, computer/keyboarding skills, teamwork, and cooperation in which I exceeded expectations. He also mentioned that a new employee would need time to learn tool design tasks. However, I wanted to highlight that I completed 340 drawings in 2017, averaging 0.7 days per drawing, while the Tool Design group averaged 1.6 days per drawing. Although I felt frustrated, I focused on showcasing my skills and proving my worth.

Despite my efforts this was my normal merit compensation, which left me feeling unfulfilled for the work I was performing.

---

**Smith &Wesson**

**Employee Compensation Statement**

| Employee Name: | Jacobs, Alphonzia | Employee ID: | 13531 |
| Job Title: | Drafter & Tool Designer I | Planner: | Emmett, Brian |

Our Company is committed to rewarding employees for their performance and contribution to the success of the business. The annual compensation planning review considers business profitability, competitive factors and assessment of business unit and individual goals in the decision making process. This statement details your pay elements for the current fiscal year.

**Base Pay**

Current Base Pay:            20.20 USD

| Element Type | Element Amount | Element Percent | Effective Date |
|---|---|---|---|
| Merit | 0.50 USD | 2.50% | 06/20/2018 |
| Total | 0.50 USD | 2.50% | |

New Base Pay:            20.70 USD

On behalf of the Leadership Team, we look forward to your continued contribution, dedication and success within the organization.

---

Run Date:        06/20/2018              Company Confidential

(W) **Smith&Wesson**

General Professional

**PERFORMANCE APPRAISAL**

DATE OF THIS REVIEW: _____

**NAME:** Alphonzia Jacobs JR

**JOB TITLE:** Tool setter

| TYPE OF REVIEW | INSTRUCTIONS FOR ANNUAL REVIEW |
|---|---|
| • ANNUAL: ☐<br><br>• TRIAL PERIOD: New Hire or Transferred Employee<br><br>(Complete competency check box and signature sections only.)<br><br>30 Day ☐　60 Day ☐　90 Day ☐ | 1. Review performance factors and competencies listed below<br>2. Review past objectives. Assign an overall "Performance Rating"<br>3. Review the evaluation with employee and discuss future objectives & development needs.<br>4. Review the Evaluation with appraiser's supervisor. Obtain their signature<br>5. Completed form is to be retained in employee's official personnel file |

## PERFORMANCE FACTORS

| Does Not Meet Expectations | Needs Improvement | Meets Expectations | Exceeds Expectations | Role Model |
|---|---|---|---|---|
| This score indicates that most if not all expectations of the position are not being met. It is unlikely that skills will be developed in a timely manner to achieve satisfactory levels of performance. Immediate attention is required. The manager should work in partnership with HR to ensure that there is a plan for corrective action and a Performance Improvement Plan is used. A 30-60 day timeframe for improvement should be established. | This score indicates that some expectations of the position are being met, but more effort is required to meet a satisfactory level of performance. Scores may reflect a learning curve for an individual who has recently taken on new responsibilities or has recently been promoted into a new position, or may reflect a performance deficit. The manager will need to discuss a plan for continued development (PDP) or improvement (PIP) with the employee | This score indicates strong performance in all facets of the position, solid achievement. Expectations have been met and at times, exceeded. Commitment to quality is evident. It is expected that a majority of scores will fall in this range. | This score signals performance above and beyond the expectations of the position. This score is characterized by unusual expertise, commitment, and quality. Performance reflects unique self-initiative and drive by the employee, resulting in valuable contributions to the organization | This score indicates performance that is consistently exceptional. Performance warrants consideration for promotion and significant increases in scope and responsibility. The manager should be in discussion with the employee and his/her manager and HR about how to best leverage the employee's talents within the organization. Scores in this range are rare |

| SMITH & WESSON CORE PRINCIPLES | Does Not Meet Expectations | Needs Improvement | Meets Expectations | Exceeds Expectations | Role Model |
|---|---|---|---|---|---|
| **CUSTOMER FOCUS**<br>-Keeps external and internal customer needs and requirements, paramount when making decisions and taking action | ☐ | ☐ | ☑ | ☐ | ☐ |
| **RESULTS ORIENTATION**<br>-Working to achieve high levels of individual and organizational performance | ☐ | ☐ | ☑ | ☐ | ☐ |
| **INITIATIVE**<br>-Takes independent action and goes beyond what the job or situation requires | ☐ | ☐ | ☐ | ☑ | ☐ |

| GENERAL PROFESSIONAL COMPETENCIES | Does Not Meet Expectations | Needs Improvement | Meets Expectations | Exceeds Expectations | Role Model |
|---|---|---|---|---|---|
| **ORGANIZATION**<br>-Naturally keeps personal area neat<br>-Puts things up when finished for the day<br>-Assembles all necessary materials and information before starting a task | ☐ | ☐ | ☑ | ☐ | ☐ |
| **LISTENING**<br>-Can keep silent while others express themselves<br>-Keeps ego and personal needs out of the conversation<br>-Tries to understand others before expressing self | ☐ | ☐ | ☑ | ☐ | ☐ |
| **SERVICE ORIENTATION**<br>-Is driven by the desire to serve the customer, focused on customer needs<br>-Responds as promptly as possible to customer needs and requests<br>-Knows customers, alliances, and partners well and supports them in appropriate ways | ☐ | ☐ | ☑ | ☐ | ☐ |

1

General Professional

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **FOLLOW THROUGH**<br>-Keeps focus on priorities; perseveres; delivers<br>-Doesn't let the details fall between the cracks<br>-Stays with a project through to it's conclusion | ☐ | ☐ | ✓ | ☐ | ☐ |
| **PERFORMANCE FOCUS**<br>-Avoids procrastination; pushes for results<br>-Manages time and priorities effectively<br>-Meets deadlines and other targets | ☐ | ☐ | ✓ | ☐ | ☐ |
| **TEAMWORK & COOPERATION**<br>-Is able to subordinate personal needs to team success<br>-Is willing to follow or lead based on the team's need; is approachable<br>-Is committed to building the spirit of the team; genuinely enjoys being a part of the team | ☐ | ☐ | ☐ | ✓ | ☐ |
| **COMPUTER/KEYBOARDING SKILLS**<br>-Can focus on the here and now<br>-Is patient paying close attention to detail<br>-Is careful to avoid errors | ☐ | ☐ | ☐ | ✓ | ☐ |
| **COMFORT WITH PAPERWORK**<br>-Is comfortable with repetitious attention to detail<br>-Tends to avoid making errors, and enjoys catching them<br>-Maintains accurate and timely records, files and reports | ☐ | ☐ | ✓ | ☐ | ☐ |
| **COMFORT WORKING INDEPENDENTLY**<br>-Is comfortable working alone when necessary<br>-Does not require close supervision<br>-Does not need others to provide structure | ☐ | ☐ | ✓ | ☐ | ☐ |
| **QUALITY ORIENTATION**<br>-Maintains high standards with staff and facility<br>-Effectively inspects and monitors for performance<br>-Shows a bias for proper maintenance, housekeeping, and adherence to requirements in general | ☐ | ☐ | ✓ | ☐ | ☐ |
| **TECHNICAL LEARNING**<br>-Prefers mastering the details before moving on to the next level<br>-Shows mastery of knowledge about the job, whether about products, markets, or subject areas<br>-Eagerly seeks and assimilates new relevant technical information | ☐ | ☐ | ✓ | ☐ | ☐ |
| **ADHERENCE TO POLICY**<br>-Adheres to industry guidelines<br>-Is prone to follow established procedures<br>-Tends to go by the book | ☐ | ☐ | ✓ | ☐ | ☐ |

**RESULTS OF PRIOR YEAR'S OBJECTIVES:**

N/A

| **OVERALL PERFORMANCE RATING** | Does Not Meet Expectations | Needs Improvement | Meets Expectations | Exceeds Expectations | Role Model |
|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ |

2

General Professional

**INDIVIDUAL DEVELOPMENT PLAN**

**Description of Development Need(s)** *Incorporate ERP/SAP System into my daily operations. Discover ways to cut cost and cycle time. Continue to work safe and be an effective team member.*

**Action Steps for Employee**

**Coaching Plan for Supervisor**

**INDIVIDUAL OBJECTIVES FOR NEXT YEAR** (Attach additional pages if necessary)

Business Objective: Compliance – Fanatical pursuit of excellence. Invest in systems and cross functional business processes to ensure operations meet the highest legal and ethical standards.
**Associated Individual Performance Objective:**

Business Objective: Enterprise Resource Planning – Invest in integrated and configurable technology infrastructure to standardize business processes and minimize costs.
**Associated Individual Performance Objective:**

Business Objective: Quality – Continue our focus on flexible manufacturing and standardized process for efficiency and scalability to provide our customers with world class quality, reliability and value in our products.
**Associated Individual Performance Objective:**

Business Objective: M & P Platform – Grow and diversify our business by continuing to build on the M & P Brand and effectively respond to consumer needs.
**Associated Individual Performance Objective:**

Business Objective: Supply Chain – Transition to an integrated supply chain to create a competitive advantage through purchasing, manufacturing and distribution of our products.
**Associated Individual Performance Objective:**

| APPRAISED BY: | EMPLOYEE SIGNATURE: | APPRAISER'S SUPERVISOR: |
|---|---|---|
| DATE: | DATE: 5/1/2013 | DATE: |

APPRAISER'S RECOMMENDATION (Check One)

____ Allow 30 additional days for improvement          ____ Schedule next formal review 1 year from this date

3

## Alphonzia Jacobs's Goals

CREATE   ADD FROM LIBRARY   VIEW ARCHIVED

| Actions | Name | Edge | Weight (%) ↓ | Obstacles | Progress | Due Date | ↓↑ |
|---------|------|------|--------------|-----------|----------|----------|-----|
| ○ | Support Department Goals | • | | 0 | ▬▬▬▬▬▬ | 6% | May 31, 2016 |
| ○ | Support NPD - Drawings completed with | • | | 0 | ▬▬▬▬▬▬ | k% | May 31, 2016 |
| ○ | Support NPD - Returned drawings to be | ○ | | 0 | ▬▬▬▬▬▬ | k% | May 31, 2016 |
| ○ | Support NPD - Review Complex Design . | • | | 0 | ▬▬▬▬▬▬ | k% | May 31, 2016 |

# Review Evaluation Check-In

| | |
|---|---|
| EMPLID | 13531 |
| Name | Jacobs, Alphonzia |
| Job Title | Drafter & Tool Designer I |
| Job Id | RDTLP1 |
| Job Grade | LP1 |
| Supervisor | Emmett, Brian |

| Goals | |
|---|---|
| Comment | Al is new to this position. He has a long way to get where he needs to be but has shown willingness to learn and do the right thing. |

| Competencies | |
|---|---|
| Comment | Al needs to listen more closely and then do the work. I find he tends to over think and analyze. Yes, continue to ask questions but then get the job done. Less discussion about it and more work doing it. |

| Development Activities | |
|---|---|
| Comment | Increase his GD&T knowledge by taking a class. |

| Overall | |
|---|---|
| Comment | Al must continue improving. The amount of time to get the work done needs to continue improving. |

Instructions for Annual Review
Jacobs, Alphonzia

 Smith&Wesson

| | | | |
|---|---|---|---|
| **EmpID** | 13531 | **Name** | Jacobs, Alphonzia |
| **Job Title** | Drafter & Tool Designer I | **Job Id** | RDTLP1 |
| **Job Grade** | LP1 | **Supervisor** | Emmett, Brian |

## Goals/Strategic Objectives | Section Weight 50%

FY2017 All Tool Designs need to be completed in less than 20 days.

Reduce all delays and wait states.

| **Start Date:** | **Due Date:** | **Actual End Date:** |
|---|---|---|
| May 01, 2016 | Apr 30, 2017 | |

| **Progress:** | **Weight:** | **Obstacles:** |
|---|---|---|
| 0% | 50% | NONE |

**Employee Comments**
Most if not all of my assigned tasks dont require more than a few days to complete.

**Employee Rating**
Significantly Exceeds Expectations

**Manager Comments**
Al completed his tasks within goal limits.

**Manager Rating**
Consistently Meets Expectations

FY2017 Complete all NPD Tool Designs as Priority

NPD Tool Design work needs to be completed without any delays to ensure they stay on schedule.

| **Start Date:** | **Due Date:** | **Actual End Date:** |
|---|---|---|
| May 01, 2016 | Apr 30, 2017 | |

| **Progress:** | **Weight:** | **Obstacles:** |
|---|---|---|
| 0% | 50% | NONE |

**Employee Comments**
Most if not all of my assigned tasks don't require more than a few days to complete.

1

Instructions for Annual Review
Jacobs, Alphonzia



**Employee Rating** -
Significantly Exceeds Expectations

**Manager Comments**
All priority work was done efficiently.

**Manager Rating**
Consistently Meets Expectations

## Goals/Strategic Objectives

**Employee Comments**
I consistantly complete my tasks within a twenty day time frame.

**Employee Rating**
Significantly Exceeds Expectations

**Manager Comments**
Goals were met.

**Manager Rating**
Consistently Meets Expectations

Score:3.0000

## Competencies | Section Weight 50%

⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀

### Communication

Provides information in a timely manner in a way that others can understand and take appropriate action

**Behaviors**
Example Behaviors
- Keeps people informed about the current status of own work.

- Provides updates to managers and internal/external customers.

- Asks questions to clarify requirements and actively listens to understand.

- Checks to make sure that others understand what is needed.

2

Instructions for Annual Review
Jacobs, Alphonzia



**Employee Comments**
I'm very conscious of communicating clearly. And at times find myself reiterating information.

**Employee Rating**
Exceeds Expectations

**Manager Comments**
Al communication has improved. Al over communicates rather what is more common under communication. Since we discussed this issue he has improved greatly. There is still a little more room for improvement.

**Manager Rating**
Consistently Meets Expectations

## Continuous Improvement

Identifies and/or implements ways to do things more efficiently and effectively

**Behaviors**
  Example Behaviors
    • Identifies and/or solves problems needing attention.

    • Challenges the status quo and looks for better ways to do things.

    • Continually looks for ways to improve the way work gets done.

    • Uses time on the job in the most productive manner.

**Employee Comments**
I was tasked to create a format and one of the stakeholders mentioned some enhancements that he would like to incorporate into the task. This incorporation had a direct impact on tool assy creation and efficiency.

**Employee Rating**
Significantly Exceeds Expectations

**Manager Comments**
Al took on the task on how Tool Assemblies were added to the Tool Design.

**Manager Rating**
Exceeds Expectations

## Customer Focus

Meets the needs of internal and external customers with a sense of urgency and long term customer satisfaction in mind

**Behaviors**

3

Instructions for Annual Review
Jacobs, Alphonzia



Example behaviors
- Acts with urgency and commitment to meet the needs of internal and external customers.

- Explores and recommends ways to improve customer service.

- Takes responsibility for ensuring that customer problems are resolved.

- Responds with a sense of urgency to address internal and external customer needs.

**Employee Comments**
I view every task as a chance to delight my customer.

**Employee Rating**
Exceeds Expectations

**Manager Comments**
Al is still on the learning curve in Tool Design.  He has been given increase Tool Designs.

**Manager Rating**
Consistently Meets Expectations

## Employee Development

Takes advantage of opportunities to improve own and other's skills and abilities

**Behaviors**
Example Behaviors
- Takes charge of their own development.

- Puts in the time and effort to learn new skills.

- Shows passion and curiosity for learning about the business.

- Develops self to prepare for the next step on their career path.

**Employee Comments**
This past year I had the opportunity to attend concept 2 design, a two day conference put on by our software provider. The conference turned out to be an invaluable resource that I continue to tap into. that along with so- licited approaches from senior tool designers I believe my development is on track.

**Employee Rating**
Exceeds Expectations

**Manager Comments**
SolidWorks training has helped Al.

**Manager Rating**

4

Instructions for Annual Review
Jacobs, Alphonzia



Consistently Meets Expectations

## Initiative

Takes necessary action without being asked or told what to do

**Behaviors**
  Example Behaviors
  - Takes initiative to solve problems and make decisions.

  - Speaks up to point out issues so they can be addressed.

  - Anticipates issues and requirements and act in advance to address them.

  - Does what is needed without being told what to do.

**Employee Comments**
In my role it is difficult to initiate new methodology so I concentrate on staying motivated and having customer centered solutions.

**Employee Rating**
Consistently Meets Expectations

**Manager Comments**
He is always interested to take on the next challenge.

**Manager Rating**
Consistently Meets Expectations

## Making Sound Decisions

Makes effective, timely and fact-based decisions, utilizing all available information

**Behaviors**
  Example Behaviors
  - Insists on getting down to the details to fully understand issues.

  - Asks questions to understand situations and uncover root causes.

  - Makes decisions based on the best and most approriate information, evidence and/or data.

  - Makes decisions according to what is best for the situation without letting personal feelings interfere.

**Employee Comments**
A few times I needed to explain my position to the customer and as a result my approach was accepted as a viable solution.

5

Instructions for Annual Review
Jacobs, Alphonzia



**Employee Rating**
Exceeds Expectations

**Manager Comments**
There has need significant improvement this past year with Al's tool design knowledge.

**Manager Rating**
Exceeds Expectations

## Planning Ahead/Thinking Strategically

Anticipates problems and opportunities. and makes plans to deal effectively with them

**Behaviors**
Example behaviors
- Prepares in advance to deal with potential obstacles and foreseeable.

- Identifies key implications of new information and events.

- Develops clear action plans that address the details needed to achieve objectives.

- Works out solutions to current problems that take into account potential future issues.

- Anticipates future needs and makes plans to address them.

**Employee Comments**
I continue to try and eliminate any unclear directives by planning ahead, asking relevant questions. gathering my task expectations and beginning with the end in mind.

**Employee Rating**
Exceeds Expectations

**Manager Comments**
Much improvement but more is needed.

**Manager Rating**
Consistently Meets Expectations

## Competencies

**Employee Comments**
I consitantly complete my tasks within a twenty day time frame.

**Employee Rating**

6

Instructions for Annual Review
Jacobs, Alphonzia



**Exceeds Expectations**

**Manager Comments**
On the right path now. Needs on target when discussing designs.

**Manager Rating**
Consistently Meets Expectations                                    Score:3.2857


## Development Activities

### Development Activities

**Employee Comments**
I've increased my SolidWorks proficiency by visiting the customer portal, watching trainings and contacting some of the experts that I was fortunate to meet during the past year.lj;lkj

**Employee Rating**
Exceeds Expectations

**Manager Comments**
Improved his SolidWorks skills by attending class this year.  May he should consider do another this coming year.

**Manager Rating**
Consistently Meets Expectations                                    Score:3.0000


## Manager Comments

### Employee Questions and Answers

**Question**
What do you see as your 3 biggest accomplishments in the past year?

**Answer**
* I completed the recomended GD&T training with Quality Manager Don Vacon

* I've reduced the lead time of my tasks with minimum input from checkers

* I've increased the confidence level of my peers to get the job done correctly the first time.

**Question**

7

Instructions for Annual Review
Jacobs, Alphonzia



What would you identify as an area for additional growth and development?

Answer
Continue to enhance my assigned task and solidworks efficiency.

Question
In what ways can your Manager help you in your overall development?

Answer
By continuing to help me identify developmental milestones.

Question
Provide any other comments.

Answer
In the upcoming year my goal is to remain adaptable to TDR & ECO work tasks assigned from respective Tool Design and Product Definition groups. Stay dependable by completing tasks in a timely manner and attend as many professional development opportunities that I can.

## Manager Questions and Answers

Question
What development needs does your employee have for continuous improvement?

Answer
Continue with SolidWorks learning

Continue with Tool Design concept learning

Question
Please provide information with regard to the employee's overall development.

Answer
Al is an entry level Tool Designer. He is progressing well.

Question
Did you conduct the Mid-Year Check-In?

Answer
No

8

Instructions for Annual Review
Jacobs, Alphonzia

 Smith&Wesson

## Overall

**Employee Comments**
In the past year I believe I've grown as a Tool Designer / Product Draftsman and built confidence within stakeholders and customers.

**Employee Rating**
Significantly Exceeds Expectations

**Manager Comments**
Al is progressing well learning Tool Design and SolidWorks. He will be given increasing complex Tool Designs this coming year.

**Manager Rating**
Consistently Meets Expectations                                                    Score:3.1429

9

Instructions for Annual Review
Jacobs, Alphonzia

 Smith&Wesson

## Employee Signoff

I acknowledge that I have reviewed the employee's performance and have conducted a meeting to discuss, in detail,the review document, along with other documents that support this employee's overall rating.

**Employee Comments**

Signed By                Alphonzia Jacobs

Date                     Jun 28. 2017

## Manager Signoff

I acknowledge that I have reviewed the employee's performance and have conducted a meeting to discuss, in detail,the review document, along with other documents that support this employee's overall rating.

**Manager Comments**

Signed By                Brian Emmett

Date                     Jun 28, 2017

10

Instructions for Annual Review
Jacobs, Alphonzia

 **Smith&Wesson**

EmpID    13531
Job Title    Drafter & Tool Designer I
Job Grade    LP1

Name    Jacobs, Alphonzia
Job Id    RDTLP1
Supervisor    Emmett, Brian

## Goals & Objectives | Section Weight 100%

FY2017 All Tool Designs need to be completed in less than 20 days.

Reduce all delays and wait states.

Start Date:
May 01, 2016

Due Date:
Apr 30, 2017

Actual End Date:
Apr 25, 2017

Progress:
100%

Weight:
50%

Obstacles:
NONE

**Employee Comments**
Most if not all my assigned tasks are completed in a timely manner.

**Employee Rating**
Achieved Expectations

**Manager Comments**
Al currently has 5 Tool Designs over the 20 day limit.  He needs to monitor this closer.

**Manager Rating**
Achieved Expectations

FY2017 Complete all NPD Tool Designs as Priority

NPD Tool Design work needs to be completed without any delays to ensure they stay on schedule.

Start Date:
May 01, 2016

Due Date:
Apr 30, 2017

Actual End Date:
Apr 25, 2017

Progress:
100%

Weight:
50%

Obstacles:
NONE

**Employee Comments**
Most if not all my assigned tasks are completed in a timely manner.

1

Instructions for Annual Review
Jacobs, Alphonzia

 Smith&Wesson®

**Employee Rating**
Achieved Expectations

**Manager Comments**
Al does a good job reacting to priority work. He communicates well regarding the Tool Designs status.

**Manager Rating**
Achieved Expectations

## Goals & Objectives

**Employee Comments**
In the past year I have been dependable in regards to completing tasks and look forward to enhancing my ability with developmental opportunities.

**Employee Rating**
Achieved Expectations

**Manager Comments**
Al completed 340 drawings during 2017. This is an average of 0.7 days per drawing while the Tool Design group averaged 1.6 days per drawing. This is a good average for the easier Level 1 work.

In 2018 Al requested some Level II work and he completed drawings mixed with his Level I work at a rate of 2.7 drawings per day.

**Manager Rating**
Achieved Expectations                                                              Score:75.0000

## Development Activities

**Development Activities**

**Employee Comments**
I've taken my managers suggestion and attended SolidWorks User Group meetings, receive daily information from the SolidWorks Community and started utilizing the My SolidWorks link from our software provider getting more in depth training from software experts.

**Manager Comments**
The quality and quantity of Al's work is good for Level I. To get to Tool Designer Level II status he needs to improve his through put for that type of work. It just takes time to learn.

**Manager Rating**

2

Instructions for Annual Review
Jacobs, Alphonzia



Score:75.0000

Achieved Expectations

## Employee Comments

### Employee Questions and Answers

**Question**
What do you see as your 3 biggest accomplishments in the past year?

**Answer**
Improved essential communication
Increased SolidWorks software user abilities
Increased confidence from my manager that I can get task he assigns done.

**Question**
What would you identify as an area for additional growth and development?

**Answer**
Become a better employee by capitalizing on Life long learning opportunities at the university level.

**Question**
In what ways can your Manager help you in your overall development?

**Answer**
By continuing his open door policy and sharing his knowledge whenever I have questions.

**Question**
Provide any other comments.

**Answer**

## Overall

**Employee Comments**
In the past year I have requested level 2 proficiency work. During which time I have demonstrated the ability to com-

3

Instructions for Annual Review
Jacobs, Alphonzia



pleto acceptable tasks in a timely manner. I believe I have grown as a Tool Designer and continue to build confidence within stakeholders and my customer base.

Employee Rating
Achieved Expectations

Manager Comments

Manager Rating
Achieved Expectations

Score:75.0000

4

One day shortly after Mr. Emmett called a meeting with two of his groups, Process Engineering & Tool Design. In that meeting, he informed my group of tool design that we would be assuming the responsibility for creating a new and distinct drawing format to be used on all new tool assembly drawings and supplying those drawings to the cutter grind department, specifically the tool setter group. Our finished drawings would be uploaded into Matrix and once approved would be seen in the Parlec System allowing the tool setter group to "set" the assembly to be used in the C.N.C. machines. Shortly thereafter, Mr. Emmett assigned me a task to create a set of tool assembly drawings, and when I enquired where the new formats were stored, he replied, "Thanks for volunteering". At that point under him and Scott Ignachuk another engineering manager over the cutter department direction I worked with Richard Foulkes one of the company's brightest engineers for about a month and together we created a new smart format that would have multiple uses for different stakeholders. From a process engineering standpoint, it stored an accurate bill of material for each assembly making ordering a breeze, it also housed the data needed for C.N.C. programming. The tool setter used it as a visual interpretation of which manufacturer holder, collet, lock nut, and pull stud is needed for the correct assembly and once built and placed on the Parlec Measuring System verifying height and width to a ten-thousandth repeatable accuracy.

Cutter grind used the file to stock the tool cribs, track scrap, and maintain cutter usage and inventory stockouts.

Let me clarify when I say smart, I mean when you placed any object into the field of the drawing it would draw the pre-loaded custom properties placed in each solid model making up the assembly, that same information populated the bill of material on the drawing. The format worked perfectly, it automatically populated the bill of material with all of the pertinent information needed to utilize in the C.N.C. machines as well as allowing the process engineer a digital representation to be used in a Computer Aided Manufacturing file to be used in verifying tool paths and cuts. The file was also the master file of all the specific characteristics such as manufacturer, part number, size, etc...It was beautiful and had everything...

My goal is not to criticize, but my group overwrote the custom properties of the files even though there was a built-in message stating "You are about to overwrite a custom property," in two short days. It is during this time I hear them laughing and conversing with each other saying things like "Let it ride." As they pushed the button overwriting the properties...At this point I'm exasperated, all the work that I put into the new format was destroyed and I needed to take a walk...

During this same time, I had the displeasure of finding a noose in the welding department on the grounds of Smith & Wesson Inc. First, let me respond to the assertion...

"That the existence of a noose on Smith & Wesson premises created a discriminatorily hostile work environment is baseless."

As a Black man, the noose symbolizes one of the most horrific, racist acts committed against black people, I can't express the amount of mental discomfort I felt when I saw it, and more disturbing it was

being used to intimidate all others. Smith & Wesson, Inc.'s stance is that "I'm desperate and attempting to deflect attention away from the fact that complainant's charge, as drafted, is utterly baseless."

Your records have indicated my direct connection with the noose, a reflection of exercisable hate and one that I really couldn't believe I was looking at in the year 2017 at my place of employment (Smith & Wesson, Inc..)

As a person who has first-hand knowledge concerning the noose, let me interject the fact that Mr. Latham was complacent for a couple of weeks and the noose was able to stay visible for a prolonged period before he showed me, and then I ultimately was the first employee to come forward and report it immediately to Anne Glicka in human resources. Incidentally, I was never spoken to again regarding how I felt about the noose or any other follow-up after that point. This begs the question, if I hadn't reported it would it still be allowed to hang in the workplace? My assertion of yes is concluded, because a lot of employees had access to that area, there was a microwave in close proximity that suggests it may have been put there by one individual, but it was permitted and acceptable by others. In my opinion that speaks directly to the culture of Smith & Wesson, Inc. It exhibits that leadership seems to act as if they believe that if they ignore the facts of racism, it will not exist. This approach has fostered a virulent undercurrent of racism, insinuating itself in every department, and empowering the racist to be bolden with conversation and actions. I've attached the picture that I shared with human resources and the litigation hold letter sent to me on behalf of Smith & Wesson Inc.



Directive Regarding Preservation of Information Related to Charles Latham

LITIGATION HOLD NOTICE

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

From: Ann B. Makkiya

Date: July 19, 2018

Hold Period: July 1, 2018 – Until Further Notice

---

S&W has become aware of a potential legal dispute with Charles Latham concerning his employment at S&W. S&W has a legal obligation to retain documents and other materials that may be relevant to any legal proceeding brought by Mr. Latham. *Please do not discuss this lawsuit or its subject matter, other than with S&W's Legal Department or outside legal counsel.*

*It is critically important that you take immediate steps to preserve all documents and information relevant to the dispute between S&W and Mr. Latham.* Failure to preserve such documents and information could harm S&W's ability to prosecute or defend against any legal claims and could subject the Company to severe penalties. Accordingly, it is critical that every employee take all steps necessary to preserve all potentially relevant documents and information that are within his or her control, including those documents that may be created after the date of this memorandum.

Until further notice, all documents (including hard-copy documents, e-mails, and other electronic records) that relate in any way to the following must be preserved and retained (i.e., do not alter, delete or otherwise modify such records, and take steps to preserve such records). The documents and electronic data that you should retain include, but are not limited to:

- All communications to and from Mr. Latham.
- All internal or external communications concerning Mr. Latham.
- All documents concerning Mr. Latham's employment with S&W, whether hard-copy or electronic, including: relevant personnel or other files; performance evaluations; job descriptions; job transfer/job assignment notices; time and attendance records; payroll files; other compensation records; investigation files; Human Resources files; Employee Relations files; legal files.
- All documents regarding any verbal and written warnings, or other discipline, given to Mr. Latham.
- All handbooks, policy statements, rules, procedures, training and orientation materials provided to Mr. Latham at any time during his employment.

- All documents that reflect or relate to any complaints by Mr. Latham, and any investigations into any such complaints.
- All notes of conversations with Mr. Latham.
- All video footage of Mr. Latham's work area.
- All still photographs of Mr. Latham's work area.
- All badge swipes for entry to/exit from Mr. Latham's work area.

In identifying and preserving data, the term "document" is to be defined broadly and includes, but is not limited to, non-identical copies of hard-copy documents that contain marginalia, underlining or highlighting. Hard-copy documents may be located in your office (e.g., desk, filing cabinets), home, department files, central storage locations, and/or off-site storage locations. "Electronic data" also is defined broadly and includes, but is not limited to, all text files (including word processing documents and presentations), spreadsheets, e-mails, databases, calendars, computer system activity logs, internet usage files, network access information, voicemail messages, instant messages, text messages, photographs, and video and audio recordings. S&W's computer systems include, but are not limited to, all workstations, laptops, network servers, shared drives, removable media (for example, USB thumb drives), handheld devices, voicemail, back-up tapes, your S&W-issued or personal phone or tablet, the cloud, social media sites, personal e-mail accounts and any files that you have at the office or at your home.

Potentially relevant documents must be preserved regardless of where they are located or the media on which they reside. Thus, this request includes not only documents and electronic data in your possession, but any documents and electronic data in your custody or control, including electronic documents or data that may be kept in departmental or central files or offsite. This also includes files and e-mails stored in a personal e-mail account (for example, Yahoo or Gmail) or on personal electronic devices. Any questions as to the scope of this directive should be resolved in favor of preservation and retention.

## Actions You Must Take Now

By way of example, the following types of documents relating or referring to the subject matter of any of the topics listed above must be preserved:

- *Hard-copy documents: Do not destroy, collect, segregate or otherwise disturb potentially relevant paper records.*
- *E-mail: Do not delete, forward or copy potentially relevant e-mail. Instead, create a "Preservation" folder in your mailbox and move all potentially relevant e-mail to this folder.*
- *Hard Drive: Do not delete, forward, modify, open or copy potentially relevant text files saved to your hard drive.*
- *Portable media: Do not discard, open, copy or modify any electronic files stored on CDs, DVDs or other portable media.*
- *Any Other Data Source: Please contact Ann Makkiya for instructions for retaining potentially relevant information from any other data source not referenced.*

Again, any question you may have as to the relevance of a particular document should be resolved in favor of preservation and retention. Please ensure that no document outlined above is altered, destroyed, or displaced during this legal hold.

Additionally, to the extent it is applicable, S&W's Record Retention Policy should be suspended with regard to potentially relevant documents. None of these documents should be disposed of regardless of any retention period defined in that policy. Any similar policy or practice regarding the destruction or retention of documents, formal or informal, is likewise suspended. In addition, any computers, cell phones, data storage devices and/or other media and devices containing potentially relevant information must not be disposed of, even if they are being replaced due to failure, upgrade or other reason.

If you have any questions, please call Ann Makkiya at ext. 3248, or 413-244-7553.

34864851.1

A couple of days later I was summoned to Senior V.P. Kathy Salvatores's office, it was during that conversation I conveyed my concerns, frustrations, and experiences. I talked about how each interaction, I could be on the receiving end of some disrespectful statement or treatment, how a lot, if not all of my tasks are scrutinized during the checking process, and how it has been such a constant negative interaction to the extent of harassment. I also mentioned my continued concern about my pay rate. She was very concerned about all of what we talked about and followed up with the engineering leadership. It was at that point my concerns about pay were acknowledged, agreeing that I was being grossly unfairly paid, and through her involvement and engineering director Craig Mariani, I was to see a 12% that year, 10% the next, and 6% when my leadership changed. I've attached a Smith & Wesson paystub along with a couple of my Pratt & Whitney paystubs for comparison. Notice the difference in pay over the 20 years.



**Earnings Statement** ADP

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. | CD |
| V77 | 29131 | 813000 | | 0000211310 | 1 |

SMITH & WESSON INC
2100 ROOSEVELT AVE.
SPRINGFIELD, MA 01104

Period Beginning: 06/28/2021
Period Ending: 07/04/2021
Pay Date: 07/08/2021

Taxable Marital Status  Married
Exemptions/Allowances:
  Federal:  0.550 Additional Tax
  MA:  0

ALPHONZIA JACOBS
140 NORFOLK STREET
SPRINGFIELD, MA 01109

| Earnings | rate | hours | this period | year to date | Other | this period | year to date |
|---|---|---|---|---|---|---|---|
| Pto Hrly | 27.1580 | 15.00 | 334.53 | 1,647.49 | Vlife Sp | 2.92 | 78.84 |
| Reg Indirect | 27.1580 | 24.00 | 651.79 | 23,703.13 | Vol Add Chd | 0.08 | 2.16 |
| Bonus | | | 1,200.00 | Vol Add Ee | 1.53 | 41.31 |
| Gun Transfer | | | 114.74 | Vol Add Sp | 0.61 | 19.47 |
| Holiday | | | 1,265.62 | 401K Pit | 65.18 | 1,680.62 |
| Ltd Gross Up | | | 39.85 | Gun X'er Fee | | 75.00 |
| Ot Indirect | | | 194.44 | Ltd Gross Up | | 28.05 |
| **Gross Pay** | | | **$11,688.92** | 28,465.20 | | | |

**Earnings Statement** ADP

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. | CD |
| V77 | 81131 | 813000 | | 0000243161 | 1 |

SMITH & WESSON INC.
2100 ROOSEVELT AVE.
SPRINGFIELD, MA 01104

Period Beginning: 06/13/2021
Period Ending: 06/13/2021
Pay Date: 06/24/2021

Taxable Marital Status  Married
Exemptions/Allowances:
  Federal:  0.550 Additional Tax
  MA:  0

ALPHONZIA JACOBS
140 NORFOLK STREET
SPRINGFIELD, MA 01109

| Earnings | rate | hours | this period | year to date | Other | this period | year to date |
|---|---|---|---|---|---|---|---|
| Bonus | | | 1,200.00 | 1,200.00 | Vision | | 39.36 |
| Gun Transfer | | | | 114.74 | Vife Chd | | 41.04 |
| Holiday | | | | 1,265.62 | Vife Ee | | 351.92 |
| Ltd Gross Up | | | | 39.85 | Vife Sp | | 70.08 |
| Ot Indirect | | | | 191.14 | Vol Add Chd | | 1.92 |
| Pto Hrly | | | | 210.04 | Vol Add Ee | | 36.72 |
| Reg Indirect | | | | 25,937.32 | Vol Add Sp | | 14.04 |
| **Gross Pay** | | | **$1,200.00** | 24,859.63 | | | |

 

303119

## UNITED TECHNOLOGIES PRATT&WHITNEY

400 MAIN ST., E. HARTFORD, CT 06108

Taxable Marital Status:   Single
Exemptions/Allowances:
    Federal:        0
    CT:             D,Filing Status A

Social Security Number: ███-0118

## Earnings Statement



Period Ending:    11/15/2002
Pay Date:         11/15/2002

ALPHONZIA JACOBS JR
140 NORFOLK STREET
SPRINGFIELD, MA 01109

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 1515.00 | 86.67 | 1,515.00 | 31,815.00 |
| Overtime | | | | 3,369.27 |
| Regular Adjust | | | | -148.59 |
| Gross Pay | | | $1,515.00 | 35,035.68 |

| Taxable Wages | this period | total to date |
|---|---|---|
| Federal | 1,251.36 | 29,008.25 |
| Social Security | 1,478.61 | 34,263.61 |
| Medicare | 1,478.61 | 34,263.61 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| Group Term Life | 0.90 | 18.90 |
| Assigned Shift | | 1.00 |
| Department | | S012484 |

| Deductions | Statutory | this period | year to date |
|---|---|---|---|
| | Federal Income Tax | -160.52 | -4,107.96 |
| | Social Security Tax | -91.67 | -2,124.34 |
| | Medicare Tax | -21.44 | -496.82 |
| | CT State Income Tax | -36.58 | -963.13 |
| | **Other** | | |
| | Flex Ad&D | -0.29* | -6.09 |
| | Flex Dental | -9.00* | -189.00 |
| | Flex Hmo | -28.00* | -595.88 |
| | S/P Loan N/R | -30.28 | -151.40 |
| | Savings Acct | -909.97 | -21,145.72 |
| | 401K Basic N/R | -90.90* | -582.11 |
| | 401K Suppl N/R | -136.35* | -4,673.25 |
| | **Net Pay** | **$909.97** | |

* Excluded from federal taxable wages

©2001 Automatic Data Processing, Inc.



IF VERIFYING DOCUMENT AUTHENTICITY - COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM

## UNITED TECHNOLOGIES PRATT&WHITNEY

400 MAIN ST., E. HARTFORD, CT 06108

Deposited to the account of
ALPHONZIA JACOBS JR

THIS IS NOT A CHECK

Advice number:    00000455124
Pay date:         11/15/2002

| account number | transit ABA | amount |
|---|---|---|
| 2636106 | 2111 7689 | $909.97 |

**NON-NEGOTIABLE**

TEAR HERE

THE ORIGINAL DOCUMENT HAS AN ARTIFICIAL WATERMARK. HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENT.

CO. FILE DEPT CLOCK VCHR. NO. 5770
PWS 025137 303 19 1F12 0000514875 11

303119


**UNITED
TECHNOLOGIES
PRATT & WHITNEY**
*400 MAIN ST., E. HARTFORD, CT 06108*

Social Security Number: ███-0116
Taxable Marital Status: Single
Exemptions/Allowances:
  Federal: 0
  State:    0, Filing Status A

# Earnings Statement



| | |
|---|---|
| Period Ending: | 12/31/2001 |
| Pay Date: | 12/31/2001 |

**ALPHONZIA JACOBS JR
140 NORFOLK STREET
SPRINGFIELD, MA 01109**

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 1515.00 | 86.67 | 1,515.00 | 11,304.23 |
| Double Time | | 7.00 | 244.72 | 244.72 |
| Overtime | | 21.00 | 550.62 | 550.62 |
| Gross Pay | | | $2,310.34 | 12,099.57 |

| Deductions | Statutory | this period | year to date |
|---|---|---|---|
| | Federal Income Tax | -360.36 | -1,656.64 |
| | Social Security Tax | -141.04 | -739.20 |
| | Medicare Tax | -32.99 | -172.88 |
| | CT State Income Tax | -72.44 | -333.05 |
| | **Other** | | |
| | Flex Ad&D | -0.29* | -1.45 |
| | Flex Dental | -6.00* | -30.00 |
| | Flex Hmo | -30.00* | -150.00 |
| | Savings Acct | -1,320.67 | -3,168.30 |
| | 401K Suppl N/R | -346.55* | -1,255.55 |
| | **Net Pay** | | $1,320.67 |

\* Excluded from federal taxable wages

| Taxable Wages | this period | total to date |
|---|---|---|
| Federal | 1,928.40 | 10,667.07 |
| Social Security | 2,274.95 | 11,922.62 |
| Medicare | 2,274.95 | 11,922.62 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| Group Term Life | 0.90 | 4.50 |
| Assigned Shift | | 1.00 |
| Department | | S012484 |

**Important Notes**
ATTENTION:W28 WILL BE SENT TO THE ADDRESS ON YOUR
CHECK STUB. PLEASE REVIEW AND UPDATE IF NECESSARY.

©1973 Automatic Data Processing, Inc.

◀ TEAR HERE

©7981ADP.PV



VERIFY DOCUMENT AUTHENTICITY - COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM

**UNITED
TECHNOLOGIES
PRATT & WHITNEY**
400 MAIN ST., E. HARTFORD, CT 06108

Advice number:  00000514875
Pay date:        12/31/2001

Deposited to the account of
ALPHONZIA JACOBS JR

THIS IS NOT A CHECK

| account number | transit-ABA | amount |
|---|---|---|
| 2636105 | 2111 7689 | $1,320.67 |

**NON-NEGOTIABLE**

THE ORIGINAL DOCUMENT HAS AN ARTIFICIAL WATERMARK ON THE BACK. HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENT.

I am being completely honest when I tell you that it felt like the group was aware of everything that was transpiring between myself and the company. In my opinion, the tool designer group was aware that I had doubled the output of tasks compared to them, and as a result, I want to highlight the checking process, which was used as an apparatus to slow me down and add amusement to their day. However, I had a very different perception, in my opinion, it was a never-ending show of control, whereas often the target intent would be manipulated to degrees of harassment.

In drafting, when creating a blueprint/drawing we convey the information necessary to define engineering intent. The blueprint/drawing should avoid any unnecessary manufacturing restrictions. The checking process allows a fresh pair of trained eyes to overlook the drawing looking for things that could enhance the manufacturability or design intent of the print. The tool used in this operation is called a <u>marked print.</u>

(see the image below as an example)

Similar to how a letter can be corrected except everything is technical, and most often the contents are industry-specific, with its corporate caveats as well. I assert that my completed drawings would bounce back and forth from checker to myself a ridiculous amount of times. I raised this concern to my leadership, and it was ignored perpetuating a behavior pattern instead of a process riddled with elements of harassment. As the person incorporating the changes it is customary not to push back on the checkers marked print, and as a result that became the pathway of permitted harassment. Normally changes are minor and can be performed quickly, moving the drawing components to be created or assembled. In my case, our file management system called MATRIX will show multiple rejections for each task I performed, no matter the complexity. It was only during the checking process that the uncommon became common practice and it was customary for the whole design or concept to change. This was a clear show of power, and when my concerns were shared with leadership there was no intervention, and as a result, it empowered the unfair behavior towards me having an incalculable destructive effect on my health.



## ENGINEERING LEADERSHIP CHANGE

Brian Courtney Engineering Director takes a new position with a new company and my direct manager Brian Emmett retires.  Rich Picard becomes my new manager, and John Pliska is named the new Engineering Director.

During Rich's brief tenure as Tool Design Manager, he assigned me as the engineering liaison to facilitate coordination between the tool setter department. Though there was no formal documentation, this new responsibility gave me the authority to assist the cutter department cell coordinator and all the tool setters who reported to him, by providing clarification on the part print, cutting tool print, supplier data, tool assembly components, or anything related to the tool assembly process. While this was a valuable bargaining tool for negotiating a higher salary, my new manager Marion Moryl felt otherwise.

I had participated in developing the process closely supervised by the previous managers Brian Emmett and Scott Ignachuk who oversaw all manufacturing. It was disheartening to see the months of work I had put in with Rich Foulkes to develop characteristic embedded solid models and formats, only to have them overwritten.  Even though they were furnished with clear requirements for the tool assembly prints, our tool design checkers were falling short and contributing to the manufacturing scrap rate and were not taking or being held responsible for the non-conforming work they produced.

This gave me a feeling of disappointment.  It was an opportunity for leadership to intervene and set the process and record straight by taking a firm stance on deliverables. However, this would become a major contributor to my stress and anxiety.  As the liaison between engineering and manufacturing, I became intimate with details, hearing all the complaints directed to my peers with the expectation that I correct the issues.  Unfortunately, the fact was I could do nothing to curb their behavior or the product they were releasing to the manufacturing floor.

This distraction didn't impede me from my responsibilities to other engineering customers despite my group dynamics I delivered and exceeded expectations frequently.

(See below correspondence and  e-mail as an example of work performed.)

Model Employee Attributes





Dear Alphonzia

When D.B. Wesson wrote the words, "No thing of importance comes without effort," he did so with first-hand knowledge regarding the truth of that statement and he subsequently made history. The story of Smith & Wesson is not only about two passionate and enterprising men; it is also the story of thousands of men and women who were equally dedicated and whose efforts forever earned Smith & Wesson a place in American History.

As our businesses continue to evolve, each of us must adapt in an increasingly dynamic world. As we do so, the expertise and wisdom we gain through time and effort contributes to our combined success. In addition, our vision and mission are only meaningful if each of us integrates them into our daily actions and decisions. Your efforts reflect these core values and I thank you for your many contributions. Your dedication to the success of Smith & Wesson and American Outdoor Brands is greatly appreciated each and every day.

On behalf of the leadership team, please consider this a small token of our esteem and recognition of the commitment and loyalty you have demonstrated. On behalf of everyone at American Outdoor Brands, thank you for your efforts and for carrying forward our founders' dreams of building a great company.

With respect,

*James*

James Debney

President and Chief Executive Officer

Delighting My Customer

**Jacobs, Alphonzia**

| | |
|---|---|
| From: | Vega, Sam |
| Sent: | Friday, May 04, 2018 3:47 PM |
| To: | Fadus, Richard; Asselin, Andrew |
| Cc: | Jacobs, Alphonzia; Cirelli, Christopher |
| Subject: | RE: New Revolver Sideplate Fixture |

Great job guys!!! I really like this!

From: Fadus, Richard
Sent: Friday, May 04, 2018 3:44 PM
To: Vega, Sam <svega@smith-wesson.com>; Asselin, Andrew <aasselin@smith-wesson.com>
Cc: Jacobs, Alphonzia <ajacobs@smith-wesson.com>; Cirelli, Christopher <ccirelli@smith-wesson.com>
Subject: New Revolver Sideplate Fixture

Sam:

Per your request... here's what the fixture is going to look like. The tool designer is just wrapping things now and it will be in check Monday (the step before it gets to me).

As discussed, please let me know of any guns you can think of that have compensators on them. As you can see based on below we may have to have longer caliber inserts on that little turret. The only ones I can think of are the V-comp, M19, 929 and the 629. X frames are exempt since they're held differently on the laser.

Thanks,

Rick



**Rick Fadus**
Smith & Wesson

1

<u>Year 2019-2022</u>

The tool assembly process has been a constant cause of stress, anxiety, and disappointment for years. Smith & Wessons Inc., appeared complicit with my tool design counterparts when they acted deliberately overwriting files years earlier.

Fast forward six years of unchecked behavior, and no accountability, Smith & Wesson empowered my co-worker's negative behavior allowing the escalation of maliciously vulgar language among things that I was subjected to. I was told "I'm not Fucking doing that" by co-workers Jim Lepage and Mike Kenney during two separate instances of producing marked prints for incorporation constitutes that statement.

At one point I was forwarded an email that originated from Rich Picard who was now the Cutter Department Cell Coordinator to my manager Marion Moryl requesting the cease from releasing tool assembly prints to manufacturing until I had a chance to view and approve them.

Rich Picard referenced my knowledge of the process and stated I was the only one who knew what was going on about the tool setter process, and how instrumental a conforming print was to his department's success. Within that e-mail he showed an example to Marion what his team leaders were identifying as unacceptable prints, commenting to his recollection the prints were supposed to be getting better not worse that our group was supplying to his group.

That e-mail was purged from my inbox. As a result, I would ask if investigator Joseph Greenhalgh has the authority to exercise a subpoena for emails and certain individuals during my last year of employment. I believe there will be an incriminating read for sure.

I offer the above as an example of how hostile my workplace had become and how leadership stood by and did nothing to intervene with the circumstances it helped create. These incidents were reported and never had any resolution in the form of accountability.

Although two influential managers, Brian Emmett and Scott Ignachuk, collaborated with me and entrusted me to update the process, my involvement did not provide me with the necessary tools for additional compensation. However, I was able to become an area expert in the Tool Assembly Process.

This had little bearing on the tool design group and as a result, improving the substandard prints was ignored for years as if there was no value in making good prints, nor were they held accountable even though it was a major job deliverable. I assert that after years of egregious behavior, it had finally become unacceptable. Consequently, I was to be pulled back in after years of watching what I will describe as willful ignorance, which showed that my concerns were never taken seriously. I had previously described the circumstances we were facing years prior but was ignored when mentioned. Maybe that is why I was never notified by my leadership that I was to be responsible for checking all the tool assembly drawings before them being released. Instead, it came in a forwarded email from Mike Agan, the only one with more seniority in the group than me and who up to that point was releasing the files to manufacturing. I would also like to point out that there was no real dialogue in the below e-mail, only when a file was hot and possibly could affect production. At this point, it was a rush job. See below:

**Jacobs, Alphonzia**

| | |
|---|---|
| From: | Agan, Michael |
| Sent: | Wednesday, November 10, 2021 12:50 PM |
| To: | Jacobs, Alphonzia |
| Cc: | Miller, Daniel |
| Subject: | FW: CSX Slide TDR's |

Al checks all tool assys

From: Miller, Daniel <dmiller@smith-wesson.com>
Sent: Wednesday, November 10, 2021 12:49 PM
To: Agan, Michael <magan@smith-wesson.com>
Subject: CSX Slide TDR's

Hey Mike,

Can you push the two following TDR's through? They are hot.

- TDR-21-672
- TDR-21-681

Thanks,
Daniel Miller
Process Engineer
(413) 747-3264

 Smith&Wesson

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) Is intended only for the use of the

As an employee, I've always turned to Human Resources to voice my concerns about rules and regulations that impact my job security and employability. This fell into one of those times.

I had a lengthy discussion with Senior Vice President Kathy Salvatore. It was at that time I expressed my frustrations with what was being asked of me again regarding the tool assemblies on the production floor. I informed her that I was not told by Marion Moryl my manager to check the group's work, but in an e-mail from Mike Agan, I was expected to do so. I also disclosed a major obstacle of being told "Fuck that I'm not doing that." When I issued a marked print for incorporation to group members Jim Lepage and Mike Kenney it was an impossible task.

Somehow unofficially, I was responsible for checking all the tool assembly files now. It was during our conversation she followed up by asking me about my pay. She then proceeded to look at my employment file, then stated that my pay had slipped below average again and that I should also add that to the conversation with my manager Marion, and then follow up with her afterward.

See below email from Mike Agan:

Jacobs, Alphonzia
_____

From:         Agan, Michael
Sent:         Thursday, October 21, 2021 10:07 AM
To:           Miller, Daniel
Cc:           Jacobs, Alphonzia; Picard, Rich
Subject:      RE: TTA8335

Dan,

Al has TTA8335 to check and Rich Picard needs to approve T15386.
I've copied them on this so they can help you out.

Mike

From: Miller, Daniel <dmiller@smith-wesson.com>
Sent: Thursday, October 21, 2021 9:10 AM
To: Agan, Michael <magan@smith-wesson.com>
Subject: TTA8335

Hey Mike,

TTA8335 is in drafting check. Can we put a rush on that drawing so we can get it out to the tool setters to make?

Also its drill T15386 is in business review, who do I contact to get that moving along?

Thanks,
Daniel Miller
Process Engineer
(413) 747-3264

Smith&Wesson®

1

## CONTINUED CONCERNS WITH PAY, RACIST ATTITUDES, AND DEMEANING BEHAVIOR

It was apparent that my present leadership of Marion Moryl and John Pliska didn't realize that I raised the issue of pay upon entry into the engineering department and during my first review with then-engineering manager Brian Emmett, explained earlier in this document.

When I had the conversation with my manager Marion Moryl, I didn't feel like he cared about being fair or impartial on the contrary I felt like my concerns about racist attitudes and demeaning behavior towards me were being minimized. I left that meeting with my manager asking me what I thought about him asking the tool design group if I deserved a raise. These were the same individuals who I complained about days earlier telling me "fuck that I'm not doing that." Concerning a marked print.

I was blown away, the preferential treatment being shown to others in the group, was disheartening. I had never experienced nor could anticipate this form of structural racism exhibited by leadership, thus was clear benign neglect and racist behavior from management. I followed up our meeting with an e-mail summarizing the facts of that meeting, and shortly after there was an acceleration of forms of aggression, discrimination, and harassment from my engineering manager and director.

Here is an example of a concerted effort to undermine my work performance. This example shows the indifference the hierarchy of power holders exhibited trying to diminish the harassment that I experienced as I worked on this task.

- Mike Agan has a meeting with our manager Marion Moryl. During that meeting, he pitched a design for a file I was assigned.
- Marion called me to his office to discuss the files and task.
- He suggested that I use Mike's solid model, and blueprint file to complete the task, informing me that Mike already had them ready to use.
- I go with his suggestion and use his files and put it in Mike's cue to check
- To my surprise Mike rejected the file, and now it needs to be redesigned.
- The file starts to bounce back and forth between Mike Agan the creator and myself.
- After multiple rejections of the file he furnished, I requested a meeting with leadership.
- In that meeting I express my frustrations and concerns with Marion Moryl and John Pliska
- It was clear the engineering manager John Pliska was uncomfortable having to explain the rationale for so many rejections and then said he reviewed the process, and it looked like I was the problem.
- At that point we went over the blueprint one more time before I was to incorporate this next set of marked print changes.
- John Pliska assured me that everything was in accordance with the protocol and that the file would not come back.
- No one informed Mike Agan that the game was over, and he rejected the file yet again.

See below communication :

From: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Sent: Wednesday, March 16, 2022 10:16 AM
To: Moryl, Marion <mmoryl@smith-wesson.com>
Cc: Pliska, John <jpliska@smith-wesson.com>
Subject: RE: Please expedite

Good morning Marion In response to Sharon Smith's e-mail to S Ignachuck that you forwarded to me, these are the files that I raised concerns about back in January. I know we are all busy so let me refresh your memory. These are the files that you called me into your office to suggest Mike Agan's concept made since from a monetary stand point one-gauge vs two. I went with the suggested design only to have to improve upon the design, and then incorporate an extensive marked print. At this time, it must have been in checking because I received it back in rejected state two months later. When I brought my concern to you again about my feelings around the checking process at that point I was under the impression that you were going to follow up with Mike. That was back in January and because I never heard anything, I sent the files back to you on Monday. Tuesday, I get CC'd dialog from Ms. Smith regarding these gauges and questioning if the person that was assigned them still works here. An hour later the files are back in my task pane without any mediation or resolution of my raised concerns. In the interest of expediting these files it may be best to reassign TDR 21-456 & 21-457 to someone else because I've incorporated multiple marked prints and each time checking turns back my file with more updates.

Sincerely,

Al J

From: Moryl, Marion
Sent: Tuesday, March 15, 2022 5:15 PM
To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: Please expedite

Al,

We need to expedite all outstanding gaging listed below and the ones I have forward back you today. Most of them are from last year and production was expecting them months ago. Please review some of the TDR's and let me know which one you want to keep and the rest I will move around within the group to get them completed by end of next week. I will stop by and see you tomorrow.
Thanks,

Marion

I would like to highlight the psychological implications that these encounters had on my health. I was being barraged by leadership with issues that are all pessimistic, and subjective in measure. At this point my leadership started to act unscrupulous, trying to portray me as being the irrational, unreasonable one, adding to my stress and anxiety. I'm frustrated and not receiving any resolution from my manager Marion Moryl, so I follow the chain of command for myself and request a meeting with engineering director John Pliska.

During that meeting, we discussed how my manager Marion suggested that I use Mike Agan's file, and how Mike wouldn't promote his file and kept rejecting it. We went over the print extensively and he reassured me that this would be the last time I incorporated a marked print for this file because he couldn't explain why it kept coming back. Then I asked him about the tool assembly process and how I gave two of my peers marked prints to incorporate and was told "fuck that I'm not doing it" he acted shocked and appeared to write Jim Lepage and Mike Kenney's names in a notebook, but there was to be no follow up with John Pliska either.

See below the Non-discrimination and Non-harassment Policy:



| Title: | HR-013 Non-Discrimination/Harassment Policy | Effective Date: | 06/14/2021 | Revision #: | 5 |
|---|---|---|---|---|---|

## SMITH & WESSON BRANDS, INC.

## NON-DISCRIMINATION AND NON-HARASSMENT POLICY

### 1. PURPOSE

1.1. It is the goal of Smith and Wesson Brands, Inc. and all of its subsidiaries (collectively the "Company") to promote and maintain a work environment free of any (a) unlawful discrimination and harassment based on race, color, religion. national origin, ancestry, sex, pregnancy. sexual orientation, gender identity. gender expression. parental status, marital status, order of protection status, age. disability, citizenship. veteran status, military status, unfavorable discharge from military service, genetic information or testing. or any other classification protected by federal, state, or local law in matters of employment and (b) sexual misconduct or sexual harassment.

1.2. Please note that while this policy sets forth Company's goals of promoting a workplace that is free from discrimination and harassment. this policy is not designed or intended to limit the Company's authority to discipline or take remedial action for workplace conduct that the Company deems unacceptable. regardless of whether that conduct satisfies the legal definition of discrimination or harassment based on sex or other protected classifications.

### 2. SCOPE

2.1. This policy applies to all employees of the Company.

### 3. POLICY

3.1. The Company does not tolerate unlawful discrimination. harassment, sexual misconduct, or sexual harassment in the workplace by employees, contract workers, vendors, suppliers, visitors, or family members of any of them. Its intent is to provide a work environment that is professional and free from intimidation, hostility, and other offenses that might interfere with employment or work performance, or any business relationships of the Company. All employees have a responsibility to keep the work environment free of such discrimination and harassment. Any employee found to have violated this policy will be subject to appropriate disciplinary action, up to and including termination of employment. Any non-employee found to have violated this policy may be subject to consequences deemed reasonable and appropriate by the Company. This policy prohibits improper conduct that courts may or may not find to be unlawful discrimination, harassment. sexual misconduct, or sexual harassment because it is Company's intent to encourage early reporting and resolution of complaints before the conduct becomes unlawful. This policy relates to conduct by a person of any gender and can occur between persons of the same or a different gender. The Company also has procedures relating to consensual romantic or sexual relationships.

3.2. **Discrimination.** It is a violation of the Company's policy to unlawfully discriminate against any employee or job applicant based on race, color, religion. national origin, ancestry, sex, pregnancy, sexual orientation, gender identity. gender expression, parental status, marital status, order of protection status. age, disability, citizenship, veteran status, military status, unfavorable discharge from military

 **Smith&Wesson**

| Title: | HR-013 Non-Discrimination/Harassment Policy | Effective Date:¹ | 06/14/2021 | Revision #: | 5 |
|---|---|---|---|---|---|

service, genetic information or testing, or any other classification protected by federal, state, or local law in matters of employment.

3.3. **Harassment.** It is a violation of the Company's policy to engage in unwelcome, hostile, or offensive conduct that is based on race, color, religion, national origin, ancestry, sex, pregnancy, sexual orientation, gender identity, gender expression, parental status, marital status, order of protection status, age, disability, citizenship, veteran status, military status, unfavorable discharge from military service, genetic information or testing, or any other protected status, in a manner such that interferes with an individual's performance or creates an intimidating, hostile, or offensive work environment. Harassing conduct includes, but is not limited to, slurs or negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; and display or circulation in the workplace of written or graphic material that denigrates or shows hostility or aversion toward an individual or group (including through email).

3.4. **Sexual misconduct, sexual harassment, and consensual romantic or sexual relationships.** It is a violation of the Company's policy to engage in sexual misconduct or sexual harassment in any manner or to engage in a consensual romantic or sexual relationship with any employee, contract worker, vendor, or supplier or family member of any of the them, without complying with the Company's procedures.

3.5. **TYPES OF SEXUAL CONDUCT AND RELATIONSHIPS COVERED BY THIS POLICY**

   3.5.1. Sexual harassment means any unwelcome sexual advances, requests for sexual favors, or other physical, verbal, or visual conduct of a sexual nature when:

   3.5.1.1. Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment by the Company, or any direct or indirect affiliation with the Company

   3.5.1.2. Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual or any vendor or supplier to the Company

   3.5.1.3. The conduct has the purpose or effect of unreasonably interfering with an individual's work performance at the Company or with any vendor or supplier to the Company; or

   3.5.1.4. The conduct creates an intimidating, hostile, or offensive work environment at the Company.

   3.5.2. The following examples of sexual harassment are intended to be guidelines and are not exclusive when determining whether there has been a violation of this policy:

   3.5.2.1. Verbal sexual harassment includes innuendoes, suggestive comments, jokes of a sexual nature, sexual propositions, lewd remarks and threats, requests for any type of sexual favor (including repeated, unwelcome requests for dates), and verbal abuse or "kidding" that is oriented toward a prohibitive form of harassment, including that which is sexual in nature, inappropriate, and unwelcome.

Now I'm going to highlight an element of harassment concerning the work and checking process that I complained about many times. The process of creating a blueprint that meets design intent in Smith & Wesson Inc. became another topic of concern that I believe will show my unfair treatment.

This encounter started with being called into my manager Marion Moryl's office so we could discuss one of my assigned tasks. During our discussion, he informed me that the checker Mike Agan showed him a design for one of the tasks that he had assigned to me. I told him, that Mike and I hadn't spoken about the file at that point and it was a surprise that he came to talk to him in regards to the file. There was no response as to why the checker went to discuss my task with my boss before speaking to me...Instead, his response was Mike showed him a concept that eliminated one fixture from the build and he agreed from a cost standpoint. I mentioned that his concept didn't meet the engineer's TDR. It was at this time he suggested that I utilize Mike's design, anyway. He told me that Mike already had the solid model and print complete. All I had to do was use it. As any other rational employee, when your manager makes a suggestion adhere to the request. I do so and as it would have it. Once I put the file in for checking, Mike rejected his file and handed me a marked print to incorporate. After incorporating three or more marked prints I informed my manager, that the file that he suggested that I use can't seem to make it through the checking process of its creator. These concerns were also ignored. Later he sends myself and Director Pliska this email repeatedly asking about the status as if we never conversed about the file.

---

**Jacobs, Alphonzla**

| | |
|---|---|
| From: | Pliska, John |
| Sent: | Thursday, April 07, 2022 5:27 PM |
| To: | Jacobs, Alphonzia; Moryl, Marion |
| Subject: | RE: 'Drawing Print' 'G10651' A |

Marion,
Please forward this TDR on. This needs to get completed.

Al,
The print we reviewed had the design for a SD 9mm sear. The request is for a Firing Pin Retainer Plate fixture. That is what the checker is seeing. That is why its being rejected.

-----Original Message-----
From: Jacobs, Alphonzia
Sent: Tuesday, March 29, 2022 11:41 AM
To: Moryl, Marion <mmoryl@smith-wesson.com>
Cc: Pliska, John <jpliska@smith-wesson.com>
Subject: FW: 'Drawing Print' 'G10651' A

Good morning just following up with our conversation that we had on March 18th regarding the checking of TDR's 21-456 & 21-457...

During that meeting I conveyed my concerns regarding the checking process, in particular how many times I've incorporated changes to a file that was supplied to me and how it felt like I would never complete the task. The determination of your review was "that the process looked fine and I'm the only one who seems to be having these issues". I left assured that the process was good and the file would not come back, but as you can see the file was rejected again...

Regards,

Al J

-----Original Message-----
From: Mike Agan <magan@smith-wesson.com>
Sent: Monday, March 28, 2022 9:06 AM
To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: 'Drawing Print' 'G10651' A

## Jacobs, Alphonzia

| | |
|---|---|
| **From:** | Pliska, John |
| **Sent:** | Monday, April 11, 2022 12:36 PM |
| **To:** | Jacobs, Alphonzia |
| **Cc:** | Moryl, Marion |
| **Subject:** | Re: 'Drawing Print' 'G10651' A |

Al,

The request of the checker was legitimate. This could have been resolve by simply talking with the checker. I'm moving the task because needs to get completed.

John Pliska
Director of Engineering, Facilities & Maintenance
Smith & Wesson

Sent from my iPhone

> On Apr 11, 2022, at 11:36 AM, Jacobs, Alphonzia <ajacobs@smith-wesson.com> wrote:
>
> Good morning my apologize for the delayed response. I see I missed some correspondence when I was out last week due to my wife contracting Covid. With all due respect John the last of many requests were.
> "Take SolidWorks drawing G10651, renumber as G10652 and resubmit". I did and now the part that is being fixtured changed...FYI each product print calls out six different profiles that will need multiple orientations so they can be checked.
>
> I thank you for having this task reassigned, it feels like a weight has been lifted of me...
>
> Sincerely,
>
> Al J
>
> -----Original Message-----
> From: Moryl, Marion
> Sent: Friday, April 08, 2022 11:42 AM
> To: Pliska, John <jpliska@smith-wesson.com>; Jacobs, Alphonzia <ajacobs@smith-wesson.com>
> Subject: RE: 'Drawing Print' 'G10651' A
>
> Will do.
>
> -----Original Message-----
> From: Pliska, John <jpliska@smith-wesson.com>
> Sent: Thursday, April 07, 2022 5:27 PM
> To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>; Moryl, Marion <mmoryl@smith-wesson.com>
> Subject: RE: 'Drawing Print' 'G10651' A
>
> Marion,
> Please forward this TDR on. This needs to get completed.

1

AJ,

The print we reviewed had the design for a SD 9mm sear. The request is for a Firing Pin Retainer Plate fixture. That is what the checker is seeing. That is why its being rejected.

—-Original Message-----
From: Jacobs, Alphonzia
Sent: Tuesday, March 29, 2022 11:41 AM
To: Moryl, Marion <mmoryl@smith-wesson.com>
Cc: Pliska, John <jpliska@smith-wesson.com>
Subject: FW: 'Drawing Print' 'G10651' A

Good morning just following up with our conversation that we had on March 18th regarding the checking of TDR's 21-456 & 21-457...

During that meeting I conveyed my concerns regarding the checking process, in particular how many times I've incorporated changes to a file that was supplied to me and how it felt like I would never complete the task. The determination of your review was "that the process looked fine and I'm the only one who seems to be having these issues". I left assured that the process was good and the file would not come back, but as you can see the file was rejected again...

Regards,

Al J

----Original Message-----
From: Mike Agan <magan@smith-wesson.com>
Sent: Monday, March 28, 2022 9:06 AM
To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: 'Drawing Print' 'G10651' A

Business Object: Inbox Task IT-0411686

http://matrix.smith-wesson.com/ematrix/common/emxNavigator.jsp?objectId=41723.36060.22591.41800

Your task Instructions are:
G10651 was rejected by magan. Rejection Comments are: FOR 3011022, FIRING PIN RETAINER PLATE

To find out more about the Task, use the following URL:
http://matrix.smith-wesson.com/ematrix/common/emxNavigator.jsp?objectId=41723.36060.55748.32570

This message, including all attachments: (I) May contain technical data as defined in the International

2

Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged,

3

confidential, and/or exempt from disclosure under applicable law. If you have received this
communication in error, please delete it and notify the sender immediately. Thank you.



This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations
(ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this
material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written
approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) is intended only for the use of
the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from
disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender
immediately. Thank you.

4

## Leadership Mischaracterizing The Facts in Exhibits

Here is an example of bullying.

As the area expert, I'm aware that our customer The Process Engineering Group utilizes our solid models to verify tool path clearance during the Computer Aided Manufacturing process. I noticed my peer Mike Agan attempting to undermine the process and circumvent the system by placing a PDF file in place of a solid model component-based tool assembly. I pointed this out to Mike during the checking process as it was completely non-conforming to the process. He ignored our conversation and my marked print for a month. I get called into my manager's office where I explain all of the files nonconforming attributes. To no consequence, my manager Marion Moryl forced me to release the file in its non-conforming state. Before I left his office I informed him that I would comply with his directive and then leave for the rest of the day. I left that day very frustrated with my manager Marion Moryl, instead of gaining his understanding to the process that could be verified by other experts, he sought to use this as a chance to slander my name to Kristen Capannola and John Pliska mischaracterizing the facts and blatantly lying saying I stormed out of his office in the months to follow.

See below:

**Jacobs, Alphonzia**

| | |
|---|---|
| From: | Jacobs, Alphonzia |
| Sent: | Wednesday, November 24, 2021 10:38 AM |
| To: | Kaczor, Ryszard; Agan, Michael |
| Cc: | Moryl, Marion |
| Subject: | RE: 3013230 X350 cylinder |

Sorry Rysz, I didn't follow up with Marion yet...

From: Kaczor, Ryszard
Sent: Wednesday, November 24, 2021 9:38 AM
To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>; Agan, Michael <magan@smith-wesson.com>
Cc: Moryl, Marion <mmoryl@smith-wesson.com>
Subject: RE: 3013230 X350 cylinder

HI AJ,

Any updates on this print ?I need it to complete my process documentation for 350 Legend cylinder.
Thanks for your help,

Rich

From: Jacobs, Alphonzia
Sent: Tuesday, November 23, 2021 9:02 AM
To: Agan, Michael <magan@smith-wesson.com>; Kaczor, Ryszard <rkaczor@smith-wesson.com>
Cc: Moryl, Marion <mmoryl@smith-wesson.com>
Subject: RE: 3013230 X350 cylinder

Mike since when do we only provide pdf files? We own the process and all definition in its entirety...
Let me know when you update the file and I will check it out.

Regards,

AJ

From: Agan, Michael
Sent: Tuesday, November 23, 2021 7:52 AM
To: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Cc: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: RE: 3013230 X350 cylinder

Rich-does Cylinder set their own tools?

From: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Sent: Tuesday, November 23, 2021 7:23 AM
To: Agan, Michael <magan@smith-wesson.com>
Cc: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: RE: 3013230 X350 cylinder

Mike,

For our tool assembly drawings we only provide pdfs.

Rich

From: Agan, Michael
Sent: Tuesday, November 23, 2021 7:15 AM
To: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Cc: Jacobs, Alphonzia <ajacobs@smith-wesson.com>
Subject: RE: 3013230 X350 cylinder

Al,
Please check DTA0206.

Rich,
Can you pack'n'go the original Solidworks drawing and assembly? Or is this an automated file?

Mike

From: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Sent: Monday, November 22, 2021 3:27 PM
To: Agan, Michael <magan@smith-wesson.com>
Subject: FW: 3013230 X350 cylinder

2

Mike,

See attached dwg.
Thanks,

Rich

From: Moryl, Marion
Sent: Monday, November 22, 2021 3:18 PM
To: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Cc: Agan, Michael <magan@smith-wesson.com>
Subject: RE: 3013230 X350 cylinder

Assigned to Mike.

From: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Sent: Monday, November 22, 2021 2:19 PM
To: Moryl, Marion <mmoryl@smith-wesson.com>
Cc: Agan, Michael <magan@smith-wesson.com>
Subject: FW: 3013230 X350 cylinder

Marion,

Can you assign TDR-21-726 to tool designer?
It's for tool assembly OTA0206 (350 legend chamber reamer).
I already have finished drawing that needs to be put in Matrix (should be quick).
Thanks,

Rich

From: Ignachuck, Scott
Sent: Monday, November 22, 2021 1:45 PM
To: Kaczor, Ryszard <rkaczor@smith-wesson.com>
Cc: Moryl, Marion <mmoryl@smith-wesson.com>; Gallant, Kristopher <kgallant@smith-wesson.com>
Subject: 3013230 X350 cylinder

3

Rich, I sent you the Rev A drawing print task for the X350 cylinder. This means it has passed First Article Inspection and testing. Please make sure everything is production ready:

- MMR complete to flip routing and BOM to production
- New tool assemblies have drawings released in Matrix and viewable on Parlec
- New cutters are set up and stocked in Autocrib
- Programs ready and available in CPMS

If you have any questions or need help with any of this, Kris Gallant can provide guidance.

Scott

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) Is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) Is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) Is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

This message, including all attachments: (i) May contain technical data as defined in the International Traffic In Arms Regulations (ITAR) (22 CFR 120.10) or technology as defined in the Export Administration Regulations (EAR) (15 CFR Part 772) Export of this material is restricted by the U.S. Government and may not be released or transferred to non-U.S. persons without prior written approval from the U.S. Department of State or U.S. Department of Commerce, as applicable; and (ii) Is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and/or exempt from disclosure under applicable law. If you have received this communication in error, please delete it and notify the sender immediately. Thank you.

## Moryl, Marion

| | |
|---|---|
| **From:** | Capannola, Kristen |
| **Sent:** | Monday, January 17, 2022 4:16 PM |
| **To:** | Moryl, Marion |
| **Subject:** | RE: Al Jacobs Incident 11/30 |

Thanks – let me know what happens when you speak with him tomorrow about his incidents of leaving early last Thurs and Friday

 **Kristen Capannola**
*Senior HR Business Partner*

From: Moryl, Marion
Sent: Monday, January 17, 2022 12:21 PM
To: Capannola, Kristen <kcapannola@smith-wesson.com>
Subject: Al Jacobs Incident 11/30

Hi Kristen,

We had a critical project tool update that needed to be pushed through the matrix right away and I asked Al to process this per Rich Kaczor request.
Al had an issue with older drawing template that was used at that time and he refused to complete the task as instructed. After a brief conversation
to explain the reason we need this task done per engineering request Al stormed out and left work. I did brought up this incident to John Pliska and we
decided to talk to him following day to understand his frustration. After 10-15 conversation he understood he can't lose his temper and just get up and leave work.
From my understanding Al got a break and knew I have to follow the policy in any future non-compliance from him.

25

## Collaborative, Cruel, Unscrupulous, Abusive, and Vindictive Behavior

The below e-mail culminates all my previous concerns. Despite Attorney's DeProspo Jr stating that there were no issues with my performance during our Zoom conference. My leadership appears to be moving clandestinely fabricating the need for me to be put on a Personal Improvement Plan - PIP Instead of addressing any of the many circumstances that I shared that involved misconduct, discriminatory, or harassing behavior. The hypocrisy of leadership concerning these circumstances should be noted, Marion Moryl used his power to silence my previous concerns, he then changed the narrative to assign blame and slander my name in an attempt to justify his inactions to suit those in Human Resources unaware I raised concerns of compliance involving the same file to the process. Despite his efforts, the facts remain.

- Pressured me to release a non-conforming file.
- Mischaracterized the fact when he stated I refused to complete an engineering request.
- Slandered my abilities when he implied I was falling short in job performance.
- Lacked compliance with protocol when he discredited my concerns.
- These are the types of actions that contributed to my psychological abuse.

**Pamela Peck**

| | |
|---|---|
| **From:** | Capannola, Kristen <kcapannola@smith-wesson.com> |
| **Sent:** | Tuesday, February 1, 2022 4:50 PM |
| **To:** | Alexander, Nasia; Cirillo, Danielle |
| **Cc:** | Moryl, Marion |
| **Subject:** | FW: Al Jacobs |

Hi guys – just wanted to bring you up to speed on some issues we're having with Al's performance.
Marion will let us know if Al is able to complete his current tasks within the time period required, or if we are headed
towards preparing a PIP.

 **Kristen Capannola**
*Senior HR Business Partner*

From: Moryl, Marion
Sent: Tuesday, February 1, 2022 4:42 PM
To: Capannola, Kristen <kcapannola@smith-wesson.com>
Subject: Al Jacobs

Hi Kristen,

I was told to document most recent incident with Al. As you may know Al has been given tasks over last few months which he
refused to complete per engineering requests and at one time lost his temper and decided to leave work for rest of the day without submitting absence in ADP.
We did have a meeting with Scott Ignachuck, Rich Picard, Al Jacobs and myself to go over his concerns and agree on specific tasks definition and
manager responsible (myself) to make final decisions when it comes to any matrix tasks. As of right now Al has over 150+ tool/assembly drawings to complete on which
we both agree will take 80 hours to complete (meeting (1/27/22). I did verify with Scott time requirement for this project and he did agree that time frame was more than satisfactory.

*Marion Moryl*

Engineering Manager
*Smith & Wesson*
*2100 Roosevelt Ave., P O Box 2208*
*Springfield, MA 01104*
Office: 1-413-747-6292
Mobile: (413) 262-4652
email: mmoryl@smith-wesson.com

 **Smith&Wesson**

Please visit our website at www.smith-wesson.com

1

Here is an example of how Manager Marion Moryl ignored my concerns for months, then later adapted a negative narrative chastising me in an e-mail with the person solely responsible for the task not being completed. This was a virtual slap in the face causing undue stress and anxiety. The treatment that I experienced during this task reflects a racial undertone, and as a result, I could not "just do my job". I was subject to unfair scrutiny, from someone who had no clue regarding process and procedures. The only thing that was starting to ring true was that the checking process was being used as a means of harassment and was allowed to do so because of the following facts.

- This was a major public relations FUBAR moment for Smith & Wesson Inc., Engineering
- Intern Gabriella Pires created the files and performed her tasks under the direction of Senior Tool Designer Mike Agan until I was asked to step in.
- Grabriella has to give some sort of account to The Western New England University Engineering Department whether favorable or not.
- Our customer/Cutter Grind's Tool Setter Department rejected all of the interns' tool assembly prints and elevated them through the chain of command until they reached the Cell Coordinator.
- The Cutter Grind Department Cell Coordinator requested by e-mail that our group halt all tool assembly prints until I had a chance to review them.
- During my file review I uncovered that all the files were not just substandard from the tool setter group requirements to set the assembly for cutting in the C.N.C. machines, the files also violated our official file management system Matrix.
- I had to coordinate with Bob Shumsky who controls all file management to have the first 30 tool assembly drawings purged from the system.
- Despite being the area expert, I was having a hard time getting the tool assemblies released because Gavin Giguere was repeatedly rejecting the files with no real explanation.
- Due to the excessive number of rejections, I spoke with Marion Moryl regarding Gavin's new discretionary release of the files, suddenly.
- There was no leadership intervention for months.

See related email below:

## Jacobs, Alphonzia

| | |
|---|---|
| **From:** | Jacobs, Alphonzia |
| **Sent:** | Thursday, June 02, 2022 9:11 AM |
| **To:** | Moryl, Marion; Giguere, Gavin |
| **Subject:** | RE: New Gemtech Tool Assemblies |

Good morning all, Marion I got involved with this task when Rich Picard forwarded you an e-mail from his team leaders complaining about the tool assemblies Gavin had released to the floor. At that time my task was to clean up his prints. However to put it frankly Gavin is getting in his own way in regards to the multiple times these files are being rejected before completion.

The first go round he appeared not to care what was on the print, but now that I'm working on it everything is under extreme scrutiny. I've mentioned this to you in the early days of my accepting those tasks to check and now it's been months and I'm still not complete with his 30 tool assemblies. I am very frustrated at that fact, but, it is out of my control when Gavin keeps rejecting my work as if I don't know what I'm doing. He was and still is under the false impression he owns my print and can dictate what goes on it, and their lies the problem. I would be happy to sit with Gavin and yourself to finally hash this out or you can reassign, whatever you think is best. At this time the only thing we seem to agree on is that this should have been done a long time ago...

I can use Rob Marsland's task as an example...
I jumped off Gavin's TDR and created 150 cutters & tool assemblies and got them through checking to the production floor for Rob Marsland in two weeks...

Again all I can do is update the files which in this case seems like I'm chasing my tail...So you would be doing me a favor taking me off his task.

Regards,

Al J

From: Moryl, Marion <mmoryl@smith-wesson.com>
Sent: Friday, May 27, 2022 4:49 PM
To: Jacobs, Alphonzia <ajacobs@smith-wesson.com>; Giguere, Gavin <ggiguere@smith-wesson.com>
Subject: RE: New Gemtech Tool Assemblies

Al,

What's going on with this request? It is absolutely critical we push NPD tooling through right away. If there's an issue Gavin is just
two steps away from where you sit and things like this cannot hold up urgent projects.

Gavin,

I will reassign your request and I will make sure this is completed right away. I apologize for the delay.

*Marion Moryl*

1

### Racist Techniques are used to dilute concerns.

During a meeting on January 27th, 2022 about compensation, my manager asked me if I thought he should go ask my co-workers if I deserved a raise. When I followed up with an email acknowledging this and how I felt it was inappropriate for him to make that suggestion to John Pliska, his boss there was no follow-up, other than additional aggression that came in the form of a corrective action later that day.

I believe this encounter to be unjust and racially motivated. The Corrective Action Notice I received with no basis from my manager Marion Moryl alleging that on January 14 I failed to give proper notice to take time off from work and left early without contacting him was another show of power. I offer the below contradiction to his allegation. I provided notice on 01/11/2022 by a text message to Mr. Moryl 3 days prior concerning my childhood friend's funeral arrangements.

On the day of the funeral, Mr. Moryl abruptly scheduled a meeting during the same time as my friend's service. The meeting was in regard to the tool assembly issues I raised and requested a meeting months earlier. I attended the meeting despite the conflict in time, then left for the service immediately after. In attendance at this meeting were Scott Ignachuk (Director of Manufacturing), Richard Foulkes (Lead Process Engineer), Rich Picard (Cutter Grind Cell Coordinator), Bill Copson (Lead Engineer over Cutter Dept.), Marion Moryl (Engineer Manager), and me. Please see the text message below, following the disputed Corrective Action Notice.

**Moryl, Marion**

| | |
|---|---|
| **From:** | Moryl, Marion |
| **Sent:** | Thursday, January 27, 2022 8:24 AM |
| **To:** | Jacobs, Alphonzia |
| **Subject:** | RE: Verbal warning |

HIAl,

Stop by and see me when you can so I can explain the performance evaluation process. Thanks,

**From:** Jacobs, Alphonzia <ajacobs@smith-wesson.com>
**Sent:** Thursday, January 27, 2022 8:20 AM
**To:** Moryl, Marion <mmoryl@smith-wesson.com>
**Subject:** RE: Verbal warning

I'm sure there was already a plan to elevate my pay...That didn't happen and now I'm just pointing out again I'm below average when it comes to the pay-scale.

**From:** Moryl, Marion
**Sent:** Thursday, January 27, 2022 8:05 AM
**To:** Jacobs, Alphonzia <ajacobs@smith-wesson.com>
**Subject:** RE: Verbal warning

All evaluations are performance based. Not sure what you mean by discrepancy.

**From:** Jacobs, Alphonzia <ajacobs@smith-wesson.com>
**Sent:** Thursday, January 27, 2022 8:00 AM
**To:** Moryl, Marion <mmoryl@smith-wesson.com>
**Subject:** RE: Verbal warning

That in my opinion is part of the discrepancy...None of my evaluations have been bad yet I'm on the lower end of compensation.

**From:** Moryl, Marion
**Sent:** Wednesday, January 26, 2022 4:00 PM
**To:** Jacobs, Alphonzia <ajacobs@smith-wesson.com>
**Subject:** RE: Verbal warning

I will not. Evaluation will be performance based.

**From:** Jacobs, Alphonzia <ajacobs@smith-wesson.com>
**Sent:** Wednesday, January 26, 2022 10:57 AM
**To:** Moryl, Marion <mmoryl@smith-wesson.com>
**Subject:** Verbal warning

Hey the verbal warning that you spoke about won't affect me getting additional compensation because of some unknown factor will it?

20

# Corrective Action Notice

**Smith&Wesson°**

| Employee Name: Jacobs Alphonzia | Department: 13900 |
|---|---|
| Badge #:13531 | Date Presented: 1/27/22 |

## Disciplinary Level

☒ **First Written Warning** – *(Active for one (1) year)*
☐ **Final Written Warning** – *(Active for one (1) year)*
☐ **Suspension/Investigation & Review to Determine Continued Employment** –
    *(Active for two (2) years)* – Dates of Suspension: _____

**Subject** (Reason for discipline):    | Attendance |

☐ Policy/Procedure Violation
☐ Behavior/Conduct Infraction
☒ Absenteeism/Tardiness

## Prior Notifications

| Level of Discipline | Date | Subject |
|---|---|---|
| First Written | | |
| Final Written | | |
| Suspension/Investigation | | |

## Incident Description and Supporting Details:
Include the following information: Date & Time of Incident, Description, Persons Involved

On January 14th Al failed to give proper notice to take time off from work and left early without contacting his active manager.

### Performance Improvement Plan

1. Measurable/Tangible Improvement Goals:
2. Training or Special Direction to Be Provided:
3. Interim Performance Evaluation Necessary?
4. Our Employee Assistance Program (EAP) Provider, ESI, can be confidentially reached to assist you at (800) 252-4555. This is strictly voluntary. A pamphlet regarding the EAP's services is available from Human Resources, or at www.theEAP.com.

### Employee Comments

(Attach additional sheets if needed)

Pursuant to Massachusetts Law, you are being formally notified that this document, along with any and all attachments, will be placed in your personnel file and may negatively impact your opportunities for employment, promotion, transfer, additional compensation and/or disciplinary action now or in the future.

This corrective action should not be taken lightly, and any further violation of company rules will result in additional disciplinary action up to and including termination of employment.

### Employee Acknowledgment

I understand that Smith & Wesson is an "at-will" employer, meaning my employment has no specified term and that the employment relationship may be terminated any time at the will of either party upon notice to the other. I also realize that Smith & Wesson is opting to provide me with corrective action measures, and can terminate such measures at any time, solely at its own discretion, and that the use of progressive discipline will not change my at-will employment status.

I have received a copy of this corrective action notice. It has been discussed with me, and I have been advised to take time to consider it before I sign it. I have indicated my opinion regarding this notice below:

☐ I agree with this corrective action.          ☒ I disagree with this corrective action.
                                                 (add comments above)

_____          _____
Employee Signature      Date       Employee Signature      Date

**Management Signatures**

_____          _____
Team Leader             Date       Cell Coordinator        Date    1/27/22

_____          ☐ Copy to Personnel File
Human Resources         Date       ☐ Copy to Employee



Marion >

iMessage
Tue, Jan 11, 10:53 AM



**Obituary for Philip Anthony Malone at Henderson's Funeral...**
hendersonsfh.com



Another good friend has been called home 😢

Delivered

iMessage

PHYSICAL HEALTH CHALLENGES AND DIAGNOSIS

The exacerbation of my health was starting to become evident. I was at work one morning and was feeling under the weather when I contacted a doctor through the Smith & Wesson 98.6 platform application. It was during that interaction that I was told to leave work immediately and visit an urgent care facility. Urgent Care didn't have the equipment to diagnose my heart issue and sent me to the emergency room. Once seen by an E.R. doctor, I was admitted to the hospital from July 6th through July 9th, 2021.

These events prompted my application for MA PFML through The Standard, which states that employees with medical conditions can qualify for Paid family and medical leave of which I only used 12 weeks, not coming close to exhausting the 20-week maximum allowance according to Massachusetts law. This makes Smith & Wesson Inc,. libel when it retaliated against me for raising concerns about its leadership, causing the denial of my extension and terminating my employment while out on protected leave.

At this point, I would like to highlight my interaction with The Standard, in particular, how many times the Standard requested to have my doctor fill out the same forms over and over and over again. As always, I brought my concern to Human Resources, and they informed me that Smith & Wesson Inc. allows the Standard to manage and administer benefits, and Smith & Wesson had no control over their process. I took that as an overt act that allowed Smith & Wesson to skirt their responsibilities once again. The un-talked-about advantage to this was, that they claimed to have no control over the insurance benefits being paid out or lack thereof. I was skeptical of that answer because I knew of one matter that occurred months earlier when they used the same tactics with my friend Vinnie Brower, an employee who went out with lead poisoning and was forced to come back to work against his doctors' orders. He told me he had no choice but to return because the alternative was being evicted from his apartment because the Standard didn't send him his check. Little did I know the same playbook would be used on me later. Again, I doubt it was just a coincidence that another Black Man was being taken advantage of. The culture promoted it. My personal experience was dreadful, unusually difficult, and nerve-racking to say the least. Something as routine as turning in requested medical documentation turned into an exhausting correspondence of requests. I submit the following as proof of an obstructive process that ensures Smith & Wesson benefits in the form of slowly compensating the employee as a delayed tactic.

See the below correspondence between my cardiologist and the Standard where there are repeated requests on the following dates: 10/19/2021, 3/21/2022, 4/29/2022, 5/25/, and 5/27/2022.

It was while out on MA PFML one of my coworkers decided to write these degrading remarks on my whiteboard.



# Transmission Report

| | | | | | |
|---|---|---|---|---|---|
| Date/Time | 05-31-2022 | 15:18:14 | Transmit Header Text | | |
| Local ID 1 | 4137487191 | | Local Name 1 | PVC | |

**This document : Confirmed**
**(reduced sample and details below)**
**Document size : 8.5"x11"**

05/27/22 15:03:04 -> 4137437191 Page 001

STANDARD INSURANCE COMPANY
Absence Management Service Center
PO BOX 3877
Portland, OR 97208
CUSTOMER SERVICE NUMBER: (866) 756-8116
FAX: (856) 751-5174

TheStandard

Date: 5/27/2022 4:02:20 PM Pages: 3

To: ATTN: Dr. Hadad / Re: Alphonsia Jacobs Fax: 4137437191

From: Customer Service Fax:

Dept: Absence Management

Your patient recently initiated a short term disability claim with The Standard. Attached, please find an Attending Physician Statement (APS) for completion. Please complete this form and return it to our office via fax. Fax# 866-751-5174.

Prompt completion of APS will allow us to process your patient's disability claim quickly.

Thank you for your assistance in this matter.

WARNING: PRIVILEGED AND CONFIDENTIAL MATERIAL

The information contained in this facsimile message is confidential, privileged, and exempt from disclosure to third persons and is intended solely for the use of the individual or entity named above. If the recipient or reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any retention, dissemination, distribution, copying, or unauthorized use of this communication is strictly prohibited. If you have received this facsimile in error, please notify the sender immediately by telephone, and also return the facsimile and any copies thereof to the sender at the above address via the U.S. Postal Service. All postal expenses will be paid by sender. Thank you.

Original available upon request

Total Pages Scanned : 3 | Total Pages Confirmed : 3

| No. | Job | Remote Station | Start Time | Duration | Pages | Line | Mode | Job Type | Results |
|---|---|---|---|---|---|---|---|---|---|
| 001 | 576 | . | 15:16:15 05-31-2022 | 00:01:37 | 3/3 | 1 | EC | HS | CP14400 |

Abbreviations:
HS: Host send
HR: Host receive
WS: Waiting send
PL: Polled local
PR: Polled remote
MS: Mailbox save
MP: Mailbox print
RP: Report
FF: Fax Forward
CP: Completed
FA: Fail
TU: Terminated by user
TS: Terminated by system
G3: Group 3
EC: Error Correct

85/27/22  14:83:84  .                    ->            4137487191 .                    Page 881

**STANDARD INSURANCE COMPANY**
Absence Management Service Center
PO BOX 3877
Portland, OR 97208
CUSTOMER SERVICE NUMBER: (866) 756-8116
FAX: (866) 751-5174



TheStandard

| | | | |
|---|---|---|---|
| Date: | 5/27/2022 4:02:20 PM | Pages: | 3 |
| To: | ATTN: Dr. Hadad / Re: Alphonzia Jacobs | Fax: | 4137487191 |
| From: | Customer Service | Fax: | |
| Dept: | Absence Management | | |

Your patient recently initiated a short term disability claim with The Standard. Attached, please find an Attending Physician Statement (APS) for completion. Please complete this form and return it to our office via fax. Fax# 866-751-5174.

Prompt completion of APS will allow us to process your patient's disability claim quickly.

Thank you for your assistance in this matter.

## WARNING: PRIVILEGED AND CONFIDENTIAL MATERIAL.

The information contained in this facsimile message is confidential, privileged, and exempt from disclosure to third persons and is intended solely for the use of the individual or entity named above. If the recipient or reader of this message I s not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any retention, dissemination, distribution, copying, or unauthorized use of this communication is strictly prohibited. If you have received this facsimile in error, please notify the sender immediately by telephone, and also return the facsimile and any copies thereof to the sender at the above address via the U.S. Postal Service. All postal expenses will be paid by sender. Thank you.

Original available upon request.

B5/27/22  14:B3:16  .                    ->           4137487191 .              Page BB2

**Standard Insurance Company**

866.756.8116 Tel  866.751.5174 Fax
PO Box 3877  Portland OR 97208

**Disability Claim/Family Medical Leave**
**Attending Physician's Statement**

## To Be Completed By Employee

| Full Name: | Employer/Company Name: | Group Policy No. |
|---|---|---|
| Alphonzia Jacobs 00JC6618 - DOB: ███-1969 | | |

*Federal law requires us to notify you that section marked with * are required for purposes of completing your disability claim.*

## To Be Completed By The Attending Physician

*The following information is needed to document the patient's inability to work. The patient is responsible for obtaining a complete form without expense to The Standard. Please complete this form and mail or fax it to The Standard using the contact information listed above.*

| 1. Diagnosis | A. Diagnosis  CHF  CM | | | ICDA Classification  150.9  142.9  150.2 |
|---|---|---|---|---|
| B Symptoms  dyspnea  lower extremity edema | | | °C.  Height  6'1" | Weight  215 lbs    B/P  126/98 |
| 2. Pregnancy (if applicable) | A. Expected date of delivery | B. Actual date of delivery | ☐ Vaginal  ☐ C-section | |
| 3. History and Treatment | A. Date you recommended the patient stop work | | B. When did symptoms appear or accident happen?  7-6-21 | |

'C. Has the patient ever had the same or similar condition? ☐ Yes ☐ No    If yes, when?

*D. Is this condition related to the patient's employment? ☐ Yes ☒ No    'E Did you complete a Workers' Compensation claim form? ☒ Yes ☐ No

F. Date of first visit for this condition  7-6-21 hospital    G. Frequency of subsequent visits:  ☐ Weekly ☐ Monthly ☒ Other  every 3-4 months    H. Date of most recent visit  3-25-22

I Describe planned course and duration of treatment

| J. Hospitalization?  ☒ Yes ☐ No | K. Date Admitted  7-6-21 | Date Discharged  7-9-21 | L. Surgery?  ☐ Yes ☒ No | M. Date Surgery Completed/Scheduled |
|---|---|---|---|---|
| N. Reason/Surgery Type | | | O. Surgery/Post-Surgery Complications?  ☐ Yes ☐ No    If yes, please describe | |

### 4. Level of Functional Impairment *Please attach recent chart notes/pertinent records.*

A. Describe patient's physical and/or mental limitations and restrictions (functional capacity).

Reduced  EF,  lift/push/pull  weight restrictions

B Factors Delaying Recovery (if applicable)

C. How long do you expect these limitations and restrictions to impair your patient?  8/10/2022
☐ Date expected to return to work ___    ☒ Unable to determine, follow up in 8 weeks    ☐ Permanently

*D. Is the patient competent to manage insurance benefits? ☒ Yes ☐ No
If no, is the patient competent to appoint someone to help manage the insurance benefits? ☐ Yes ☐ No

### 5. Physician Information *Please type or print.*

| Name of physician completing this form  Elizabeth Peckham | Specialty  Cardiology | | | Phone No.  (413) 748-7095 |
|---|---|---|---|---|
| Address  300 Stafford St. | City  Springfield | State  MA | ZIP  01104 | Fax No.  (413) 748-7191 |

*Acknowledgement — I certify that the answers I have made to the above questions are complete and true to the best of my knowledge and belief. I acknowledge that I have read the fraud notice on page 2 of this form.

Signature ___    Date  5/31/2022

51 14600                                    1 of 2                                    (5/13)

Jacobs, Alphonzia (MRN 687046)                                    Encounter Date: 10/19/2021

69

# Jacobs, Alphonzia                                              MRN: 687046

**Telephone** 10/19/2021          Provider: Elizabeth Nicole Peckham, NP (Cardiology)
Cardio PVC POC 154                Reason for call: other

## Conversation: other                                          (Newest Message First)

October 19, 2021

Jillian Menec R.M.A.

Note 🔔 📧                                                4:40 PM         JM

Copy sent to be scanned In


Jillian Menec R.M.A.

Note 🔔 📧                                                4:30 PM         JM

Disability claim form from standard insurance company filled out by ENP. I
have faxed it to them and mailed the pt a copy also


## Media
From this encounter
Scan on 10/21/2021 3:13 PM by Sasha Otanez: FORM


## Orders Placed
None


## Medication Renewals and Changes
As of 10/19/2021 4:40 PM

None


## Medication List at End of Visit
As of 10/19/2021 4:40 PM

|  | Refills | Start Date | End Date |
|---|---|---|---|
| aspirin 81 MG EC tablet |  |  | 8/10/2022 |
| Take 81 mg by mouth. - Oral |  |  |  |
| Patient-reported medication |  |  |  |
| carvedilol (COREG) 12.5 MG tablet | 2 | 9/24/2021 | 3/31/2022 |
| Take 1 tablet by mouth 2 times daily (with meals) for 180 days. - Oral |  |  |  |

Jacobs, Alphonzia (MRN 687046) Printed by Jillian Menec R.M.A. [995794] at 5/26/202...    Page 1 of 2

Jacobs, Alphonzia (MRN 687046)                                        Encounter Date: 03/21/2022

# Jacobs, Alphonzia                                                   MRN: 687046

**Telephone** 3/21/2022          Provider: Elizabeth Nicole Peckham, NP (Cardiology)
Cardio PVC POC 154              Reason for call: other

**Conversation: other**                                             (Newest Message First)

March 21, 2022

Jillian Menec R.M.A.

Note                                                          4:07 PM          JM

I spoke with the patient and I have faxed paper work and I will leave a copy at
he front desk for him to pick it up. A copy will also be scanned in


Elizabeth Nicole Peckham, NP

Note                                                          3:31 PM          EP

I filled this out already and Jill has it.


Dawn Grimaldi R.N. routed this conversation to Elizabeth Nicole Peckham, NP • 3:09 PM      DG
Jillian Menec R.M.A.


Catheline Martinez routed this conversation to Pvca Triage Mercy Site Pool      2:49 PM    CM


Catheline Martinez

· 'Note                                                       2:49 PM          CM

Patientstates that he dropped off paperwork this Friday for ENP to fill out.
Patient states that he received a call questioning why this paperwork needs to
be filled out now by ENP? I could not find any documentation of this but
patient wants ENP to know that this paperwork was needed back when he
was first seen but the insurance company did not send it to PVCA. Please call
patient with any questions at 413-244-2938


AJ      ↪ Jacobs, Alphonzia contacted Catheline Martinez                        2:46 PM

Jacobs, Alphonzia (MRN 687046)                                          Encounter Date: 04/29/2022

## Jacobs, Alphonzia                                          MRN: 687046

**Telephone** 4/29/2022          Provider: James D. Haddad, MD (Cardiovascular Disease)
Status: Open                    Reason for call: other
Cardio PVC POC 154

### Conversation: other                                          (Newest Message First)

May 2, 2022

Jillian Menec R.M.A.

- Note 🔔 📧                                                    3:54 PM          JM

Only the second half of section 7 had to be filled out. Per Nen we could just
add on to the old paper work. I have faxed it back to them. I called and spoke
to the patient and he will pick up a copy of this.

April 29, 2022

Jillian Menec R.M.A.

Note 🔔 📧                                                      3:35 PM          JM

I called and spoke to Nen at the insurance company and I will have ENP take
a look at the paper work

Frank Rios routed this conversation to Jillian Menec R.M.A.          3:21 PM          FR

Frank Rios

- Note 🔔 📧                                                    3:21 PM          FR

Pt is calling stating that ENP usually fills out this form he needs filled out, she
last filled it out in march but pt states insurance company sent him an email
showing where the provider needs to fill out. Pt states frequency from when
he first started seeing ENP". Pls call pt with any questions 413-244-2938

AJ     ↩ Jacobs, Alphonzia contacted Frank Rios                      3:19 PM

*This encounter is not signed. The conversation may still be ongoing.*

## Communications

Jacobs, Alphonzia (MRN 687046) Printed by Jillian Menec R.M.A. [995794] at 5/26/202...   Page 1 of 2

Jacobs, Alphonzia (MRN 687046)                                    Encounter Date: 05/25/2022

Meaghan Landry R.N. routed this conversation to Jillian Menec R.M.A. • James    1:54 PM    **ML**
D. Haddad, MD • Elizabeth Nicole Peckham, NP

Natasha L Rivera routed this conversation to Pvca Triage Mercy Site Pool    1:48 PM    **NR**

**Natasha L Rivera**

Note 🔔 💬                                                                1:48 PM    **NR**

Patient called in regarding the TFML form that had previously been completed
for him by the provider. The patient did not elaborate on the exact definition of
the form. Patient stated that the forms had been completed last year, but his
insurance company is now requesting the forms to be filled out again with
more in depth information. Patient stated that the last forms that had been
completed were interpreted by the insurance company as only giving the
patient 2 days off per cardiac episode. And only 2 episodes per every six
months. Patient stated this is incorrect.
Please call the patient back at 413-244-2938.

**AJ**    ↪ Jacobs, Alphonzia contacted Natasha L Rivera                    1:42 PM

*This encounter is not signed. The conversation may still be ongoing.*

Jacobs, Alphonzia (MRN 687046) Printed by Jillian Menec R.M.A. [995794] at 5/26/202... Page 2 of 3

Jacobs, Alphonzia (MRN 687046)                          Encounter Date: 05/25/2022

# Jacobs, Alphonzia                                      MRN: 687046

**Telephone** 5/25/2022          Provider: James D. Haddad, MD (Cardiovascular Disease)
Status: Open                     Reason for call: other
Cardio PVC POC 154

## Conversation: other                                   (Newest Message First)

### May 31, 2022

Jillian Menec R.M.A.

Note 🄰 🖾                                                        4:25 PM        JM

The patient will pick up a copy also. I have left a copy up front

Jillian Menec R.M.A.

Note 🄰 🖾                                                        4:11 PM        JM

I faxed over paper work to Standard Insurnace company I faxed it to 866-751-5174.

Jillian Menec R.M.A.

Note 🄰 🖾                                                        4:03 PM        JM

New paper work faxed over to be filled out and left on ENP's desk

### May 25, 2022

Jillian Menec R.M.A. routed this conversation to Elizabeth Nicole Peckham, NP   3:11 PM    JM

Jillian Menec R.M.A.

Note 🄰 🖾                                                        3:11 PM        JM

The patient called and is asking for some help. We filled out some FMLA paper work for him and it was faxed over back in March. They still have not processed his paper work. He has not gotten paid for the time that he missed since last July. He is asking if maybe you can type a letter stating that we have provided all infor mation that was requested but they still are givin him a hard time about when he has a flare up how much time he can take. They told him he can have 2 days every 6 months if needed which is not what you filled out. He is asking for any help that you can provide.

Jacobs, Alphonzia (MRN 687046) Printed by Jillian Menec R.M.A. [995794] at 5/26/202...   Page 1 of 3

## MENTAL HEALTH AND DIAGNOSIS

The constant barrage of mental anguish took a toll on my body and spirit, resulting in securing mental health treatment. Please see the below from Breaking Ground.



# Breaking Ground

Counseling, Coaching, Consulting

July 20, 2023

Dear Sir or Madam:

Per request from Alphonzia Jacobs, this letter is to confirm that Alphonzia Jacobs, birthdate ▇▇▇▇ 1969, was diagnosed with the following at the time he was last seen for psychotherapy with this practice in August 2022:

F324 Major Depressive Disorder, Single Episode, Moderate, in partial remission
F419 Anxiety Disorder, Unspecified

Treatment was terminated by client after he did not reschedule more than 30 days after a missed appointment on September 6, 2022.

Sincerely,

Tamika Brock

Tamika Brock, MSW, CISD, LCSW
381 Hubbard Street
Glastonbury, CT 06033
Fax: 855-955-3938
Phone: 860-470-6747

# BIOPSYCHOSOCIAL [MENTAL HEALTH ASSESSMENT]

| | | | |
|---|---|---|---|
| **Client Name:** | Alphonzie Jacobs | **Medical Record Number:** 9545-142 | |
| **DOB:** | ▮▮▮ 1969 | | |
| **Treating Clinician:** | Tamika Brock, MSW, CISD, LCSW MSW, CERTIFIED SCHOOL SOCIAL WORKER, CISD, LCSW | **Provider:** | Tamika Brock, MSW, CISD, LCSW Breaking Ground Counseling |

## Diagnostic Codes

[F419] Anxiety disorder, unspecified

[F32q] Major depressive disorder, single episode, in partial remission

| Date of service | Duration | Service Location | Location Code |
|---|---|---|---|
| Sat Apr 02 2022 | 0 hour(s) 45 minute(s) | Office | 11 |

**Referred by:**

Self-referral through ESI EAP

**Client's idea of presenting problem:**

"Work-related issues that may have some racially-based components to it. I found you through ESI EAP. I am looking for a black or Spanish clinician. I don't want to talk to white people about certain things. I am going through shit at work. I don't want to keep feeling like that all the time. I am a total design engineer at Smith and Wesson and I am one of two Black people there out of 75. They don't want to let me have any success here. I have been here about 10 years in total but things have escalated the past six months. They have not been as subtle. I am in Springfield but I can come to Glastonbury this Saturday. I am not sure if this is going to be helpful but I do need someone to talk to. I have never had a suicide attempt before and I am not having thoughts of hurting myself or anyone else. I have never been hospitalized for mental health issues. I have never been in therapy before. No one in my family has ever had a suicide attempt, been hospitalized for mental health issues, or completed suicide. No one else in my family has ever been diagnosed with any mental health issues. I started high blood pressure pills about 10 years ago. I was diagnosed with high blood pressure about 10 years ago. I am not addicted to anything. I do smoke marijuana. Do you think that is an addiction?"

**Problem onset timeline**

It has been about the past 6 months that things have escalated. As a black man there is a certain level of inherent racism that we have to deal with- even when they do not realize they are being racist they are. We basically numb ourselves to it. Things definitely became more intense when I mentioned the money to my supervisor - my pay being so low. I mentioned that in January 2022. "

**Reason/Motivation for Treatment/Eval Now:** On a scale of 1 to 5 how motivated are you for tx now? What motivates you to change now? Is there anyone influencing your decision to get help/treatment now?

"5 - Because I am really interested in learning about what the process is going to hold for me. This is me sharing what is going on but the other side is things that I can do to help me cope."

**Tell me about any barriers/obstacles between you and getting tx now? (External, internal)**

Client denied

**What concerns, if any, do you have about getting tx or changing yourself or current circumstances now?**

Client denied

Jacobs, Alphonzia (MRN 687046)                              Encounter Date: 09/01/2021

HEMATOLOGY/LYMPHOLOGY No prolonged bleeding, easy bruisability or swollen nodes
NEURO: No persistent headache, syncope, seizures, weakness or numbness

**PAST MEDICAL HISTORY:**

Patient Active Problem List

| Diagnosis | Date Noted |
|---|---|
| • Cardiomyopathy (HCC) [I42.9] | 09/01/2021 |
| • HFrEF (heart failure with reduced ejection fraction) (HCC) [I50.20] | 09/01/2021 |
| • HTN (hypertension) [I10] | 08/19/2021 |
| • Dyspnea [R06.00] | 08/31/2021 |
| • Dyslipidemia [E78.5] | 08/19/2021 |
| • CHF (congestive heart failure) (HCC) [I50.9] | 08/19/2021 |

**FAMILY HISTORY:**

Family History

| Problem | Relation | Age of Onset |
|---|---|---|
| • CAD | Mother | |

**SOCIAL HISTORY:**

Social History

Tobacco Use
• Smoking status:        Never Smoker
• Smokeless tobacco:     Never Used
Substance Use Topics
• Alcohol use:           Yes
        Comment: Socially

History
   **Last Reviewed by Jillian Menec R.M.A. on 9/1/2021 at 10:46 AM**
   Sections Reviewed
   Family, Tobacco, Alcohol, Drug Use

**ACTIVE MEDICATIONS:**

Current Outpatient Medications

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • aspirin 81 MG EC tablet | Take 81 mg by mouth. | | |
| • atorvastatin (LIPITOR) 40 MG tablet | Take 40 mg by mouth. | | |

Jacobs, Alphonzia (MRN 687046) Printed by Michelle Zaccari [994532] at 10/3/2023 4:3...  Page 2 of 5

The purpose of this document was to bring attention to the concerns that I have raised over my ten-year tenure with Smith & Wesson Inc. The discrimination I've experienced, the harassment I felt, and overall, the unfair treatment I endured. This document will also demonstrate that the company's diversity initiatives are shortsighted. I will provide examples to help differentiate between situations that I believe are racially motivated. Specifically, I will discuss how maintaining power and control through numerical dominance I perceived as discriminatory, and how being one of only two people of color in a room of 75 for years reinforced that perception. I believe this lack of diversity contributed to my struggle for equitable pay.

Despite Smith & Wesson's claims of equality and inclusivity for all, as a black employee, I have personally experienced a consistent struggle to receive what the industry has determined as fair compensation. I will show how despite receiving a 12%, 10%, and 6% increase in salary over three consecutive years, I was still below average on the pay scale.

Senior Vice President of Human Resources, Kathy Salvatore, and Engineering Director Craig Mariani were instrumental. It was under the new leadership of John Pliska and Marion Moryl my rate of pay fell below average again. This fact was brought to my attention by Kathy Salvatore for the second time who suggested that I speak with my manager, Marion Moryl.

As a reflection of the type of employee I tried to be while under the employ of Smith & Wesson Inc.

### INITIATED HOLIDAY LUNCHEON AND GATHERING – 2013 - 2021

I state the following to give a perspective on the type of collaborative person I am despite the treatment I received from the company, my leadership, and my colleagues. I attempted to bring positive energy to the work environment a few months into my transition to the engineering group. During the holiday season, I discovered that there had never been a holiday party. I asked Mr. Emmett if I could organize one, and he agreed as long as no one objected. I collected signatures of approval from 63 out of 65 people, and I created The Engineering Annual Holiday Party termed "Festivus" which was a term I used from the show Seinfeld in an attempt to be all-inclusive. At first, it started out as a complete day of eating delightful dishes created or purchased by members of engineering. Then I changed the mission and started collecting undergarments to be donated to the less fortunate in our society. As a secure facility, I also coordinated day passes for our retired colleagues, or as I called them, "Pioneers of the company," to come back to their old department of engineering on our last day before the holiday shutdown. This event had become an annual staple.



Season's Greetings Everyone. Hard to believe it's that time of year again! I HO-HO-Hope you can find it in your heart to show some compassion for our less fortunate and donate NEW: under clothes, briefs, socks, t-shirts...et

to be delivered to the Springfield Rescue Mission on behalf of Smith & Wesson Engineering Dept.

He's made his list & checked it twice, but you're still invited to attend whether you've been naughty or nice. So, wear your festive apparel and enjoy our last working day of the year with a FESTIVUS POT LUCK FEAST!

This year's FESTIVUS FEAST

Date: 12/20/2019

Place: EC-2

Signup sheet will be by the microwaves.





Good afternoon all. I hope this message finds you well.

Hard to believe it's that time of year again... Whether you've been NAUGHTY OR NICE please save the date of 12/22/2017 wear your ugly sweater and help make Festivus the sequel a memorable day.

Sign-up sheets will be in the microwave area

Thanks in advance,

All

In conclusion, It is my position that Smith & Wesson, the leadership, or my colleagues:

- Failed to pay me fairly while employed in the engineering department despite my practical and expert experience. The initial leader changed the position level from III to I, then denied my previous experience was relevant. When I transitioned from floor laborer to engineer, my salary increased by fifty cents (.50). At the end of my time at Smith & Wesson my gross salary was less in 2022 than my salary was at Pratt & Whitney twenty years earlier in 2002. Human Resources recognized the salary to be extremely low resulting in increases with increments of 12%, 10%, and 6% within 3 years but not retroactive to address lost wages over the years.
- Failed to protect me and other Black and Brown employees from numerous racist and harassing acts from colleagues who participated in maintaining a hostile work environment. This includes the noose I found in another department and reported to Human Resources, colleagues writing inappropriately on my whiteboard.
- Made false allegations that I failed to give appropriate notice to and improperly provided me with a Corrective Action Notice claiming, "On January 14, Al failed to give proper notice to take time off from work and left early without contacting his active manager." I produced as evidence the text message that confirms the manager was made aware of the funeral on the eve of January 11th. Due to the time of the text, it's fair to say that Mr. Moryl may not have seen the text until January 12, two days before the funeral. I didn't take the full day off. I believe Mr. Moryl was trying to frustrate me.
- Attempted to force me out of the Company after 10 years of employment and during an age making it difficult for me to secure employment elsewhere, discriminating against me. Leadership failed to give me an extension on my MA PFML adding to the mental and physical anguished experiences and health condition.

Respectfully Submitted,

Alphonzia Jacobs, Jr.

# **RELIEF**

I respectfully urge your honor to impose a decree that reflects the reality that, although Smith & Wesson possesses all necessary system-level procedures and protocols, the leadership opted to disregard their own guidelines. This decision allowed inherent biases to jeopardize the corporation's integrity. I advocate for a thorough review of their corporate policies, and ask that you tie this document to a substantial financial award that mirrors the insurance premiums corporations incur for litigations of this nature.

I firmly believe that a person's health is invaluable, and determining an appropriate figure to quantify it can be quite challenging. In my case, I must take into account my ongoing medication needs, which are critical for managing my condition. My doctor has informed me that I will require lifelong treatment with several essential medications, including Carvedilol, Entresto, Furosemide, Spironolactone, and Farxiga.

Given the circumstances of my health condition—specifically, my diagnosis of congestive heart failure—I would seek no less than $5 million in compensation. This figure is not merely arbitrary; it is a careful consideration of the profound impact my illness has had on my daily life. The heart failure I experience has been exacerbated by over a decade of stress, anxiety, and harassment in my workplace, and this financial amount accurately reflects the long-term effects on my physical and mental well-being. This sum also considers current and future medical expenses, lifestyle adjustments, and the overall toll that these challenges have taken on my quality of life.

Made Under The Penalties of Perjury:

_Alphonzia Jacob Jr_                    10/20/2025

Alphonzia Jacobs Jr
140 Norfolk Street
SPFLD, MA 01109
(413) 244-2938

alphonzia413@comcast.net                    10/20/2025