**COMMONWEALTH OF MASSACHUSETTS**
**HAMPDEN SUPERIOR COURT**
**CIVIL ACTION NO. 2579CV00702**

JUN 26 AM 9:00

---

**ALPHONZIA JACOBS, JR.,**
*Plaintiff,*

v.

**SMITH & WESSON, INC.,**
*Defendant.*

---

# PLAINTIFF'S COMPLAINT AND MOTION FOR RELIEF

NOW COMES the Plaintiff, Alphonzia Jacobs, Jr., appearing *pro se*, and respectfully moves this Honorable Court pursuant to Massachusetts General Laws Chapter 151B, Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*), 42 U.S.C. § 1981, M.G.L. c. 175M, and M.G.L. c. 149 § 105A, to enter judgment in Plaintiff's favor on all counts set forth herein, and to award compensatory damages, punitive damages, lost wages, back pay, front pay, emotional distress damages, and such other relief as this Court deems just and proper. In support thereof, Plaintiff states as follows:

## PRELIMINARY STATEMENT

Plaintiff Alphonzia Jacobs, Jr. ("Plaintiff" or "Mr. Jacobs"), a Black man who devoted ten years of skilled service to Defendant Smith & Wesson, Inc. ("Defendant" or "Smith & Wesson"), brings this action to redress a sustained, systemic campaign of race discrimination, racially hostile work environment, pay inequity, harassment, retaliation, and wrongful termination in violation of Massachusetts General Laws Chapter 151B, Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), 42 U.S.C. § 1981, and Massachusetts common law.

Throughout his tenure—spanning the manufacturing floor (2011–2013) and the Engineering Department (2013–2022)—Mr. Jacobs was subjected to unequal compensation, a racially hostile work environment that included the display of a noose on company premises, demeaning and profane treatment from colleagues and supervisors, retaliatory management actions, and ultimately

wrongful termination while he was on protected Massachusetts Paid Family and Medical Leave ("MA PFML") due to cardiac and mental health conditions caused and exacerbated by Defendant's conduct.

Mr. Jacobs seeks compensatory damages, punitive damages, lost wages, back pay, front pay, emotional distress damages, and all other relief this Court deems just and proper.

## PARTIES

1. Plaintiff Alphonzia Jacobs, Jr. is an individual residing in the Commonwealth of Massachusetts. At all times relevant to this Complaint, Mr. Jacobs was employed by Smith & Wesson, Inc. from approximately 2011 through 2022.

2. Defendant Smith & Wesson, Inc. is a corporation organized under the laws of the State of Delaware, registered and doing business in the Commonwealth of Massachusetts, with its principal place of business located in Springfield, Hampden County, Massachusetts. At all relevant times, Defendant employed more than fifteen (15) employees and is subject to the requirements of M.G.L. c. 151B, Title VII, and 42 U.S.C. § 1981.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to M.G.L. c. 151B § 9, which authorizes a private right of action in Superior Court following administrative proceedings before the Massachusetts Commission Against Discrimination ("MCAD").

4. Plaintiff timely filed a charge of discrimination with the MCAD, Docket No. 23SEM01011, and with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 16C-2023-01298. Plaintiff has exhausted all required administrative remedies and has the right to pursue this action in Superior Court.

5. Venue is proper in Hampden County Superior Court because the Defendant's principal place of business is located in Hampden County and the acts and omissions giving rise to this Complaint occurred within Hampden County, Massachusetts.

## FACTUAL ALLEGATIONS

### A. Employment Background and Pay Discrimination (2011–2013)

6. Mr. Jacobs was hired by Smith & Wesson, Inc. in approximately 2011 and was initially assigned to the manufacturing department.

7. During his time in manufacturing, Mr. Jacobs worked substantial overtime hours in an understaffed department that offered unlimited overtime to meet production targets. He discovered that his overtime compensation did not accurately reflect the time-and-a-half rate to which he was legally entitled; instead, his pay stubs showed only the half-time differential, reflecting an underpayment of earned wages.

8. Mr. Jacobs raised this concern directly with Dottie Perella, the payroll manager, and met with her to review his pay stubs. Despite acknowledging the irregularity, Defendant failed to provide an adequate explanation or corrective resolution, and Mr. Jacobs never received restitution for the improper compensation.

**B. Transfer to Engineering and Systematic Pay Suppression (2013–2019)**

9. In or about 2013, Mr. Jacobs was recruited for a position in the Engineering Department by Human Resources Hiring Director Chris Fedina, who acknowledged Mr. Jacobs's expertise in computer-aided drafting and his proficiency in Unigraphics Solid Modeling. The position was originally posted and discussed as a Tool Designer Level III.

10. After the interview but before the formal offer, Engineering Manager Brian Emmett unilaterally downgraded the position to an entry-level Tool Designer Level I without explanation. As a result, Mr. Jacobs's salary upon transferring to engineering increased by only fifty cents ($0.50) per hour over his manufacturing floor rate—far below industry standards for a professional with his credentials.

11. Mr. Jacobs brought eight (8) years of engineering experience from Pratt & Whitney, where he held Department of Defense top-secret clearance and created engineering drawings and solid models for the F-35 Joint Strike Fighter program. During his tenure at Pratt & Whitney, Mr. Jacobs earned the prestigious Eagle Award, a distinction so selective that the vast majority of Pratt & Whitney's workforce never receives it—reserved exclusively for those whose performance and professional excellence place them among the company's finest. This highly selective recognition, conferred upon only a small fraction of the company's workforce, further underscores the discriminatory nature of Defendant's refusal to recognize his qualifications and experience for compensation purposes. That Smith & Wesson hired a man of this caliber and then deliberately suppressed his compensation and title below entry-level standards speaks directly to the discriminatory nature of their conduct. Despite this exceptional background, Defendant refused to recognize his experience for compensation purposes.

12. In the second year of his performance review, Mr. Jacobs raised the issue of his Level I designation with Mr. Emmett, who promised advancement to Level II upon completion of Geometric Dimensioning & Tolerancing (GD&T) training. Mr. Jacobs successfully completed the training, as documented in his 2017 performance review. Mr. Emmett never promoted Mr. Jacobs to Level II.

13. In a subsequent review, Mr. Emmett acknowledged that Mr. Jacobs had met the stated conditions for advancement but stated that a budget line item did not exist that year to change the position level—a rationale that was applied to Mr. Jacobs but not shown to be applied to comparably situated non-Black employees.

14. In 2017, Mr. Jacobs completed 340 drawings, averaging 0.7 days per drawing, while the Tool Design group as a whole averaged 1.6 days per drawing—more than twice as long. Despite this documented superior performance, Mr. Jacobs continued to receive compensation substantially below his peers and below industry averages.

15. Senior Vice President of Human Resources Kathy Salvatore eventually acknowledged that Mr. Jacobs was being grossly underpaid and, in collaboration with then-Engineering Director Craig Mariani, arranged salary increases of 12%, 10%, and 6% over three consecutive years. These increases, while meaningful, were not retroactive and did not compensate Mr. Jacobs for years of suppressed wages. At the conclusion of his employment in 2022, Mr. Jacobs's gross salary was lower than his salary at Pratt & Whitney twenty years earlier in 2002.

**C. Racially Hostile Work Environment — The Noose (2017)**

16. In or about 2017, Mr. Jacobs discovered a noose displayed in the welding department on Smith & Wesson's premises. The noose had been permitted to remain visible for a prolonged period—several weeks—before a coworker showed it to Mr. Jacobs.

17. Mr. Jacobs was the first employee to formally report the noose. He immediately reported it to Anne Glicka in Human Resources and provided photographic documentation. After making this report, Mr. Jacobs was never contacted again regarding the matter, received no follow-up communication, and was given no information about any investigation or remedial action taken by Smith & Wesson.

18. As a Black man, Mr. Jacobs experienced profound psychological and emotional distress upon discovering the noose. The noose is one of the most historically violent and racially terrorizing symbols directed at Black Americans. Smith & Wesson's failure to promptly remove the noose, investigate its origin, hold responsible parties accountable, and follow up with Mr. Jacobs constituted a failure to remedy a racially hostile work environment.

19. Defendant's subsequent characterization of the noose as not creating a hostile work environment and its description of Mr. Jacobs's charge as "utterly baseless" reflects Defendant's indifference to the severe and pervasive racial hostility it permitted in its workplace.

20. In the wake of his report, Mr. Jacobs was summoned to the office of Senior Vice President Kathy Salvatore, to whom he disclosed his ongoing concerns about harassment, discriminatory treatment, and suppressed compensation. SVP Salvatore expressed concern and engaged engineering leadership, resulting in the pay increases described above. However, no meaningful cultural or disciplinary remediation was implemented.

**D. Continued Harassment, Hostile Work Environment, and Leadership Indifference (2019–2022)**

21. Following a leadership transition in which Engineering Director John Courtney departed, and Brian Emmett retired, John Pliska became the new Engineering Director, and Marion Moryl became Mr. Jacobs's direct manager.

22. Under the new leadership of Moryl and Pliska, Mr. Jacobs was subjected to escalating harassment and discriminatory treatment. Coworkers Jim Lepage and Mike Kenney each separately told Mr. Jacobs, in response to legitimate engineering requests, that they were "not fucking doing that." Mr. Jacobs reported these incidents to Engineering Director John Pliska, who appeared to document the names but took no corrective action.

23. Mr. Jacobs was subjected to a sustained pattern of abusive conduct through the drawing checking process, whereby his completed engineering drawings were repeatedly rejected an abnormal number of times without legitimate technical justification. This pattern was documented in Defendant's own file management system, MATRIX, showing multiple rejections for each task Mr. Jacobs performed. Mr. Jacobs raised this concern repeatedly to leadership; leadership took no remedial action.

24. Manager Marion Moryl assigned Mr. Jacobs to use a coworker's (Mike Agan's) design for an engineering task. When the file was submitted for checking, Mike Agan—the same person who created the design—rejected his own file and issued a marked print for incorporation. The file bounced back and forth repeatedly. When Engineering Director Pliska personally reviewed the matter and assured Mr. Jacobs the file would not be rejected again, Agan nonetheless rejected it yet again. Leadership failed to intervene or hold Agan accountable.

25. In January 2022, during a meeting concerning compensation, Manager Moryl suggested to Mr. Jacobs that he should poll Mr. Jacobs's coworkers to determine whether Mr. Jacobs deserved a raise—the same coworkers who had directed profane refusals at Mr. Jacobs days earlier. This suggestion was racially demeaning and constituted managerial misconduct.

26. When Mr. Jacobs followed up on this incident in writing to Engineering Director Pliska, Moryl retaliated by issuing a Corrective Action Notice that same day, falsely alleging that Mr. Jacobs had failed to provide proper notice before leaving work on January 14, 2022. In fact, Mr. Jacobs had sent a text message to Moryl on January 11, 2022—three days in advance—notifying him of his childhood friend's funeral. Moreover, Moryl himself had scheduled a mandatory meeting that same morning, which Mr. Jacobs attended before departing for the service.

27. While Mr. Jacobs was on MA PFML, a coworker wrote degrading remarks on Mr. Jacobs's workplace whiteboard. This act of racial harassment occurred on Smith & Wesson's premises, during working hours, and was directed at an employee known to be on protected medical leave.

**E. Violation of Internal Non-Discrimination Policy**

28. Smith & Wesson's HR-013 Non-Discrimination Harassment Policy expressly requires that any manager, supervisor, or member of management who becomes aware of a complaint involving discrimination, harassment, or related misconduct must immediately report it to Human Resources or the General Counsel. Policy sections 4.3 and 4.7 further require a good-faith investigation upon receipt of such complaints.

29. Multiple members of management, including Marion Moryl and John Pliska, were made aware of Mr. Jacobs's repeated complaints of discrimination, harassment, profane hostility, and racially motivated treatment. Defendant failed to report these complaints to Human Resources or General Counsel as required by its own policy, and failed to conduct any good-faith investigation in accordance with Policy sections 4.3 and 4.7.

30. Defendant's failure to adhere to its own non-discrimination policies enabled the continuation and escalation of the hostile work environment Mr. Jacobs endured.

## F. Physical and Mental Health Consequences

31. The sustained workplace stress, harassment, and discriminatory treatment caused Mr. Jacobs to suffer serious and documented physical health consequences. On or about July 6, 2021, Mr. Jacobs experienced a cardiac episode while at work. He was directed by a physician to leave work immediately, was evaluated at urgent care, and was subsequently admitted to the hospital from July 6 through July 9, 2021, for diagnosis and treatment of a heart condition.

32. In addition to his cardiac condition, Mr. Jacobs suffered and continues to suffer from depression, anxiety, and a profound sense of helplessness and powerlessness directly caused by Defendant's discriminatory conduct, harassment, and retaliation. Mr. Jacobs sought and received mental health treatment, the records of which document his diagnosis and the causal connection to his workplace experiences.

33. The combination of Mr. Jacobs's cardiac condition and mental health diagnoses formed the basis of his application for Massachusetts Paid Family and Medical Leave under M.G.L. c. 175M, administered through The Standard insurance carrier.

## G. Interference With Protected Leave and Wrongful Termination

34. Mr. Jacobs applied for and was approved for MA PFML following his July 2021 hospitalization. He used only 12 of the 20 weeks of protected leave to which he was entitled under Massachusetts law.

35. The administration of Mr. Jacobs's PFML benefits was characterized by repeated, unnecessary requests for his treating cardiologist to resubmit identical medical documentation. Correspondence reflects that The Standard issued repeated documentation requests on October 19, 2021; March 21, 2022; April 29, 2022; May 25, 2022; and May 27, 2022. Smith & Wesson disclaimed any responsibility for or control over this process while simultaneously benefiting from the delay in benefit payments, which placed severe financial hardship on Mr. Jacobs and his family.

36. Mr. Jacobs did not receive his first benefit payment until the eighth week of his leave—a delay that imposed severe and immediate financial hardship on Mr. Jacobs and his family and compounded his documented anxiety and depression. Without any income for nearly two months, Mr. Jacobs and his family struggled to afford basic necessities, including food. Household bills went unpaid and utilities were at risk of being shut off. Mr. Jacobs fell behind on financial obligations he had previously met without difficulty, creating a cascading cycle of debt and stress that persisted well beyond the delay itself. The impact extended to Mr. Jacobs's children, who were affected by the family's inability to meet ordinary expenses related to their schooling and daily activities. The eight-week income gap placed severe strain on Mr. Jacobs's household relationships, generating ongoing stress and anxiety within the home and contributing to marital strain at a time when Mr. Jacobs was already medically vulnerable. The experience left Mr. Jacobs with a profound sense of helplessness and loss of dignity—a man who had worked diligently for over a decade, contributed to programs of national defense, and earned distinguished recognition in his field, reduced to being unable to provide for his family while recovering from a cardiac episode caused by his employer's own misconduct.

37. In or around May 2022, approximately two weeks before his scheduled return date, Mr. Jacobs contacted The Standard to request an extension of his protected leave based on the ongoing medical necessity documented by his treating physicians. Defendant's administration of this process resulted in a denial of his extension request.

38. Smith & Wesson terminated Mr. Jacobs's employment while he was on protected MA PFML leave, a protected activity under M.G.L. c. 175M. Defendant's own attorney, at a Zoom hearing, stated that Smith & Wesson terminated Mr. Jacobs's employment for "not returning to work."

39. Defendant further denied Mr. Jacobs's claim for unemployment insurance benefits, falsely asserting that he had voluntarily quit. This representation was false and constituted an additional act of retaliation against Mr. Jacobs for exercising his rights under Massachusetts law.

40. Mr. Jacobs was 10 years into his employment at the time of termination and, given his age, faced significant difficulty securing comparable replacement employment—a foreseeable consequence of Defendant's retaliatory termination.

## CAUSES OF ACTION

### COUNT I — Race Discrimination in Violation of M.G.L. c. 151B § 4 and Title VII (42 U.S.C. § 2000e-2)

41. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

42. Defendant discriminated against Plaintiff on the basis of his race (Black/African American) in the terms, conditions, and privileges of his employment, including but not limited to: suppressing his compensation below that of similarly situated non-Black employees; downgrading his position level post-interview without legitimate business justification; denying his advancement despite fulfilling stated criteria; and permitting a racially hostile work environment.

43. Defendant's discriminatory conduct was intentional, willful, and carried out with reckless indifference to Mr. Jacobs's federally and state-protected rights.

44. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff suffered lost wages, diminished earning capacity, emotional distress, physical injury, and other damages.

**COUNT II — Racially Hostile Work Environment in Violation of M.G.L. c. 151B § 4 and Title VII**

45. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

46. Defendant permitted, and in some instances facilitated, a work environment that was hostile and abusive on the basis of Plaintiff's race. The hostile conditions included: the display of a noose on company premises; profane and demeaning treatment from coworkers that went undisciplined; racist and degrading remarks written on Plaintiff's whiteboard during his protected leave; racially demeaning management conduct, including the suggestion to poll coworkers on Plaintiff's worthiness for a raise; and pervasive indifference by management to Plaintiff's repeated reports of discriminatory treatment.

47. The hostile work environment was severe and pervasive, and Defendant knew or should have known of these conditions and failed to take prompt, effective remedial action.

48. As a direct and proximate result of the hostile work environment, Plaintiff suffered cardiac illness, depression, anxiety, emotional distress, and other damages.

**COUNT III — Race Discrimination and Hostile Work Environment in Violation of 42 U.S.C. § 1981**

49. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

50. 42 U.S.C. § 1981 guarantees all persons the same right to make and enforce contracts as is enjoyed by white citizens. The employment relationship between Plaintiff and Defendant is a contractual relationship within the meaning of § 1981.

51. Defendant intentionally discriminated against Plaintiff on the basis of his race in the making, performance, and enjoyment of this contractual relationship, including through pay suppression, hostile working conditions, false disciplinary action, and retaliatory termination.

52. As a direct and proximate result of Defendant's violations of 42 U.S.C. § 1981, Plaintiff suffered damages as described herein.

**COUNT IV — Retaliation in Violation of M.G.L. c. 151B § 4(4) and Title VII**

53. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

54. Plaintiff engaged in protected activity under M.G.L. c. 151B and Title VII on multiple occasions, including by: reporting the noose to Human Resources; raising concerns about racial harassment and pay inequity to supervisors and Human Resources; and communicating formally with management regarding discriminatory treatment.

55. In response to Plaintiff's protected activity, Defendant retaliated against him by: issuing a pretextual Corrective Action Notice; assigning Plaintiff to tasks designed to generate failures; attempting to place Plaintiff on a Personal Improvement Plan; denying his PFML extension; terminating his employment while on protected leave; and falsely contesting his unemployment insurance claim.

56. There is a direct causal connection between Plaintiff's protected activity and the adverse employment actions taken against him. The temporal proximity between Plaintiff's complaints and Defendant's retaliatory actions, combined with the pretextual nature of the stated justifications, establishes Defendant's retaliatory motive.

**COUNT V — Wrongful Termination / Interference With Protected Leave in Violation of M.G.L. c. 175M**

57. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

58. Massachusetts Paid Family and Medical Leave, M.G.L. c. 175M, prohibits employers from interfering with, restraining, or denying an employee's exercise of rights under the Act, and from retaliating against an employee for taking protected leave.

59. Defendant terminated Mr. Jacobs's employment while he was on approved, protected MA PFML leave and while a request for a leave extension—supported by medical documentation—was pending. Defendant's termination of Plaintiff's employment under these circumstances constitutes interference with and retaliation for Plaintiff's exercise of his statutory PFML rights.

60. Additionally, Defendant's systematic obstruction of Plaintiff's benefit payments through repeated documentation demands—causing an eight-week delay in the first payment—constitutes interference with Plaintiff's PFML rights.

**COUNT VI — Wage Discrimination in Violation of M.G.L. c. 149 § 105A and Related Provisions**

61. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

62. Defendant paid Plaintiff less than non-Black employees performing substantially similar work requiring substantially similar skill, effort, and responsibility. This pay disparity persisted over nearly a decade and was acknowledged by Defendant's own senior Human Resources leadership on at least two occasions.

63. Defendant's failure to correct this disparity on a retroactive basis and its continued suppression of Plaintiff's compensation below market rates constitutes unlawful wage discrimination.

## DAMAGES

64. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff Alphonzia Jacobs, Jr. has suffered the following damages, in amounts to be proven at trial:

(a) Lost wages, including back pay from the date of termination through the date of judgment, representing compensation Plaintiff would have earned but for Defendant's wrongful termination;

(b) Front pay representing future lost earnings and diminished earning capacity attributable to Defendant's conduct;

(c) Lost and suppressed wages over approximately nine (9) years of employment in the Engineering Department during which Plaintiff was paid below market rates due to race discrimination;

(d) Compensatory damages for severe emotional distress, mental anguish, depression, anxiety, humiliation, loss of dignity, and helplessness caused and exacerbated by Defendant's unlawful conduct;

(e) Compensatory damages for physical injury, including cardiac illness and its ongoing sequelae, caused and exacerbated by the stress of Defendant's discriminatory and harassing workplace;

(f) Loss of employee benefits, including health insurance and retirement contributions;

(g) Punitive damages for Defendant's intentional, willful, and recklessly indifferent violations of Plaintiff's civil rights, which were carried out by supervisory and senior management personnel with knowledge of their unlawfulness;

(h) Attorneys' fees and costs to the extent provided by law;

(i) Pre- and post-judgment interest; and

(j) Such other and further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Massachusetts Rule of Civil Procedure 38(b) and the Seventh Amendment to the United States Constitution, Plaintiff Alphonzia Jacobs, Jr. hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Alphonzia Jacobs, Jr. respectfully requests that this Court:

1. Enter judgment in Plaintiff's favor on all Counts of this Complaint;

2. Award Plaintiff compensatory damages for lost wages, back pay, front pay, emotional distress, physical injury, and all other losses proximately caused by Defendant's unlawful conduct, in an amount to be determined at trial;

3. Award Plaintiff punitive damages for Defendant's intentional and recklessly indifferent violations of his civil rights;

4. Award Plaintiff pre- and post-judgment interest on all monetary awards;

5. Award Plaintiff the costs of this action and attorneys' fees to the extent provided by applicable law;

6. Order such other equitable and injunctive relief as this Court deems just and proper; and

7. Grant Plaintiff such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**ALPHONZIA JACOBS, JR.**
Plaintiff, Pro Se
140 Norfolk Street
Springfield, MA 01109
(413) 244-2938
alphonzia413@comcast.net

Dated: June 26, 2026

**VERIFICATION**

I, Alphonzia Jacobs, Jr., state under the penalties of perjury that I am the Plaintiff in the above-captioned action, that I have read the foregoing Complaint, and that the facts stated therein are true and accurate to the best of my knowledge, information, and belief.

Alphonzia Jacobs, Jr.

Dated: 6/26/2026